# EXHIBIT N

Execution Copy

## GENERAL INDENTURE

between

## THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I

and

## STATE STREET BANK AND TRUST COMPANY,
as Trustee

Relating To

Student Loan Asset Backed Auction Rate Notes

Dated as of November 1, 2001

# `TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS, INTERPRETATION

Section 1.01.    Definitions .................................................................................................4
Section 1.02.    Interpretation.............................................................................................20

## ARTICLE II

### TERMS OF NOTES

Section 2.01.    Authorization of Notes...............................................................................21
Section 2.02.    Issuance and Delivery of Notes ................................................................22
Section 2.03.    Conditions Precedent to Delivery of Notes .............................................22
Section 2.04.    Limited Obligations of Issuer ...................................................................24

## ARTICLE III

### GENERAL TERMS AND PROVISIONS OF NOTES

Section 3.01.    Place, Medium of Payment Denomination, Maturities, Credit or Liquidity
                 Facilities, Form and Date................................................................................24
Section 3.02.    Legends......................................................................................................25
Section 3.03.    Interchangeability of Notes........................................................................25
Section 3.04.    Negotiability, Transfer and Registry .........................................................26
Section 3.05.    Persons Treated as Registered Owners .....................................................26
Section 3.06.    Regulations With Respect to Exchanges and Transfers ............................26
Section 3.07.    Notes Mutilated, Destroyed, Stolen or Lost .............................................27
Section 3.08.    Cancellation of Notes.................................................................................27
Section 3.09.    Security Depository Procedures..................................................................27
Section 3.10.    Preparation of Definitive Notes; Temporary Notes....................................27
Section 3.11.    Execution and Authentication.....................................................................28

## ARTICLE IV

### APPLICATION OF NOTE PROCEEDS AND OTHER AMOUNTS

Section 4.01.    Application of Note Proceeds, Accrued Interest and Premium ..................28
Section 4.02.    Application of Proceeds of Refinancing......................................................29
Section 4.03.    Application of Amounts Pledged as Security for Notes Defeased ..............29

## ARTICLE V

### PLEDGE OF INDENTURE; ESTABLISHMENT OF FUNDS AND ACCOUNTS

i

Section 5.01.    Pledge Effected by Indenture; Priority ............................................29
Section 5.02.    Creation of Funds ...........................................................................29
Section 5.03.    Acquisition Fund.............................................................................30
Section 5.04.    Revenue Fund. ................................................................................32
Section 5.05.    Note Fund .......................................................................................37
Section 5.06.    Credit Proceeds Fund .....................................................................38
Section 5.07.    Debt Service Reserve Fund.............................................................39
Section 5.08.    Operating Fund ...............................................................................39
Section 5.09.    Purchase Fund.................................................................................40
Section 5.10.    Investment of Funds........................................................................40
Section 5.11.    Withdrawal of Excess Coverage .....................................................41
Section 5.12.    Order of Use of Amounts in Funds For Payment of Program Expenses, Maintenance and Operating Expenses, Notes and Reimbursement Obligations.....................................................................................................42
Section 5.13.    Investment Requirements ................................................................42

## ARTICLE VI

## REDEMPTION OF NOTES

Section 6.01.    Privilege of Redemption and Redemption Price................................44
Section 6.02.    Optional Redemption.......................................................................44
Section 6.03.    Mandatory Redemption ...................................................................45
Section 6.04.    Selection of Notes to Be Redeemed ................................................45
Section 6.05.    Payment of Redeemed Notes...........................................................46

## ARTICLE VII

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE ISSUER

Section 7.01.    Payment of Notes.............................................................................46
Section 7.02.    Designation of Indenture Agents .....................................................47
Section 7.03.    Power to Issue Notes and Pledge Trust Estate..................................47
Section 7.04.    Further Assurances ..........................................................................47
Section 7.05.    Accounts and Reports. .....................................................................47
Section 7.06.    Student Loan Program. ....................................................................48
Section 7.07.    Servicing of Financed Student Loans ...............................................49
Section 7.08.    Issuance of Additional Notes............................................................50
Section 7.09.    Compliance With Conditions Precedent............................................50
Section 7.10.    General Compliance With Conditions in this Indenture and any Reimbursement Agreements.........................................................................50
Section 7.11.    Additional Covenants ......................................................................51
Section 7.12.    Covenant Regarding Financed Student Loans...................................52
Section 7.13.    Continued Existence; Successor of Issuer ........................................52
Section 7.14.    [Reserved].......................................................................................53
Section 7.15.    Representations and Warranties and Covenants of the Issuer ............53
Section 7.16.    Issuer Covenants .............................................................................56

ii

Section 7.17.    Program Expenses..................................................................................................57

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES NOT REQUIRING CONSENT OF REGISTERED OWNERS

Section 8.01.    Supplemental Indentures Not Requiring the Consent of Registered Owners ....................................................................................................................58
Section 8.02.    General Provisions. ...............................................................................................60

## ARTICLE IX

## SUPPLEMENTAL INDENTURES REQUIRING CONSENT OF REGISTERED OWNERS

Section 9.01.    Mailing of Notice of Amendment.........................................................................60
Section 9.02.    Powers of Amendment...........................................................................................60
Section 9.03.    Consent of Registered Owners. ............................................................................61
Section 9.04.    Modifications by Unanimous Consent ..................................................................62
Section 9.05.    Exclusion of Notes.................................................................................................63
Section 9.06.    Notation on Notes .................................................................................................63
Section 9.07.    Consent of the Credit Facility Provider to Certain Modifications.......................63

## ARTICLE X

## DEFAULTS AND REMEDIES

Section 10.01.    Events of Default ................................................................................................63
Section 10.01A    Waivers of Events of Default..............................................................................64
Section 10.02.    Remedies.............................................................................................................65
Section 10.03.    Priority of Payments After Default. ....................................................................68
Section 10.04.    Termination of Proceedings.................................................................................71
Section 10.05.    Registered Owners' Direction of Proceedings.....................................................72
Section 10.06.    Limitation on Rights of Registered Owners. .......................................................73
Section 10.07.    Possession of Notes by Trustee Not Required.....................................................74
Section 10.08.    Remedies Not Exclusive......................................................................................74
Section 10.09.    No Waiver of Default ...........................................................................................74
Section 10.10.    Notice of Event of Default; Acceleration ............................................................74

## ARTICLE XI

## CONCERNING THE INDENTURE AGENTS

Section 11.01.    Appointment and Acceptance of Duties of Trustee..............................................75
Section 11.02.    Appointment and Acceptance of Duties of Paying Agents Note Registrar and Other Indenture Agents................................................................................79
Section 11.03.    Responsibility of Indenture Agents .....................................................................79
Section 11.04.    Evidence on Which Indenture Agents May Act ...................................................80

iii

Section 11.05.    Compensation and Indemnification .................................................80
Section 11.06.    Permitted Acts and Functions ......................................................81
Section 11.07.    [Reserved] .............................................................................81
Section 11.08.    [Reserved] .............................................................................81
Section 11.09.    Resignation of Trustee ...............................................................81
Section 11.10.    Removal of Trustee ...................................................................81
Section 11.11.    Appointment of Successor Trustee. .................................................82
Section 11.12.    Transfer of Rights and Property to Successor Trustee ...................82
Section 11.13.    Merger or Consolidation ............................................................83
Section 11.14.    Adoption of Authentication ........................................................83
Section 11.15.    Resignation or Removal of the Tender Agent, Paying Agents, Registrar
                  and Other Indenture Agents and Appointment of Successors. ..........83
Section 11.16.    Evidence of Signatures of Registered Owners and Ownership of Notes..........84
Section 11.17.    Preservation and Inspection of Documents ....................................84
Section 11.18.    Statement of Trustee of Funds and Accounts and Other Matters ....................85

## ARTICLE XI-A

## PROVISIONS RELATING TO THE CREDIT FACILITY

Section 11.01a    Covenants And Notices .............................................................85
Section 11.02A    Ambac May Direct An Accounting ...............................................87
Section 11.03A    [Reserved] .............................................................................87
Section 11.04A    Other Rights of Ambac ..............................................................87
Section 11.05A    Default by Ambac ....................................................................90
Section 11.06A    Rating Services .......................................................................90
Section 11.07A    Reimbursement of Fees, Expenses and Draws under Policy ............90
Section 11.08A    Ambac Indemnity ....................................................................91

## ARTICLE XII

## TERMINATION

Section 12.01.    Termination of the Trust. .............................................................93
Section 12.02.    Notice ...................................................................................94

## ARTICLE XIII

## DEFEASANCE; MISCELLANEOUS PROVISIONS

Section 13.01.    Defeasance. .............................................................................94
Section 13.02.    Delegation of Duties by the Issuer ................................................97
Section 13.03.    Appointment of Agents, Etc .........................................................97
Section 13.04.    Notices ...................................................................................97
Section 13.05.    Governing Law .........................................................................98
Section 13.06.    Notices to Rating Agencies ..........................................................98
Section 13.07.    Nonliability of Officers ..............................................................98

iv

Section 13.08.   Parties Interested Herein ...................................................................99
Section 13.09.   Counterparts .......................................................................................99
Section 13.10.   Limitation of Liability ........................................................................99

EXHIBIT A   STUDENT LOAN ACQUISITION CERTIFICATEION ................................ A-1

EXHIBIT B   FORM OF CERTIFICATE AND AGREEMENT ............................................B-1

EXHIBIT C   FINANCED STUDENT LOAN REPORT.........................................................C-1

SSL-DOCS2 70028246v8

# GENERAL INDENTURE

**THIS GENERAL INDENTURE**, dated as of November 1, 2001 (the "Indenture"), by and between **THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I**, a Delaware business trust (the "Issuer"), and **STATE STREET BANK AND TRUST COMPANY**, a Massachusetts trust company authorized to accept trusts of the nature established herein (herein called the "Trustee"):

## W I T N E S S E T H :

WHEREAS, the Issuer expects to acquire certain private student loans (the "Private Loans") pursuant to the Depositor's Private Student Loan Education One Loan Program (the "Student Loan Program"), whereby a borrower may obtain a Private Loan to fund certain expenses at an educational institution approved under the Student Loan Program, all of which Private Loans (the "TERI Loans") are eligible to be insured by The Education Resources Institute, Inc., a private non-profit corporation organized under Chapter 180 of the Massachusetts General Laws ("TERI"); and

WHEREAS, pursuant to the Issuer's organizational documents and this Indenture, the Issuer is authorized to issue its debt obligations (the "Notes") to obtain funds to purchase student loans including the Private Loans (collectively, the "Student Loans"); and

WHEREAS, any series of Notes (a "Series") may be secured by a form of credit enhancement purchased by the Issuer, including, without limitation, a letter of credit, bond insurance, a surety bond or a standby bond purchase agreement (each a "Credit Facility") delivered by the provider of such Credit Facility (the "Credit Facility Provider"); and

WHEREAS, Ambac Assurance Corporation, a Wisconsin stock insurance corporation, as a Credit Facility Provider, will provide the initial Credit Facility; and

WHEREAS, any Series of Notes may bear interest at fixed rates (the "Fixed Rate Notes") or at adjustable rates (the "Adjustable Rate Notes"), and any Series of Adjustable Rate Notes may be entitled to the benefit of a liquidity facility purchased by the Issuer (each a "Liquidity Facility") designed to provide for the payment of the purchase price (the "Purchase Price") of such Adjustable Rate Notes upon a tender thereof pursuant to this Indenture; and

WHEREAS, the repayment to a Credit Facility Provider or the provider of a Liquidity Facility (each a "Liquidity Facility Provider") may be secured by a reimbursement agreement between the Issuer and the corresponding Credit Facility Provider or the corresponding Liquidity Facility Provider or pursuant to a Credit Facility or the Indenture; and

WHEREAS, the Issuer may, with the written approval of each Credit Facility Provider, if any, enter into contracts providing for an interest rate cap, floor, swap or other similar instrument (each an "Interest Rate Exchange Agreement") corresponding to one or more Series of the Notes pursuant to the terms and provisions of this Indenture; and

WHEREAS, the Issuer may purchase a letter of credit, surety bond, insurance policy, agreement guaranteeing payment or other undertaking by a financial institution to ensure that

cash in an amount required to meet the Debt Service Reserve Requirement (as such term is hereinafter defined) is available to the Trustee (a "Debt Service Reserve Policy") from the provider of such Debt Service Reserve Policy (the "Surety Provider"); and

WHEREAS, the Notes issued hereunder may be issued as (i) senior obligations (the "Senior Notes"), which are the highest priority Notes permitted to be issued by this Indenture, (ii) as subordinate obligations (the "Subordinate Notes"), the repayment of which is subordinated to each of the Senior Notes, any Interest Rate Exchange Agreements (other than any payment due upon termination of the Interest Rate Exchange Agreement) which are secured on a parity with the Senior Notes, any Reimbursement Agreements which are secured on a parity with the Senior Notes and any Debt Service Reserve Policies, or (iii) as junior-subordinate obligations (the "Junior-Subordinate Notes"), the repayment of which is subordinated to each of the Senior Notes, the Subordinate Notes, any Interest Rate Exchange Agreements (other than any payment due upon termination of the Interest Rate Exchange Agreement) which are secured on a parity with the Senior Notes or the Subordinate Notes, any Reimbursement Agreements which are secured on a parity with the Senior Notes or the Subordinate Notes and any Debt Service Reserve Policies; and

WHEREAS, the Notes and, except as otherwise may be provided therein, the payment obligations under all Reimbursement Agreements, all Interest Rate Exchange Agreements and all Debt Service Reserve Policies, are secured as hereinafter provided, but solely by the pledge of the Trust Estate described herein; provided that (i) the rights of the registered owners (the "Registered Owners") of the Senior Notes, any Credit Facility Provider and any Liquidity Facility Provider for Senior Notes, the providers of Interest Rate Exchange Agreements (other than any payment due upon termination of the Interest Rate Exchange Agreement) secured on a parity with the Senior Notes and any Surety Provider to such security shall be superior to the rights of the Registered Owners of the Subordinate Notes, the Registered Owners of the Junior-Subordinate Notes, any Credit Facility Provider and any Liquidity Facility Provider for the Subordinate Notes or the Junior-Subordinate Notes and providers of Interest Rate Exchange Agreements secured on a parity with the Subordinate Notes or the Junior-Subordinate Notes, (ii) the rights of Registered Owners of the Subordinate Notes, any Credit Facility Provider and any Liquidity Facility Provider for the Subordinate Notes and providers of Interest Rate Exchange Agreements (other than any payment due upon termination of the Interest Rate Exchange Agreement) secured on a parity with the Subordinate Notes to such security shall, to the extent provided herein, be superior to the rights of the Registered Owners of the Junior-Subordinate Notes, any Credit Facility Provider and any Liquidity Facility Provider for the Junior-Subordinate Notes and providers of Interest Rate Exchange Agreements secured on a parity with the Junior-Subordinate Notes; and

WHEREAS, upon execution and delivery of a Supplemental Indenture with respect to a Series of Notes, all acts, proceedings and things necessary and required by law to make said Notes, when executed by the Issuer and authenticated by the Trustee, the valid and binding legal obligations of the Issuer and to constitute and make this Indenture a valid and effective Indenture, have been done, taken and performed and the issuance, execution and delivery of said Notes and the execution, acknowledgment and delivery of this Indenture have in all respects been duly authorized by the Issuer.

2

NOW, THEREFORE, THIS INDENTURE WITNESSETH THAT:

In consideration of the premises and of the mutual covenants herein contained, and of the purchase and acceptance of the Notes by the Registered Owners thereof, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and for the purpose of fixing and declaring the terms and conditions upon which the Notes are to be and may be issued, authenticated and delivered, secured and accepted by all persons who shall from time to time be or become the Registered Owners thereof, and in order to secure as hereinafter provided, (a) the payment of the principal or Redemption Price (as such term is hereinafter defined) of, and the interest and any Carry-over Amounts (as such term is hereinafter defined) (and accrued interest thereon) on, the Notes at any time issued and Outstanding (as such term is hereinafter defined) under this Indenture according to their tenor and effect; (b) the performance and observance of all of the covenants and conditions in the Notes and contained in this Indenture; and (c) the payment of all amounts owing under any Reimbursement Agreement, any Interest Rate Exchange Agreement, or to any Credit Facility Provider, any Surety Provider or any Liquidity Facility Provider, the Issuer has executed and delivered this Indenture and does hereby bargain, assign, pledge and grant a security interest, subject to use and applications in accordance with the provisions hereof, in the following (constituting the "Trust Estate") to the Trustee:

## GRANTING CLAUSES

### CLAUSE I

All Financed Student Loans (as such term is hereinafter defined), including any evidence of indebtedness, including agreements and notes made by Financed Student Loan borrowers and cosigners and any and all other contracts, instruments and documents executed and delivered by the Financed Student Loan borrowers, cosigners or any other party evidencing, relating to, arising out of or in any way connected with such Financed Student Loans, and any insurance or guarantees related to such Financed Student Loans, and extensions or renewals thereof and proceeds thereof;

### CLAUSE II

All proceeds of the Notes, all Revenues and Recoveries of Principal (as each such term is hereinafter defined) and all other amounts deposited in the Funds and Accounts (as such term is hereinafter defined) until their use or release from the Funds and Accounts. Such Note proceeds, Revenues, Recoveries of Principal and other deposits may take the form of moneys, securities, accounts, chattel paper, instruments, and general intangibles and proceeds thereof;

### CLAUSE III

The rights of the Issuer in and to all Servicing Agreements, all Student Loan Purchase Agreements, all Guarantee Agreements, the TERI Deposit and Security Agreement and all Pledge Accounts (as each such term is hereinafter defined) as the same relate to the Financed Student Loans and proceeds thereof; and

3

## CLAUSE IV

Any and all other real or personal property of every name and nature, from time to time
. hereafter by delivery or by writing of any kind conveyed, mortgaged, pledged, assigned or
transferred as and for additional security hereunder by the Issuer or by anyone on its behalf or
with its written consent to the Trustee, which is hereby authorized to receive any and all such
property at any and all times and to hold and apply the same subject to the terms hereof and
proceeds thereof.

TO HAVE AND TO HOLD the same unto the Trustee and its successor or successors
and its or their assigns forever, in trust, nevertheless, for the following beneficiaries, as their
interests may appear: Registered Owners of the Notes, any Credit Facility Provider, any Surety
Provider, any Liquidity Facility Provider and any counterparty to an Interest Rate Exchange
Agreement.

IN TRUST NEVERTHELESS, UPON CONDITION that, if the Issuer shall well and
truly pay, or cause to be paid, the principal of (and premium, if any) and interest on the Notes
according to the true intent and meaning thereof, or there shall be deposited with the Trustee
such amounts in such form in order that none of the Notes shall remain Outstanding as herein
deemed and provided, and shall pay or cause to be paid all amounts due hereby and all amounts
owed to any Indenture Agent (as such term is hereinafter defined), any Credit Facility Provider,
any Liquidity Facility Provider and any Surety Provider in accordance with the terms and
provisions hereof, of any Reimbursement Agreement and of any agreement related to the
issuance of a Debt Service Reserve Policy, then upon the full and final payment of all such sums
and amounts or upon deposit of the same, this Indenture and the rights, titles, liens, security
interests, and assignments herein granted shall cease, determine, and be void and this Indenture
shall be released by the Trustee in due form at the expense of the Issuer, except only as herein
provided; otherwise this Indenture to be and remain in full force and effect.

AND IT IS HEREBY COVENANTED AND DECLARED that the Trust Estate is to be
held and applied by the Trustee, subject to the further covenants, conditions, and trust hereinafter
set forth, and the Issuer does hereby covenant and agree to and with the Trustee and the Credit
Facility Provider, as follows.

## ARTICLE I

## DEFINITIONS, INTERPRETATION

**Section 1.01. Definitions**. In this Indenture, the following words and terms shall, unless
the context otherwise requires, have the following meanings:

"*Account*" means any of the accounts created and established within any Fund pursuant
to this Indenture.

"*Accountant*" means PricewaterhouseCoopers LLP and any other independent certified
public accountant as may be selected by the Issuer and approved in writing by each Credit
Facility Provider, if any.

4

"*Accrued Assets*" means, as of any date of computation, the sum of (i) the outstanding principal amount of all Financed Student Loans pledged under this Indenture; provided that any Student Loan for which payment is more than 180 days overdue shall be valued at 0 percent of the principal and interest amount due thereon, (ii) the aggregate Value of all other amounts on deposit in all the Funds and Accounts and the Pledge Accounts and, (iii) the amount of accrued but unpaid borrower interest on Financed Student Loans,  and (iv) without duplication, all accrued but unpaid interest and income on Investment Securities.

"*Accrued Liabilities*" means, as of any date of computation, the sum of the (i) unpaid principal of and unpaid interest on all Outstanding Notes, (ii) amounts owing due to unreimbursed draws under the Debt Service Reserve Policy, if any, (iii) any accrued but unpaid Program Expenses, and (v) any accrued but unpaid Maintenance and Operating Expenses.

"*Acquisition Fund*" means the Fund by that name created in Section 5.02 hereof and further described in Section 5.03 hereof.

"*Adjustable Rate Notes*" means those Notes whose terms provide for the adjustment, by auction, by reference to an index or otherwise, of the interest rate to be borne by such Notes periodically prior to their stated maturity and may, under the terms of a Supplemental Indenture, provide for mandatory tender or tender optionally upon demand of the Registered Owner thereof.

"*Administrator*" means First Marblehead Data Services Inc., a Massachusetts corporation, and any successor thereto or assignee thereof approved in writing by each Credit Facility Provider.

"*Administration Agreement*" means any administration agreement by and between the Administrator and the Issuer.

"*Affiliate*" means a Person which is directly or indirectly controlled by the Issuer or by any other Affiliate and any Person which directly or indirectly controls the Issuer or which directly or indirectly controls any other Affiliate; provided, however, that the term "Affiliate" shall not include the Issuer.  For purposes of this definition, control means the power to direct the management and policies of a Person through the ownership of not less than a majority of its voting securities or the right to designate or elect not less than a majority of the members of its board of directors or other governing board or body by contract or otherwise.

"*Ambac*" means Ambac Assurance Corporation, a Wisconsin stock insurance corporation, and any successor thereto.

"*Ambac Indemnity Payments*" means amounts due and owing to Ambac from the Issuer pursuant to Section 11.08A hereto.

"*Auction Agent*" means any Person designated as such pursuant to a Supplemental Indenture with the written approval of each Credit Facility Provider, if any for any successor or assignee thereto.

"*Authenticating Agent*" means the Trustee or any other Indenture Agent as may be authorized pursuant to a Supplemental Indenture to perform the acts required of such agent in conformance with the provisions of this Indenture and such Supplemental Indenture.

"*Authorized Representative*" means, with the respect to the Issuer, the Depositor's President, any Vice President or any other person designated by the President or any Vice President to act as the authorized representative of the Issuer hereunder.

"*Bankruptcy Code*" means, the United States Bankruptcy Code, 11 U.S.C., *et seq.*

"*Bank One*" means Bank One, National Association, a national banking association organized under the laws of the United States, its successors and assigns.

"*Bank One Student Loan Purchase Agreement*" means the Note Purchase Agreement, by and between Bank One and the First Marblehead Corporation, dated April 30, 2001, as amended.

"*Beneficial Owner*" means, when a Series of Notes are in the Book-Entry Form, any person who acquires a beneficial ownership interest in a Note of that Series held by the Securities Depository.

"*Book-Entry Form*" means a form or system under which (a) the beneficial right to principal and interest may be transferred only through a book entry, (b) physical securities in registered form are issued only to a Securities Depository or its nominee as registered owner, with the securities "immobilized" to the custody of the Securities Depository or its nominee, and (c) the book entry is the record that identifies the owners of beneficial interests in that principal and interest.

"*Broker-Dealer*" means any Person designated as such pursuant to a Supplemental Indenture with the written approval of each Credit Facility Provider, if any, or any successor or assignee thereof.

"*Business Day*" means any day other than a Saturday, Sunday, legal holiday or any other day on which banking institutions in the City of New York, New York, or the city in which the principal corporate trust office of the Trustee is located, are generally authorized or obligated by law or executive order to close or are closed or rendered inoperable due to natural disaster or terrorist act, or on which the New York Stock Exchange or on which the office designated for presentation by each Credit Facility Provider or by each Liquidity Facility Provider then providing a Liquidity Facility for any of the Notes is closed. The term "Business Day" shall also not include any date specified as not being a Business Day in any Supplemental Indenture.

"*Capital Appreciation Notes*" means those Notes which, by their terms, do not bear interest, but accrete interest upon the capital portion thereof until stated maturity or earlier redemption.

"*Capitalized Funds Account*" means the account by that name that may be created in the Revenue Fund pursuant to Section 5.02 hereof and further described in Section 5.04 hereof.

"*Carry-over Amount*" means, if and to the extent specifically provided for as such in a Supplemental Indenture with respect to a Series of Adjustable Rate Notes, the amount, if any, by which (a) the interest payable on such Series with respect to a given interest period is exceeded by (b) the interest that otherwise would have been payable with respect to such interest period but for a stated limitation on the interest rate for such interest period. To the extent required by a Supplemental Indenture providing for any Carry-over Amount, interest will accrue on such Carry-over Amount until paid or extinguished. Any reference to "principal" or "interest" in this Indenture, any Reimbursement Agreement and in the related Notes shall not include (unless expressly provided otherwise), within the meanings of such words, any Carry-over Amount or any interest accrued on any Carry-over Amount.

"*Certificate and Agreement*" means the Certificate and Agreement by and between the Issuer and Ambac, a form of which is attached as Exhibit B hereto, as may be amended from time to time by the parties thereto.

"*Certificate*" means (a) a signed document either attesting to or acknowledging the circumstances, representations or other matters stated therein or in attachments thereto or setting forth matters to be determined pursuant to this Indenture and any applicable Reimbursement Agreement, or (b) the report of an Accountant or Authorized Representative as to audits or other procedures called for by this Indenture and any applicable Reimbursement Agreement, as the case may be.

"*Code*" means the Internal Revenue Code of 1986, as amended, and the regulations, rulings and court decisions promulgated thereunder and pertaining thereto.

"*Co-signed Loan*" means a Private-Loan with at least two signatures on the note evidencing such Private Loan from persons who together met or exceeded the creditworthy underwriting standards as set forth in the Program Manual.

"*Co-signed Loans Cumulative Default Rate*" means the percentage equivalent of the fraction (i) the numerator of which is the cumulative principal balance of all Co-signed Loans which are Defaulted Student Loans acquired on and since the Issue Date, and (ii) the denominator of which is the cumulative principal balance (on a loan by loan basis, the beginning principal balance of each Co-signed Loan on the first date each loan first enters repayment status) of all Co-signed Loans that have entered repayment status since the Issue Date plus any prepayments on such Co-signed Loans that have occurred prior to those Co-signed Loans entering repayment.

"*Cost of Issuance Account*" means the account created pursuant to Section 5.02 hereof, held by the Trustee for the benefit of the Issuer, which is neither a Fund nor an Account constituting part of the Trust Estate.

"*Credit Confirmation*" means a letter from each Credit Facility Provider, if any, confirming that the action proposed by the Issuer is approved by such Credit Facility Provider.

"*Credit Facility*" means any form of credit enhancement purchased by the Issuer for a Series of Notes, including, without limitation, a letter of credit, bond insurance (including the note guaranty insurance policy of Ambac), a surety bond or a standby bond purchase agreement,

which shall be identified in the Supplemental Indenture for such Series, and may include as part of the same facility, a liquidity component which, if issued separately, would constitute a Liquidity Facility acceptable in form and substance to the Credit Facility Provider.

"*Credit Facility Provider*" means (i) Ambac and (ii) any other Person approved in writing by Ambac in its sole discretion (so long as Ambac provides a Credit Facility securing any of the Notes) which issues a Credit Facility for a Series of Notes; provided, however, that whenever this Indenture shall require the consent, approval or direction of any or each Credit Facility Provider, such provision shall mean solely the consent, approval or direction of Ambac, unless Ambac shall no longer provide a Credit Facility securing any Series of the Notes.

"*Credit Proceeds Fund*" means the Fund by that name created by Section 5.02 hereof and further described in Section 5.06 hereof.

"*Debt Service*" means, with respect to any particular Fiscal Year and any particular Series of Notes, an amount equal to the sum of (a) all interest payable on such Notes during such Fiscal Year, plus (b) any Principal Installments of such Notes during such Fiscal Year, plus (c) any additional applicable premium payable on such Notes during such Fiscal Year, but shall not include the Purchase Price of Notes or any Carry-over Amounts or interest thereon.

"*Creditworthy Loans*" means a Private Loan with only a student signature on the note evidencing such Private Loan and such student met or exceeded the creditworthy underwriting standards as set forth in the Program Manual.

"*Creditworthy Loans Cumulative Default Rate*" means the percentage equivalent of the fraction (i) the numerator of which is the cumulative principal balance of all Creditworthy Loans which are Defaulted Student Loans acquired on and since the Issue Date, and (ii) the denominator of which is the cumulative principal balance (on a loan by loan basis, the beginning principal balance of each Creditworthy Loan on the first date each loan first enters repayment status) of all Creditworthy Loans that have entered repayment status since the Issue Date plus any prepayments on such Creditworthy Loans that have occurred prior to those Creditworthy Loans entering repayment.

"*Debt Service Reserve Fund*" means the Fund by that name created by Section 5.02 hereof and further described in Section 5.07 hereof.

"*Debt Service Reserve Policy*" means a letter of credit, surety bond, insurance policy, agreement guaranteeing payment or other undertaking by a financial institution to ensure that cash in an amount required to meet the Debt Service Reserve Requirement is available to the Trustee approved in writing by the Credit Facility Provider.

"*Debt Service Reserve Requirement*" means, as of any date of calculation, the greater of (i) an amount equal to the aggregate of the amounts specified in each and every Supplemental Indenture authorizing the issuance of a Series of Notes as the amount required to be deposited in the Debt Service Reserve Fund with respect to such Series of Notes and approved in writing by each Credit Facility Provider, if any, and (ii) $1,000,000.

"*Default*" means an event or condition, the occurrence of which would, with the lapse of time or the giving of notice or both, shall become an Event of Default.

"*Default Claim*" means a default claim filed by the Servicer with a Guarantee Agency under the Servicing Agreement.

"*Defaulted Creditworthy Loan*" means a Defaulted Student Loan that is a Creditworthy Loan.

"*Defaulted Co-signed Loan*" means a Defaulted Student Loan that is an Co-signed Loan.

"*Defaulted Student Loan*" means, as of any date of determination a Private Loan for which any installment of principal or interest was not paid when due (as determined under the related Student Loan documents without regard to any waiver or forbearance (other than forebearance contemplated within the Program Manual) granted by the Issuer or the Servicer) and has remained unpaid for 180 days or more, as such period of time may be revised, waived or amended with the written consent of the Credit Facility Provider.

"*Depositor*" means Gate Holdings, Inc., as depositor under the Trust Agreement, and any successor thereto or assignee thereof.

"*Dissolution*" means, with respect to Article XII hereof and the Issuer, the occurrence of any of the events which would cause a dissolution of a business trust organized under the laws of the State of Delaware.

"*Education One Loan Program*" means the private, alternative loan program to students enrolled in approved institutions of higher learning located in the United States, established by Bank One, National Association, TERI and The First Marblehead Corporation.

"*Eligible Funds*" means (a) proceeds of the Notes and the proceeds from the investment thereof; (b) moneys with respect to which the Trustee receives a written opinion of nationally recognized counsel experienced in bankruptcy matters to the effect that payment of such moneys to the Registered Owners of the Notes would not constitute a voidable preference under Section 544 or 547 of the Federal Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and would not be recoverable under Section 550 of the Bankruptcy Code in the event the Issuer or an Affiliate was to become a debtor under the Bankruptcy Code; or (c) moneys derived from a Credit Facility or Liquidity Facility.

"*Event of Default*" means any of the events specified in Section 10.01 hereof.

"*Excess Coverage*" means, as of any date of calculation, the amount by which the sum of the value of (a) the Financed Student Loans (valued at par plus accrued and capitalized interest), without duplication, credited to the Acquisition Fund, other than Defaulted Student Loans, and (b) all cash and Investment Securities held in the Funds and Accounts and Pledge Account (valued as set forth herein or in a Supplemental Indenture, plus accrued interest, but excluding amounts irrevocably set aside to pay particular Notes pursuant to Section 13.01 hereof) shall exceed 103.5% (or such lesser percentage with a Credit Confirmation (or, for Notes not subject to a Credit Facility, a Rating Confirmation)) of the sum of the principal and accrued interest on

all Outstanding Senior Notes and all accrued Program Expenses and Maintenance and Operating Expenses as evidenced in a Certificate of an Authorized Representative to the Trustee, upon which the Trustee may conclusively rely ; provided, however, that if, as of such date, the Private Loan Cumulative Default Rate is equal to or greater than 10%, the foregoing percentage shall be increased to 105.5%.

"*Financed Student Loan*" means any Student Loan that has been (a) purchased, refinanced or originated with moneys in the Acquisition Fund and credited to the Acquisition Fund, (b) received in exchange for other Financed Student Loans upon the sale thereof or substitution therefor in accordance with Section 7.06(e) hereof or the provisions of a Supplemental Indenture and credited to the Acquisition Fund, or (c) otherwise credited to any Fund or Account as part of the Trust Estate, but does not include Student Loans released from the lien of this Indenture and sold or exchanged, as permitted in this Indenture, to any purchaser, including the Depositor.

"*Fiscal Year*" means a 12-month period commencing on the first day of January of any year, or such other 12-month period adopted by the Issuer as its fiscal year for accounting purposes.

"*Fixed Rate Notes*" means those Notes which, by their terms, bear interest at a specified rate or rates until their stated maturity, payable (except with respect to Capital Appreciation Notes) periodically so long as such Notes are Outstanding, all as may be particularly set forth in a Supplemental Indenture.

"*Fund*" means any of the Funds created and established, or further authorized, pursuant to Section 5.02 hereof, including the Funds and Accounts and the Credit Proceeds Fund, but excluding the Purchase Fund and the Operating Fund.

"*Funds and Accounts*" means the Acquisition Fund, the Revenue Fund, the Note Fund and the Debt Service Reserve Fund, and any Accounts contained therein, created pursuant to Section 5.02 hereof.

"*Governmental Obligations*" means direct obligations of the United States and other obligations, the principal and interest of which are guaranteed by the United States as to full and timely payment.

"*Guarantee*" means with respect to a Student Loan, the insurance or guarantee of a Guarantee Agency pursuant to such Guarantee Agency's Guarantee Agreement.

"*Guarantee Agency*" means TERI, and any other entity approved in writing by each Credit Facility Provider, if any, which has entered into an agreement with the Issuer, or with the Trustee on the Issuer's behalf, which guarantees student loans under the Student Loan Program.

"*Guarantee Agreement*" means any guaranty, insurance or lender agreement between the Issuer, or the Trustee on the Issuer's behalf, and any other Guarantee Agency.

"*Indenture*" means, collectively, this General Indenture and any Supplemental Indentures and any amendments thereto made in accordance with their respective terms.

10

"*Indenture Agent*" means the Trustee, the Registrar, the Authenticating Agent, any Paying Agent and any Tender Agent and any successors or assigns, in each case approved in writing by each Credit Facility Provider, if any, and any such additional agent as may be authorized pursuant to a Supplemental Indenture and approved in writing by each Credit Facility Provider, if any, or any or all of them as may be appropriate.

"*Initial Purchaser*" means any initial purchaser of Notes as set forth in a Supplemental Indenture.

"*Insured Notes*" means any Series of Notes subject to a note insurance policy issued by Ambac.

"*Interest Account*" means each account by that name created in the Note Fund with respect to the Senior Notes, the Subordinate Notes and the Junior-Subordinate Notes pursuant to Section 5.02 hereof and further described in Section 5.05 hereof.

"*Interest Payment Date*" means any date or dates upon which interest on the Notes is due and payable in accordance with their terms.

"*Interest Rate Exchange Agreement*" means a contract providing for an interest rate cap, floor, swap or other similar instrument entered into pursuant to Section 7.08 hereof and approved in writing by each Credit Facility Provider, if any.

"*Investment Securities*" shall have the meaning, for any Series of Notes, given to that term in any Supplemental Indenture.

"*Issue Date*" means the date a Series of Notes is delivered to the initial purchasers thereof in exchange for the purchase price of such Series of Notes.

"*Issuer*" means The National Collegiate Master Student Loan Trust I, a Delaware business trust, or any Person which shall hereafter succeed to the powers, duties and functions thereof.

"*Issuer Order*" means a written order of the Issuer executed by an Authorized Representative, requiring action on the part of any Indenture Agent, and certifying such action is in accordance with this Indenture and any applicable Reimbursement Agreement.

"*Junior-Subordinate Notes*" means the Notes of the Issuer designated as "Junior-Subordinate Notes" pursuant to a Supplemental Indenture authorizing the issuance of such Junior-Subordinate Notes, the repayment of principal of and interest on which are subordinated to the repayment of principal of and interest on the Senior Notes and the Subordinate Notes and payments required to be made pursuant to any Interest Rate Exchange Agreements secured on a parity with the Senior Notes or the Subordinate Notes, payments required to be made pursuant to any Reimbursement Agreements secured on a parity with the Senior Notes or the Subordinate Notes and payments required to be made pursuant to any Debt Service Reserve Policy.

"*Late Payment Rate*" means the maximum rate of interest set forth in the credit facility provided by Ambac.

11

"*Liquidity Facility*" means any facility designed to provide for the payment of the Purchase Price of any Adjustable Rate Notes upon tender thereof approved as to form and substance in writing by the Credit Facility Provider.

"*Liquidity Facility Provider*" means the issuer of a Liquidity Facility approved in writing by the Credit Facility Provider.

"*Maintenance and Operating Expenses*" means the expenses of the Issuer incurred in connection with the operation of the Student Loan Program and its acquisition of Student Loans under this Indenture, including consultant's fees, attorneys' fees, auditing fees, marketing fees, travel expenses of directors and officers, insurance and such other reasonable and necessary expenses which may be incurred directly or indirectly in connection with the operation of the Student Loan Program and its acquisition of Student Loans, but such term shall not include letter of credit or other credit enhancement or liquidity fees, Note placement fees, servicing fees and expenses incurred under the Servicing Agreement, Indenture Agent fees and expenses incurred under this Indenture, any Auction Agent fees and expenses incurred under an auction agreement, any Broker-Dealer fees and expenses incurred under a broker-dealer agreement, any Owner Trustee fees and expenses incurred under a Trust Agreement, any fees and expenses of the Administrator incurred under an Administration Agreement, or any Remarketing Agent fees and expenses under a remarketing agreement, Issuer expenses covered by Program Expenses, fees and expenses associated with an Interest Rate Exchange Agreement, Debt Servicer Reserve Policy or any other amounts covered by Program Expenses.

"*Monthly Calculation Date*" means the twenty-fifth day of each calendar month, or in the event such twenty-fifth day is not a Business Day, the next succeeding Business Day.

"*Note*" means one of the notes, bonds or other debt securities authenticated and delivered pursuant to this Indenture, including any additional or refinancing notes issued pursuant to Article II hereof.

"*Note Fund*" means the Fund by that name created by Section 5.02 hereof, including a Senior Principal Account, a Subordinate Principal Account, a Junior-Subordinate Principal Account, a Senior Interest Account, a Subordinate Interest Account and a Junior-Subordinate Interest Account established therein, and further described in Section 5.05 hereof.

"*Note Payment Date*" means the date or dates specified in any Supplemental Indenture for payment of principal of or interest on the Notes.

"*Operating Fund*" means the Fund by that name created by Section 5.02 hereof and further described in Section 5.08 hereof.

"*Opinion of Counsel*" means a written opinion of an attorney at law or firm of attorneys selected by the Person obliged to deliver an opinion on the subject in question, reasonably acceptable to the Person who is to receive the same hereunder, duly admitted to the practice of law before the highest court of any state of the United States of America or the District of Columbia.

12

"*Outstanding*" when used with reference to the Notes, means, as of any date, all Notes, including any Notes held in custody for the benefit of any Credit Facility Provider, theretofore or thereupon being authenticated and delivered under this Indenture except:

      (a)    any Note canceled by the Trustee or delivered to the Trustee for cancellation at or prior to such date;

      (b)    on or after any purchase date for Notes subject to tender pursuant to the provisions of any Supplemental Indenture, all Notes or portions thereof (excluding any Notes held in custody for the benefit of any Credit Facility Provider) which are tendered or deemed to have been tendered for purchase, provided that moneys sufficient for such purchase are on deposit with the Trustee or the Tender Agent;

      (c)    any Note in lieu of or in substitution for which other Notes shall have been authenticated and delivered pursuant to Sections 3.07, 6.06 or 9.06 hereof; and

      (d)    any Note paid or deemed to have been paid as provided in Section 13.01(b) hereof.

Notwithstanding the above, in the event that the principal and/or interest due on any Notes shall be paid by Ambac pursuant to the Credit Facility, such Notes shall remain Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Issuer.

"*Owner Trustee*" means First Union Trust Company, National Association, not in its individual capacity but solely as owner trustee under the Trust Agreement, and any successor thereto or assignee thereof.

"*Parity Ratio*" means as of the date of computation, the percentage equivalent of the fraction, the numerator of which is Accrued Assets and the denominator of which is Accrued Liabilities, as calculated by the Administrator at the request of the Issuer or at the direction of Ambac.

"*Paying Agent*" means the Trustee or any other commercial bank or trust company designated as paying agent for the Notes, and its successor or successors hereafter appointed in the manner herein provided and approved in writing by each Credit Facility Provider, if any.

"*Person*" means any individual, corporation, partnership, joint venture, association, joint stock company, trust, limited liability company, unincorporated organization or government or any agency, instrumentality or political subdivision thereof.

"*Pledge Account*" means any security account of a Guarantee Agency pursuant to which the segregated reserves therein shall be available to meet obligations of such Guarantee Agency with respect to Financed Student Loans guaranteed by such Guarantee Agency, including the TERI Deposit and Security Agreement.

"*Principal Account*" means each account by that name created in the Note Fund with respect to the Senior Notes, the Subordinate Notes and the Junior-Subordinate Notes pursuant to Section 5.02 hereof and further described in Section 5.05 hereof.

"*Principal Installment*" means, as of any Monthly Calculation Date, (a) the aggregate principal amount of Outstanding Notes due on a certain future date, reduced by the aggregate principal amount of such Notes which would have been retired by such future date by reason of the payment when due and application in accordance with this Indenture of Sinking Fund Payments payable before such certain future date, plus (b) any Sinking Fund Payments due on such certain future date, plus (c) the principal component of the Redemption Price of the Notes then having been called for redemption on such certain future date.

"*Principal Payment Date*" means, with reference to any Series or portion of a Series of Notes, the date upon which a Principal Installment on such Notes becomes payable.

"*Private Loan*" means (a) a loan made to a borrower which (i) has been originated in material compliance with the Program Manual and (ii) is made to a borrower to pay the costs of attendance at a school approved under the Student Loan Program or (b) any other loan approved in writing by each Credit Facility Provider (or, for Notes not subject to a Credit Facility, a Rating Confirmation).

"*Private Loan Cumulative Default Rate*" means the percentage equivalent of the fraction (i) the numerator is the cumulative principal balance of all Private Loans which are Defaulted Student Loans acquired on and since the Issue Date, and (ii) the denominator of which is the cumulative principal balance (on a loan by loan basis, the beginning principal balance of each Private Loan on the first date each loan first enters repayment status) of all Private Loans that have entered repayment status since the Issue Date plus any prepayments on such Private Loans that have occurred prior to those Private Loans entering repayment..

"*Private Student Loan Purchase Agreements*" means, the Bank One Student Loan Purchase Agreement and any other agreement, approved in writing by the Credit Facility Provider, pursuant to which the Depositor or the Issuer acquires Private Loans.

"*Program Expenses*" means (a) the fees and expenses of each Indenture Agent, (b) fees and expenses of the Auction Agent and Broker-Dealers, (c) the fees and expenses of any Remarketing Agent then acting under a Supplemental Indenture with respect to Adjustable Rate Notes, (d) the fees, premium and expenses of a Credit Facility Provider or a Liquidity Facility Provider and Ambac Indemnity Payments following the issuance of any Series of Notes for which a Credit Facility or Liquidity Facility is in place, (e) the fees of the Servicer under any Servicing Agreement, (f) the fees and expenses of the Administrator under an Administration Agreement, (g) the fees and expenses of the Owner Trustee under the Trust Agreement, (h) the fees and expenses of the Issuer incurred in connection with the preparation of Opinions of Counsel and other authorized reports or statements attributable to the Notes and the Financed Student Loans acquired hereunder, (i) fees and expenses associated with the delivery of a substitute Credit Facility or Liquidity Facility under a Supplemental Indenture, (j) fees and expenses associated with (but not payments under) an Interest Rate Exchange Agreement, (k) the fees and expenses associated with any Debt Service Reserve Policy, (l) the costs of remarketing

14

any of the Adjustable Rate Notes, which costs shall be limited to (i) fees and expenses of the financial advisers, underwriters, placement agents and/or initial purchasers to the Issuer in connection with a remarketing, (ii) the fees and expenses of attorneys representing the parties in connection with a remarketing (excluding the attorneys for any Credit Facility Provider), (iii) the cost of printing in connection with a remarketing, (iv) the fees and expenses of Accountants in connection with a remarketing and (v) the fees of any Rating Agency then rating the Notes, and (m) fees and expenses of the Administrator.

"*Program Manual*" means the Education One Loan Program guidelines which describe the Education One Loan Program for the origination, acquisition, financing and servicing of Financed Student Loans, as amended, revised or supplemented from time to time; provided, however, that no such amendment, revision or supplement shall (a) reduce in any manner the amount of, or delay the timing of, collections of payments with respect to Financed Student Loans or (b) reduce the underwriting standards with respect to Financed Student Loans or (c) conflict with any restriction in the Certificate and Agreement, in each case without a written approval of the Credit Facility Provider.

"*Purchase Fund*" means the Fund by that name created by Section 5.02 hereof and further described in Section 5.09 hereof.

"*Purchase Price*" means the price due to a tendering Registered Owner of any Adjustable Rate Note issued hereunder, being the principal amount thereof, plus interest accrued at the applicable rate or rates to the related purchase date.

"*Rating Agency*" means any nationally recognized securities rating agency to the extent such agency has issued and continues to maintain a rating on a Series of Notes at the time in question, at the request of the Issuer.

"*Rating Confirmation*" means a letter from each Rating Agency then providing a rating for a particular Series of Notes, confirming that the action proposed to be taken by the Issuer will not, in and of itself, have the effect of reducing or withdrawing the rating then applicable to that Series of Notes.

"*Rating Notification*" means written notice required to be given hereunder or under any Supplemental Indenture of any action or proposed action provided by the Issuer to each Rating Agency then providing a rating for a particular Series of Notes.

"*Recoveries of Principal*" means all amounts received by the Trustee from or on account of any Financed Student Loan as a recovery of the principal amount thereof, including scheduled, delinquent and advance payments, payouts or prepayments, proceeds from insurance or from the sale, assignment, transfer, reallocation or other disposition of a Financed Student Loan and any payments representing such principal from the guaranteeing or insuring of any Financed Student Loan (including, but not limited to, amounts payable from the Pledge Account in accordance with the TERI Deposit and Security Agreement).

"*Recycling*" means the acquisition by the Issuer of additional Student Loans for contribution to any Trust Estate with monies derived from Recoveries of Principal during any Recycling Period provided in a Supplemental Indenture.

15

"*Recycling Period*" means the period during which Recycling shall be permitted, as set forth in a Supplemental Indenture.

"*Recycling Suspension Event*" shall have the meaning set forth in Section 11.04A(d) hereto.

"*Redemption Date*" means the date upon which Notes are to be called for redemption pursuant to this Indenture.

"*Redemption Price*" means, with respect to any Note, the principal amount thereof, plus the applicable premium, if any, and interest accrued or accreted to the Redemption Date established for such Note.

"*Registered Owner*" means any person who shall be the registered owner of any Outstanding Note as set forth on the registration books maintained by the Registrar.

"*Registrar*" means the Trustee, the Authenticating Agent or any other agent of the Issuer at the office of which Notes may be presented for registration, transfer or exchange as provided in Section 3.04 hereof.

"*Reimbursement Agreement*" means any Credit Facility agreement or Liquidity Facility agreement by and between the Issuer, the Depositor and any Credit Facility Provider or any Liquidity Facility Provider or any obligation of the Issuer to Ambac hereunder, the Credit Facility or under any agreement related to the issuance of Notes hereunder.

"*Reimbursement Amounts*" means any amounts payable by the Issuer to a Credit Facility Provider pursuant to any Reimbursement Agreement including any payment obligation of the Issuer to Ambac under this Indenture.

"*Remarketing Agent*" means any Person designated as such pursuant to a Supplemental Indenture.

"*Revenue Fund*" means the Fund by that name created by Section 5.02 hereof, including one or more Capitalized Fund Accounts, and further described in Section 5.04 hereof.

"*Revenues*" means all payments, proceeds, charges and other income, other than Recoveries of Principal, received by or on behalf of the Issuer from or on account of any Financed Student Loan (including scheduled, delinquent and advance payments of and any Default Claim proceeds with respect to, interest due to or received by or on behalf of, the Issuer with respect to any Financed Student Loan) and all interest earned or gain realized from the investment of amounts in the Funds and Accounts, and all payments received by or on behalf of the Issuer pursuant to an Interest Rate Exchange Agreement.

"*Securities Depository*" means The Depository Trust Company, a New York corporation, its successors and assigns, or any other security depository appointed by the Issuer with the written approval of each Credit Facility Provider, if any.

"*Seller*" means any person that sells Student Loans to the Depositor or the Issuer pursuant to a Student Loan Purchase Agreement.

"*Senior Notes*" means the Notes of the Issuer designated as "Senior Notes" pursuant to a Supplemental Indenture authorizing the issuance of such Senior Notes, the repayment of principal of and interest on which are senior to the repayment of principal of and interest on the Subordinate Notes and the Junior-Subordinate Notes and payments required to be made pursuant to any Interest Rate Exchange Agreements and Reimbursement Agreements secured on a parity with the Subordinate Notes or the Junior-Subordinate Notes.

"*Series*" means all of the Notes designated as a Series in a Supplemental Indenture, and any Notes thereafter authenticated and delivered in lieu of or in substitution for (but not to refinance) such Series of Notes as herein provided.

"*Servicer*" means, the Pennsylvania Higher Education Assistance Agency, or any other loan servicer approved in writing by each Credit Facility Provider, if any, and with a Rating Notification.

"*Servicer Indemnity Payments*" means outstanding indemnity payments that may become due and payable by the Issuer to the Servicer pursuant to a Servicing Agreement.

"*Servicing Agreement*" means any servicing agreement between the Issuer and a Servicer under which such Servicer agrees to service Financed Student Loans included in the Trust Estate, which servicing agreement shall be approved in writing by each Credit Facility Provider, if any.

"*Servicing Review*" means a due diligence compliance review of the Servicer, to the full extent as permitted by the applicable Servicing Agreement, relating to the Student Loan Program prepared by an Accountant. Such review shall include a review of a representative sample of Student Loans for compliance with the Servicing Agreement and the Program Manual. Such review shall include a report setting forth (i) an explanation of the procedure used by such Accountant and the scope of the review and (ii) a detailed presentation of the findings of such review. Such procedures will be developed in consultation with Ambac.

"*Sinking Fund Payment*" means, as of any particular date of calculation, the amount required to be paid by the Issuer on a certain future date for the retirement of Outstanding Notes which mature after said future date, but does not include any amount payable by the Issuer by reason of the maturity of a Note or by call for redemption at the election of the Issuer.

"*Structuring Advisor*" means The First Marblehead Corporation, a Delaware corporation, and any successor thereto or assignee thereof, pursuant to any Structuring Advisor Agreement between the Structuring Advisor and the Issuer.

"*Structuring Advisory Fees*" means the expenses of the Issuer incurred in connection the operation of the Student Loan Program and its acquisition of Student Loans under this Indenture attributable to the fees and expenses of the Structuring Advisor.

"*Student Loan*" means any loan made to finance post-secondary education that is (a) , a Private Loan or (b) otherwise permitted to be acquired by the Issuer pursuant to this Indenture

(provided a Credit Confirmation (or, for Notes not subject to a Credit Facility, a Rating Confirmation) is received with respect thereto).

"*Student Loan Acquisition Certificate*" means the Student Loan Acquisition Certificate in substantially the form attached as Exhibit A hereto, as such Exhibit A may be amended or supplemented from time to time.

"*Student Loan Files*" means

>       (a)       the original fully executed copy of the note evidencing the Financed Student Loan (including the original loan application fully executed by the Borrower); and

>       (e)       any and all other documents and computerized records that the Servicer shall keep on file, in accordance with its customary procedures, relating to such Financed Student Loan or any borrower with respect thereto.

"*Student Loan Program*" means the Education One Loan Program for the origination, acquisition, holding, servicing and financing of Private Loans, which program is governed by the Program Manual.

"*Student Loan Purchase Agreement*" means, collectively, the Private Student Loan Purchase Agreements and any other similar agreement approved in writing by each Credit Facility Provider, if any (or, if there is no Credit Facility Provider, with a Rating Confirmation), providing for the sale of Student Loans to the Depositor or the Issuer, or the Trustee on behalf of the Issuer, for deposit into the Trust Estate.

"*Subordinate Notes*" means the Notes of the Issuer designated as "Subordinate Notes" pursuant to a Supplemental Indenture authorizing the issuance of such Subordinate Notes, the repayment of principal of and interest on which is subordinated to the repayment of principal of and interest on the Senior Notes and payments required to be made pursuant to any Interest Rate Exchange Agreements secured on a parity with the Senior Notes, payments required to be made pursuant to any Reimbursement Agreements secured on a parity with the Senior Notes and payments required to be made pursuant to any Debt Service Reserve Policy, but is senior to the repayment of principal of and interest on the Junior-Subordinate Notes and payments required to be made pursuant to any Interest Rate Exchange Agreements secured on a parity with the Junior-Subordinate Notes and payments required to be made pursuant to any Reimbursement Agreements secured on a parity with the Junior-Subordinate Notes.

"*Subservicer*" means any subservicer of Financed Student Loans approved in writing by each Credit Facility Provider, if any, and if no Credit Facility Provider is in place, appointed by the Servicer with a Rating Notification.

"*Supplemental Indenture*" means any Indenture supplemental to or amendatory of this Indenture, executed by the Issuer and the Trustee and effective in accordance with Article VIII hereof.

"*Surety Provider*" means the provider of a Debt Service Reserve Policy.

18

"*TERI*" means The Education Resources Institute, Inc., a non-profit corporation organized under Chapter 180 of the Massachusetts General Laws, or its successors and assigns.

"*TERI Deposit and Security Agreement*" means any deposit and security agreement, by and among the Issuer, TERI and the Trustee with respect to an issuance of Notes hereunder.

"*Tender Agent*" means any commercial bank or trust company appointed by the Issuer in accordance with Section 11.02 hereof to serve as the agent for tender of Adjustable Rate Notes issued hereunder.

"*Transaction Documents*" means this Indenture, any Supplemental Indenture, any offering document prepared in connection with the offer and sale of Notes and all Servicing Agreements, all Private Student Loan Purchase Agreements, all Guarantee Agreements, the TERI Deposit and Security Agreement, Administration Agreement, any Credit Facility, Debt Service Reserve Policy, Interest Rate Exchange Agreement, Liquidity Facility, Trust Agreement, Certificate and Agreement, Program Manual and any and all agreements and documents to which the Issuer is a party relating to the issuance of a Series of Notes, including any auction agency agreement, broker-dealer agreement, market agent agreement and note purchase agreement.

"*Trust Agreement*" means any trust agreement by and among the Depositor and the Owner Trustee.

"*Trust Estate*" means the assets described as such in the granting clauses of this Indenture.

"*UCC*" means the Uniform Commercial Code of the applicable state.

"*Undelivered Notes*" means any Adjustable Rate Notes whose Registered Owner has submitted a demand that such Notes be repurchased by the Issuer on a designated Purchase Date or which are subject to mandatory tender for purchase in accordance with the terms of a Supplemental Indenture, and which are not, in fact, delivered for repurchase on the specified Purchase Date by the Registered Owners thereof, but as to which the Purchase Price has been set aside in the Purchase Fund.

"*Value*" shall mean, as of any date of computation, the value of the Trust Estate calculated by or on behalf of Ambac by the Administrator as to (i) below and otherwise by the Trustee, as follows:

(i) with respect to any Student Loan, the unpaid principal thereof plus any accrued but unpaid interest;

(ii) with respect to any funds of the Issuer held under this Indenture and on deposit in any commercial bank or as to any certificates of deposit or banker's acceptances, the face amount thereof plus accrued but unpaid interest;

(iii) as to investments, the bid and asked prices of which are published on a regular basis in The Wall Street Journal (or, if not there, in The New York

Times), the average of the bid and asked prices for such investments so published on such date of calculation or most recently prior to such date of calculation;

(iv) as to investments (other than investment agreements and repurchase agreements), the bid and asked prices of which are not published on a regular basis in The Wall Street Journal or The New York Times, (a) the lower of the bid prices at such date of calculation for such investments by any two nationally recognized government securities dealers (selected by the Trustee in its absolute discretion) at the time making a market in such investments, or (b) the bid price published by a nationally recognized pricing service;

(v) as to an investment agreement, an amount equal to the principal amount plus any accrued interest required to be remitted to the Trustee (without regard to notice requirements of seven days or less) pursuant to the terms of such investment agreement if all Notes were accelerated on such date following the occurrence and during the continuance of an Event of Default hereunder;

(vi) as to a repurchase agreement, an amount equal to the unpaid repurchase price thereof plus any accrued interest thereon as of such date; and

(vii) with respect to any investment not specified above, (A) if Notes are then Outstanding and insured by Ambac, the value thereof established by prior agreement by the Issuer, the Trustee and Ambac or (B) if no Notes are then Outstanding and insured by Ambac, the value thereof established by prior agreement by the Issuer, the Trustee and the Rating Agencies.

**Section 1.02. Interpretation**.

(a) In this Indenture, unless the context otherwise requires:

(i) the terms "hereby," "hereof," "herein," "hereunder" and similar terms, as used in this Indenture, refer to this Indenture, and the term "heretofore" means before, and the term "hereafter" means after, the date of this Indenture;

(ii) words of the masculine gender mean and include correlative words of the feminine and neuter genders and words importing the singular number mean and include the plural number and vice versa;

(iii) words importing persons shall include firms, associations, partnerships (including limited partnerships), trusts, corporations and other legal entities, including public bodies, as well as natural persons;

(iv) any headings preceding the texts of the several Articles and Sections of this Indenture and any table of contents or marginal notes appended to copies hereof shall be solely for convenience of reference and shall not constitute a part of this Indenture, nor shall they affect its meaning, construction or effect;

20

(v)     this Indenture shall be governed by and construed in accordance with the applicable laws of the State of New York;

(vi)     the verbs "finance," "purchase" and "acquire," when used with reference to a Financed Student Loan, shall be construed to include (A) the making or purchase of such Financed Student Loan or the obtaining of such Financed Student Loan by exchange or otherwise, or (B) the participation by the Issuer, either alone or with others, in the making or purchase thereof;

(vii)     references to time shall mean the applicable local time in New York, New York, unless otherwise specified in a Supplemental Indenture; and

(viii)     references to Sections and Articles, unless otherwise indicated, refer to Sections and Articles in this Indenture.

(b)     Nothing in this Indenture, expressed or implied, is intended or shall be construed to confer upon, or to give to, any person, other than the Issuer, the Indenture Agents, any provider of an Interest Rate Exchange Agreement, any Credit Facility Provider, any Liquidity Facility Provider, any Surety Provider and the Registered Owners of the Notes, any right, remedy or claim under or by reason of this Indenture or any covenant, condition or stipulation thereof. All the covenants, stipulations, promises and agreements herein contained by and on behalf of the Issuer shall be for the sole and exclusive benefit of the Issuer, the Indenture Agents, any provider of an Interest Rate Exchange Agreement, any Credit Facility Provider, any Liquidity Facility Provider, any Surety Provider and the Registered Owners of the Notes.

(c)     If any one or more of the covenants or agreements provided herein on the part of the Issuer or any Indenture Agent to be performed should be contrary to law, then such covenant or covenants or agreement or agreements, shall be deemed separable from the remaining covenants and agreements hereof and shall in no way affect the validity of the other provisions of this Indenture or of the Notes.

(d)     In consideration of the purchase and acceptance of the Notes by those who shall hold the same from time to time, the provisions of this Indenture shall be a part of the contract of the Issuer with the Registered Owners of the Notes and shall be deemed to be and shall constitute a contract among the Issuer and the Registered Owners from time to time of the Notes.

## ARTICLE II

## TERMS OF NOTES

**Section 2.01. Authorization of Notes**.   In order to (a) obtain funds to purchase or finance Student Loans, (b) refinance obligations of the Issuer, and (c) in connection with the foregoing, to set aside the amount the Issuer determines is necessary for capitalized interest and reserves and to pay costs of issuance, obligations of the Issuer in the form of Notes are hereby authorized to be issued from time to time hereunder in one or more Series of Senior Notes, Subordinate Notes or Junior-Subordinate Notes without limitation as to amount except as may be

21

provided by law.  No Notes shall be issued under this Indenture unless they are part of an issue described in a Supplemental Indenture and until the conditions contained in Section 2.03 hereof are satisfied.

**Section 2.02.  Issuance and Delivery of Notes**.  After their authorization by the Issuer, Notes may be executed by or on behalf of the Issuer and delivered to an Authenticating Agent for authentication and, upon compliance by the Issuer with the requirements of Section 2.03 hereof, the Authenticating Agent shall thereupon authenticate and deliver such Notes to or upon the order of the Issuer.

**Section 2.03.  Conditions Precedent to Delivery of Notes**.  The Notes of each Series shall be authenticated and delivered upon Issuer Order, but only upon the receipt by the Trustee of the following:

(a)     A copy of the Supplemental Indenture authorizing such Series, duly executed by an Authorized Representative of the Issuer and the Trustee, which shall specify:

(i)     the authorized principal amount and designation of such Notes;

(ii)     the purposes for which such Notes are issued, which shall be one or more of the purposes set forth in Section 2.01 hereof;

(iii)     the dated dates and maturity dates of such Series of Notes;

(iv)     the interest rates or interest component (in the case of Capital Appreciation Notes) of and principal amounts payable upon such Notes (or the manner of determining such rates or amounts) and the Interest Payment Dates, if any, and Principal Payment Dates therefor;

(v)     the denominations of, and the manner of dating, numbering and lettering such Notes;

(vi)     the Paying Agents for and the places of payment of such Notes or the manner of appointing and designating the same;

(vii)     the amounts required to be deposited in the Debt Service Reserve Fund pursuant to the Debt Service Reserve Requirement, including, if applicable, the deposit of a Debt Service Reserve Policy therein;

(viii)     provisions concerning the forms of such Notes (including, without limitation, whether such Notes shall be delivered in book-entry-only form) and of the Authenticating Agent's certificate of authentication;

(ix)     to what funds moneys are to be deposited;

(x)     the Redemption Price, if any, of and, subject to the provisions of Article VI hereof, the redemption terms for such Notes;

22

(xi)    the amounts and due dates of the Sinking Fund Payments, if any, for any of such Notes;

(xii)    the nature and extent of any Credit Facility or Liquidity Facility for any or all of such Notes, together with the identity of the Credit Facility Provider or the Liquidity Facility Provider, if any;

(xiii)    whether such Notes constitute Senior Notes, Subordinate Notes or Junior-Subordinate Notes; and

(xiv)    any other provisions deemed advisable by the Issuer as shall not conflict with the provisions hereof.

(b)    In the event there are then other Notes Outstanding hereunder, the written consent of each Credit Facility Provider and the written consent of any Liquidity Facility Provider whose Liquidity Facility secures Notes of the same or lower priority as the Notes proposed to be issued.

(c)    An Opinion of Counsel of the Issuer to the effect that:  (i) this Indenture and such Supplemental Indenture have been duly authorized, executed and delivered by the Issuer and, assuming due authorization, execution and delivery by the other parties thereto, is valid and binding upon the Issuer (subject to the operation of bankruptcy, insolvency, preferential transfer, fraudulent transfer, fraudulent conveyance or other laws relating to or affecting creditors rights generally, now existing or hereafter enacted, and by the application of general principles of equity including those relating to equitable subordination and judicial discretion); (ii) pursuant to this Indenture the Issuer has assigned and pledged, and all necessary action on the part of the Issuer has been taken as required to assign and pledge under this Indenture, all of the Trust Estate to the Trustee, subject to customary exceptions acceptable to the initial purchasers of the Notes; (iii) upon the execution, authentication and delivery thereof, such Notes will have been duly and validly authorized and issued in accordance with applicable law and the provisions of this Indenture; (iv) such Notes are valid and binding obligations of the Issuer; (v) the Notes will be classified as the Issuer's debt for federal income tax purposes; and (vi) the Issuer shall have granted a first priority, perfected security interest in all Financed Student Loans purchased, originated, or financed in favor of the Trustee in the manner provided for by the laws of the applicable state.  The Opinion of Counsel shall provide that each Credit Facility Provider, if any, may rely thereon.

(d)    A written order as to the delivery of such Notes, signed by an Authorized Representative.

(e)    In the event that there are then other Notes Outstanding hereunder, (i) a Rating Confirmation with respect to all other Notes Outstanding, and (ii) on the date of issuance and delivery of any additional Notes, a certification of an Authorized Representative to the effect that the Issuer is not then in default in the performance of any of the covenants, conditions, agreements or provisions contained in this Indenture, unless

23

the issuance of such additional Notes and the application of the proceeds thereof is intended to, and will, cure such default upon the issuance of such additional Notes.

(f)     Such further documents, certificates, instruments and moneys as are required by any Supplemental Indenture entered into pursuant to Article VIII or IX hereof.

The Trustee shall notify the Issuer of its receipt of proceeds from a Series of Notes and shall deposit them to the funds provided in the Supplemental Indenture.

**Section 2.04. Limited Obligations of Issuer.**  The Notes and, except as otherwise may be provided therein, the payment obligations under all Reimbursement Agreements, all Interest Rate Exchange Agreements and all Debt Service Reserve Policies are special limited, not general, obligations of the Issuer payable solely from the Trust Estate, subject to the application thereof to the purposes and on the conditions permitted by this Indenture.

**ARTICLE III**

**GENERAL TERMS AND PROVISIONS OF NOTES**

**Section 3.01. Place, Medium of Payment Denomination, Maturities, Credit or Liquidity Facilities, Form and Date.**

(a)     Except as otherwise provided in a Supplemental Indenture providing for the issuance thereof, (i) the principal of, and premium, if any, on the Notes are payable upon presentation and surrender thereof at the principal corporate trust office of the Paying Agent designated in the applicable Supplemental Indenture and (ii) interest on the Notes will be paid by check or draft drawn upon the Paying Agent and mailed to the Registered Owners at their addresses shown on the Note register of the Registrar; provided that, at the written request of the Registered Owner of at least $1,000,000 in aggregate principal amount of Notes (which request shall be delivered at least 10 days prior to the applicable Interest Payment Date and may provide that it will remain in effect with respect to each subsequent Interest Payment Date unless and until changed or revoked at any time (but at least 10 days) prior to an Interest Payment Date by subsequent written notice to the Paying Agent) interest shall be paid by wire transfer or other method of transfer of immediately available funds acceptable to the Paying Agent and the Issuer.  Payment as aforesaid shall be made in moneys of the United States of America which at the time of payment constitute legal tender for the payment of public and private debts.  Each check or wire transfer of payments on the Notes shall identify by CUSIP Number the Notes to which such payment relates.

(b)     The date upon which any Principal Installment or Sinking Fund Payment with respect to a Series of Notes is to be payable shall be as set forth in the Supplemental Indenture authorizing such Notes.  Interest, if any, on each Note shall be payable as set forth in the Supplemental Indenture authorizing such Notes.  If any Note Payment Date shall fall on a day which is not a Business Day, principal of, premium, if any, and interest payable on the Notes or any portion thereof on such Note Payment Date shall be paid on

24

the immediately succeeding Business Day, and no additional interest shall accrue on such Notes or the interest due thereon as a result thereof (except as may otherwise be provided as to a particular Series or priority of Notes in the related Supplemental Indenture and/or Reimbursement Agreement).

(c)     Notes shall be issued in fully registered form, without coupons.

(d)     All Series of Notes shall be dated as provided in the Supplemental Indenture authorizing such Notes.  Notes of any Series authenticated on or after the dated date but prior to the first Interest Payment Date applicable to Notes of such Series shall bear interest from the dated date, but Notes authenticated on or subsequent to the first Interest Payment Date applicable to Notes of such Series shall bear interest from the Interest Payment Date next preceding the date of authentication thereof (unless such date of authentication shall be an Interest Payment Date, in which case they shall bear interest from such Interest Payment Date).  If, however, as shown by the records of the Trustee and Registrar, interest on such Series of Notes shall be in default the Notes issued in lieu of such Notes surrendered for transfer or exchange shall bear interest from the date to which interest has been paid in full on the Notes surrendered.

(e)     In addition to registered Notes requiring physical delivery, Notes may be issued in Book-Entry Form if the Supplemental Indenture authorizing the issuance of such Notes so specifies.

(f)     The Notes of all or any portion of any Series may be Fixed Rate Notes, Adjustable Rate Notes, Capital Appreciation Notes, or some combination thereof, as shall be set forth in the Supplemental Indenture authorizing such Notes.

(g)     Payment of the principal, Purchase Price and Redemption Price of and interest on the Notes of any Series may be payable from or secured by a Credit Facility or Liquidity Facility (or any substitute or alternate therefor), as shall be set forth in the Supplemental Indenture authorizing such Series.  The Credit Facility Provider or Liquidity Facility Provider for that Series may be granted such rights to consent to or approve of action required or permitted hereunder as shall be set forth in the Supplemental Indenture authorizing the Series of Notes benefiting from such Credit Facility or Liquidity Facility; provided, that the granting of such rights will not adversely affect the rating or ratings, if any, on any Outstanding Notes as evidenced by a Rating Confirmation.

**Section 3.02.  Legends**.  The Notes of each Series may contain or have endorsed thereon such provisions, restrictions as to transferability, specifications and descriptive words not inconsistent with the provisions of this Indenture as may be necessary or desirable to comply with the terms of the offering, regulations, custom, or otherwise.

**Section 3.03.  Interchangeability of Notes**.    Notes, upon surrender thereof at the principal corporate trust office of the Registrar with a written instrument of transfer satisfactory to the Registrar, duly executed by the Registered Owner or his duly authorized attorney, may at the option of the Registered Owner thereof, and upon payment by such Registered Owner of any

25

charges which the Authenticating Agent may make as provided in Section 3.06 hereof, be exchanged for an equal aggregate principal amount of Notes of the same Series and maturity bearing the same rate of interest and having the same terms, of any authorized denominations; provided, however, that the exchange of Notes may be restricted by the Supplemental Indenture pursuant to which such Notes are issued.

Section 3.04. **Negotiability, Transfer and Registry**.   Except as provided in any Supplemental Indenture, all the Notes issued under this Indenture shall be negotiable, subject to the provisions for registration, transfer and exchange contained in this Indenture and in the Notes.  So long as any of the Notes remain Outstanding, the Issuer shall maintain and keep, at the principal corporate trust office of the Registrar, books for the registration, transfer and exchange of the Notes.  Upon presentation thereof for such purpose at said office, the Registrar shall register or cause to be registered in such books, and permit to be transferred thereon, any Notes pursuant to such reasonable regulations as may be set forth in a Supplemental Indenture. So long as any of the Notes remain Outstanding, the Issuer shall make all necessary provisions to permit the exchange of Notes at the principal corporate trust office of the Registrar.

Each Note shall be transferable only upon the books of the Issuer, which shall be kept for such purpose at the principal corporate trust office of the Registrar, by the Registered Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof, together with a written instrument of transfer satisfactory to the Registrar duly executed by the Registered Owner or his duly authorized attorney.  Upon the transfer of any such Note, the Issuer shall issue in the name of the transferee a new Note or Notes, of the same aggregate principal amount, Series, interest rate and maturity as the surrendered Note.

Section 3.05. **Persons Treated as Registered Owners**.  The Issuer and any Indenture Agent may deem and treat the person in whose name any Note shall be registered upon the books of the Issuer as the absolute owner of such Note, whether such Note shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal of and interest on such Note and for all other purposes, and all such payments so made to any such Registered Owner or upon his order shall be valid and effectual to satisfy and discharge the liability upon such Note to the extent of the sum or sums so paid, and neither the Issuer nor any Indenture Agent shall be liable for any notice to the contrary.  If the Trustee is not the Registrar, the Registrar will deliver an updated register of the Registered Owners of the Notes to the Trustee upon the Trustee's request and in any case at least quarterly.

Section 3.06. **Regulations With Respect to Exchanges and Transfers**.  In all cases in which the privilege of exchanging Notes or transferring Notes is exercised, the Issuer shall execute and an Authenticating Agent shall authenticate and deliver Notes in accordance with the provisions of this Indenture.  For every such exchange or transfer of Notes, whether temporary or definitive, the Issuer or an Authenticating Agent may make a charge to the requesting Registered Owner in an amount sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or transfer.  The Issuer will not be obligated to (a) register the transfer of or exchange any Note of a Series during a period beginning on the date Notes of the Series are selected for redemption and ending on the day of the mailing of a notice of redemption of Notes selected for redemption or (b) register the transfer of or exchange any

26

Note selected for redemption in whole or in part, except the unredeemed portion of a Note being redeemed in part.

**Section 3.07. Notes Mutilated, Destroyed, Stolen or Lost.**  In case any Note shall become mutilated or be destroyed, stolen or lost, the Issuer shall execute and an Authenticating Agent shall authenticate a new Note of like Series, interest rate, maturity, principal amount and other terms of the Note so mutilated, destroyed, stolen or lost.  In the case of a mutilated Note, such new Note shall be delivered only upon surrender and cancellation of such mutilated Note. In the case of a Note issued in lieu of and substitution for a Note which has been destroyed, stolen or lost, such new Note shall be delivered only upon filing with the Trustee of evidence satisfactory to establish to the Issuer and the Trustee that such Note has been destroyed, stolen or lost and to prove the ownership thereof and upon furnishing the Issuer and the Trustee with indemnity satisfactory to the Trustee.  The person requesting the authentication and delivery of a new Note pursuant to this Section shall comply with such other reasonable regulations as the Issuer and the Trustee may prescribe and pay such expenses as the Issuer and the Trustee may incur in connection therewith.  All Notes so surrendered to the Trustee shall be canceled by it. Evidence of such cancellation shall be given to the Issuer.

**Section 3.08. Cancellation of Notes.**  All Notes paid or redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Notes, together with all Notes purchased by the Trustee, shall thereupon be promptly canceled. The Trustee shall execute a certificate of cancellation in duplicate by the signature of one of its authorized officers describing the Notes so canceled.  Such executed certificate shall be filed with the Issuer and the other executed certificate shall be retained by the Trustee.

**Section 3.09. Security Depository Procedures.**  Except as such procedures conflict with the provisions of this Indenture, so long as any Series of Notes are in Book-Entry Form under an agreement or agreements with a Securities Depository, the policies and procedures of the Securities Depository on receipt of payments, tenders, transfer and exchange of such Notes and presentation of such Notes for payment or cancellation shall govern such Series of Notes.

**Section 3.10. Preparation of Definitive Notes; Temporary Notes.**

(a)      Definitive Notes shall be typewritten, lithographed or printed.  Until definitive Notes are prepared, the Issuer may execute and deliver, in lieu of definitive Notes, but subject to the same provisions, limitations and conditions as the definitive Notes, except as to the denominations thereof and as to exchangeability, one or more temporary Notes, substantially of the tenor of the definitive Notes in lieu of which such temporary Notes are issued, in authorized denominations or any multiple thereof, and with such omissions, insertions and variations as may be appropriate to temporary Notes. Upon surrender of such temporary Notes for exchange and cancellation, the Issuer at its own expense shall prepare and execute and, without charge to the Registered Owner thereof, deliver in exchange therefor, at the corporate trust office of an Authenticating Agent, definitive Notes, of the same aggregate principal amount, Series and maturity, bearing the same rate of interest and having the same terms as the temporary Notes surrendered.  Until so exchanged, the temporary Notes shall be in all respects entitled to the same benefits and security as definitive Notes issued pursuant to this Indenture.

27

(b)     All temporary Notes surrendered in exchange for definitive Notes shall be forthwith canceled by the Trustee.

**Section 3.11.  Execution and Authentication.**

(a)     After their authorization pursuant to a Supplemental Indenture, Notes of a Series may be executed pursuant to or on behalf of the Issuer and delivered to an Authenticating Agent for authentication.  The Notes shall be executed in the name and on behalf of the Issuer by the manual or, to the extent permitted by law, the facsimile signature of an Authorized Representative of the Issuer or as otherwise may be required by the Supplemental Indenture authorizing the Notes of a Series.  In case any one or more of the officers or employees who shall have signed any of the Notes shall cease to be such officer or employee before the Notes so signed shall have been actually delivered, such Notes may, nevertheless, be delivered as herein provided, and may be issued as if the person who signed such Notes had not ceased to hold such office or be so employed.  Any Note may be signed on behalf of the Issuer by such persons as at the actual time of the execution of such Note shall be Authorized Representatives, although at the date of the Notes of such Series such persons may not have been so authorized.

(b)     The Notes of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Indenture authorizing such Notes, executed manually by an Authenticating Agent.  No Note shall be entitled to any right or benefit under this Indenture or shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by an Authenticating Agent.  Such certificate of an Authenticating Agent upon any Note executed on behalf of the Issuer shall be conclusive evidence that the Note so authenticated was issued and delivered under this Indenture and that the Registered Owner thereof is entitled to the benefits hereof.

(c)     Issuance of Notes in Book-Entry Form shall take place upon the completion of such acts as may be specified and in the manner which may be specified in the Supplemental Indenture authorizing such issuance.

# ARTICLE IV

# APPLICATION OF NOTE PROCEEDS AND OTHER AMOUNTS

**Section 4.01.  Application of Note Proceeds, Accrued Interest and Premium**.  Except as otherwise provided in a Supplemental Indenture, the proceeds of sale of any Series of Notes, other than the proceeds of refinancing Notes, or the proceeds of Notes issued to refinance other notes or obligations of the Issuer not issued under this Indenture, shall, as soon as practicable upon the delivery of the Notes, be applied as follows:

(a)     the amount, if any, necessary to cause the aggregate amount on deposit in the Debt Service Reserve Fund, together with any Debt Service Reserve Policy, to at least equal the aggregate amount of the Debt Service Reserve Requirement immediately following the time of such delivery shall be deposited into the Debt Service Reserve

SSL-DOCS2 70028246v8

Fund, together with such additional amounts, if any, as may be specified in the Supplemental Indenture authorizing such Series;

(b)    upon the delivery of a Series of Notes, the amount, if any, received at such time as a premium above the aggregate principal amount of such Notes shall be applied by the Trustee as specified in the Supplemental Indenture authorizing such Series, and the amount, if any, received as accrued interest, if any, as designated by a Supplemental Indenture, shall be deposited into the Revenue Fund;

(c)    upon delivery of a Series of Notes, any amount required to be deposited in the Capitalized Funds Account of the Revenue Fund to pay a portion of the interest accruing on the Notes and any Program Expenses and any Maintenance and Operating Expenses shall be deposited in such Account; and

(d)    the balance remaining after such deposits have been made shall be deposited into the Acquisition Fund.

**Section 4.02. Application of Proceeds of Refinancing.**  The proceeds of Notes issued to refinance other Notes or obligations of the Issuer not issued under this Indenture, shall be deposited as provided in the Supplemental Indenture authorizing such Series of Notes.

**Section 4.03. Application of Amounts Pledged as Security for Notes Defeased.**  The balance of any Fund or Account of the Issuer which is pledged as security for any Series of Notes of the Issuer shall be distributed, upon the defeasance of such Series, as prescribed in the Supplemental Indenture authorizing such refinancing Notes.

**ARTICLE V**

**PLEDGE OF INDENTURE; ESTABLISHMENT OF FUNDS AND ACCOUNTS**

**Section 5.01. Pledge Effected by Indenture; Priority.**  The Trust Estate is hereby pledged in accordance with the Recitals and the Granting Clauses hereof.  To the fullest extent provided by applicable law, the money and property hereby pledged shall immediately be subject to the lien of such pledge and such lien shall be valid and binding against all parties having claims in tort, contract or otherwise against the Issuer, irrespective of whether such parties have notice of the pledge.

**Section 5.02. Creation of Funds.**  There are hereby created and established the following Funds to be held by the Trustee in the name of the Trustee for the benefit of the Registered Owners and maintained in accordance with the provisions of this Indenture:

(a)    Acquisition Fund;

(b)    Revenue Fund, within which there may be a Capitalized Funds Account;

(c)    Note Fund, within which there shall be a Senior Principal Account, a Subordinate Principal Account, a Junior-Subordinate Principal Account, a Senior Interest Account, a Subordinate Interest Account and a Junior-Subordinate Interest Account;

29

(d)     Credit Proceeds Fund; and

(e)     Debt Service Reserve Fund.

There is hereby created a Cost of Issuance Account and an Operating Fund each of which will be established by the Issuer, but neither of which will constitute a Fund or Account held by the Trustee as part of the Trust Estate.  The Cost of Issuance Account shall be held by the Trustee for the benefit of the Issuer and the Operating Fund shall be held by a depository bank for the benefit of the Issuer.  None of the Registered Owners, any Credit Facility Provider, any Liquidity Facility Provider or any Surety Provider shall have any right, title or interest therein.

There is also hereby created and established a Purchase Fund which is not part of the Trust Estate and which shall be held by the Tender Agent for the purposes described in Section 5.09 hereof.

The Trustee is hereby authorized for the purpose of facilitating administration of the Trust Estate to create further Accounts or subaccounts in any of the various Funds and Accounts established hereunder which are deemed to be desirable or necessary.

The Issuer shall cause to be filed UCC financing statements (and continuation statements) and shall direct the Trustee to execute control and custodian agreements all as shall be necessary under applicable law to perfect and maintain the security interest created by this Indenture in the Financed Student Loans and the Accounts and Funds.  Following the filing of any UCC financing statement with respect to this Indenture the Trustee hereby agrees to notify the Issuer six months prior to the expiration of such filing of the need to file continuation statements, and to the extent permitted by law, the Issuer shall execute and file such continuation statements, and provide a copy thereof to the Indenture Trustee along with an Opinion of Counsel to the effect that all action has been taken as is necessary to maintain the lien and security interest created by this Indenture.

**Section 5.03. Acquisition Fund**.  There shall be deposited into the Acquisition Fund amounts described in any Supplemental Indenture, moneys from proceeds of any Notes, any Recoveries of Principal required to be transferred thereto pursuant to a Supplemental Indenture and any moneys transferred thereto from the Revenue Fund pursuant to Section 5.04 hereof. Financed Student Loans shall be held by the Trustee or its agent or bailee (including any Servicer) in compliance with applicable provisions of the UCC and shall be pledged to the Trust Estate and accounted for as a part of the Acquisition Fund.

Moneys on deposit in the Acquisition Fund shall be used, (a) to pay principal of and interest due on the Notes and to pay Program Expenses, Maintenance and Operating Expenses and other costs upon the transfer of such moneys to the Revenue Fund as provided in Section 5.12 hereof; (b) upon Issuer Order, to redeem Notes in accordance with the provisions of any Supplemental Indenture; and (c) upon receipt by the Trustee of a Student Loan Acquisition Certificate in the form attached as Exhibit A hereto, to acquire Student Loans at a price no greater than the price set forth in the Certificate and Agreement; provided, however that during the first 60 days following the occurrence and continuance of a Recycling Period Suspension, no Student Loans shall be acquired from such moneys and, thereafter, if such Recycling Period

30

Suspension shall remain in effect, such moneys shall be used to redeem Notes in accordance with the provisions of the related Supplemental Indenture. Any such Issuer Order or Student Loan Acquisition Certificate shall state that such proposed use of moneys is in compliance with the provisions of this Indenture. The Trustee may conclusively rely on such Issuer Order or Student Loan Acquisition Certificate. If the Issuer determines that all or any portion of such moneys in the Acquisition Fund cannot be used to acquire Student Loans, then an Authorized Representative of the Issuer may, by Issuer Order, direct the Trustee to redeem Notes in accordance with any Supplemental Indenture.

Notwithstanding the foregoing, if there are not sufficient moneys on deposit in the Revenue Fund to make the transfers and disbursements required by Section 5.04(b)(i) through (xvii) hereof, then, an amount equal to any such deficiency shall, be transferred from the Acquisition Fund to the Revenue Fund pursuant to Section 5.12 hereof.

The Issuer will be the owner of the Financed Student Loans and it is understood and agreed that the Trustee will have a security interest in the Financed Student Loans for and on behalf of the Registered Owners, each Credit Facility Provider, each Liquidity Facility Provider and each Surety Provider, as applicable. In the case of a single Financed Student Loan evidenced by a separate note, each such note will be held by the Trustee or its agents in the name of the Issuer, for the benefit of the Registered Owners, each Credit Facility Provider, each Liquidity Facility Provider, each provider of an Interest Rate Exchange Agreement and each Surety Provider, as applicable.

Financed Student Loans shall be sold, transferred, exchanged or otherwise disposed of (other than for transfer to a Guarantee Agency) by the Trustee free from the lien of this Indenture at any time pursuant to an Issuer Order and if the Trustee is provided with the following:

      (a)    an Issuer Order stating the sale price and directing that Financed Student Loans be sold, transferred or otherwise disposed of and delivered to a transferee whose name shall be specified; and

      (b)    a Certificate signed by an Authorized Representative of the Issuer to the effect that (i) the disposition price is equal to or in excess of the amount required in Section 7.06(c) hereof, (ii) if after giving effect to any such sale, Excess Coverage is not at the required level and (iii) the Issuer has received the written consent of the Credit Facility Provider for such sale.

Further, Financed Student Loans shall also be sold, transferred or otherwise disposed of by the Trustee, pursuant to an Issuer Order in which the Issuer determines that such disposition of Financed Student Loans from the Trust Estate is necessary in order to avoid the occurrence of an Event of Default hereunder or to avoid any default in the payment obligations of the Issuer under any Reimbursement Agreement, in such amount and at such times and prices as may be specified in such Issuer Order with prior written consent of the Credit Facility Provider. The Trustee, following receipt of the foregoing and of a Certificate of the Issuer and Credit Facility Provider consent described in clause (b) above upon which the Trustee may conclusively rely, shall deliver such Financed Student Loans free from the lien of this Indenture upon the receipt of the purchase price or consideration specified in an Issuer Order, in compliance with the

31

foregoing.  The proceeds to be received upon any disposition may consist of any combination of cash, Investment Securities and Financed Student Loans.

**Section 5.04.  Revenue Fund.**

(a)      The Trustee shall deposit in the Revenue Fund the amounts described in any Supplemental Indenture, any other amounts deposited thereto on Issuer Order, all Revenues and any Recoveries of Principal required to be transferred thereto pursuant to a Supplemental Indenture, including earnings on amounts in the Funds and Accounts (except as specified herein), any transfers as set forth in Section 5.12 hereof, all payments of principal and interest, together with any repurchase or indemnity payments from Sellers, funds transferred to the Trustee from the Servicer's or Servicers' separate bank accounts maintained pursuant to any servicing agreement, Pledge Account payments, Guarantee Agency payments, and proceeds from the sale of Financed Student Loans.  Money in the Revenue Fund shall be kept separate and apart from all other Funds.

A Supplemental Indenture for a Series of Notes may provide for the deposit of funds into a Capitalized Funds Account of the Revenue Fund.  Unless otherwise provided in the Supplemental Indenture, the Trustee shall use the funds on deposit in a Capitalized Funds Account, upon Issuer Order, solely to pay interest on the Series of Notes, Program Expenses and Maintenance and Operating Expenses for which the Capitalized Funds Account was created only to the extent that there are insufficient funds in the Revenue Fund to cover payment of such items.

(b)      On each Monthly Calculation Date, the Issuer shall provide to the Trustee an Issuer Order directing the following reservations, payments, deposits or transfers in the following order of priority:

(i)      there shall be reserved an amount equal to the fees and expenses of each Indenture Agent, the fees and expenses of the Servicer under any Servicing Agreement, the fees and expenses of any Auction Agent and Broker-Dealer, the premiums, fees and expenses of each Credit Facility Provider under any Credit Facility, the fees and expenses of each Surety Provider under any Debt Service Reserve Policy, the fees and expenses of each Liquidity Facility Provider under any Liquidity Facility, the fees and expenses of the Owner Trustee under any Trust Agreement, the fees and expenses of the Administrator under any Administration Agreement and the fees and expenses of any Remarketing Agent then acting under any Supplemental Indenture, that will become payable during the following calendar month, in each case not in excess of the amount such fees and expenses are set forth in and limited by the latest Certificate and Agreement and not less than, in the case of any Indenture Agent, the amount of the fees and expenses set forth in the related initial Certificate and Agreement;

(ii)      on a parity basis, pro rata between (A) and (B) in proportion to amounts payable in the aggregate pursuant to each of such subparagraphs:

(A)     with respect to each Series of Senior Notes on which interest is paid at least every 30 days, there shall be transferred to the Senior Interest Account established within the Note Fund an amount equal to the interest that will become payable on such Senior Notes during the following calendar month.  With respect to each Series of Senior Notes on which interest is paid at intervals in excess of every 30 days, there shall be made monthly deposits to the Senior Interest Account established within the Note Fund on each Monthly Calculation Date preceding each Interest Payment Date to aggregate the full amount of the interest payable on such Senior Notes on such Interest Payment Date.  With respect to any Senior Notes which are Adjustable Rate Notes for which any such amount cannot be determined, such reservation shall be made based upon assumptions set forth in the Supplemental Indenture authorizing such Senior Notes; and

(B)     with respect to any Interest Rate Exchange Agreement relating to a Series of Senior Notes under which the Issuer is required to make a payment at least every 30 days (other than any payment due upon termination of the Interest Rate Exchange Agreement), there shall be deposited to the Senior Interest Account established within the Note Fund an amount equal to the amount of such payments that will become payable under the Interest Rate Exchange Agreement during the following calendar month.  With respect to each Interest Rate Exchange Agreement relating to any Series of Senior Notes under which the Issuer is required to make payments at intervals in excess of 30 days (other than any payment due upon termination of the Interest Rate Exchange Agreement), there shall be made monthly deposits to the Senior Interest Account established within the Note Fund on each Monthly Calculation Date preceding each date on which such payments are due to aggregate the full amount of such payments payable on such date.  With respect to any Interest Rate Exchange Agreement for which any such amount cannot be determined, such reservation shall be made based upon assumptions set forth in the Supplemental Indenture authorizing such Interest Rate Exchange Agreement;

(iii)     there shall be transferred to the Senior Principal Account established within the Note Fund for the Senior Notes an amount which, together with amounts already on deposit in the Senior Principal Account, is equal to all principal due with respect to the Senior Notes during the following calendar month;

(iv)     to the extent necessary to reimburse a Surety Provider of a Debt Service Reserve Policy, payment shall be made to such Surety Provider of all other amounts due under the agreement with such provider relating to such Debt Service Reserve Policy and, to the extent necessary, to increase the balance therein to the Debt Service Reserve Requirement, a transfer shall be made to the Debt Service Reserve Fund;

33

(v)     all other amounts due and owing to a Credit Facility Provider under a Reimbursement Agreement with such Credit Facility Provider relating to a Credit Facility securing any Senior Notes, including any Ambac Indemnity Payments, together with any required interest thereon, shall be paid to such Credit Facility Provider;

(vi)     all other amounts due and owing to the Liquidity Facility Providers under the agreement or agreements with such Liquidity Facility Providers relating to a Liquidity Facility providing for payment of the Purchase Price of any Senior Notes, together with any interest thereon, shall be paid to such Liquidity Facility Provider;

(vii)     on a parity basis, pro rata between (A) and (B) in proportion to amounts payable in the aggregate pursuant to each of such subparagraphs:

(A)     with respect to each Series of Subordinate Notes on which interest is paid at least every 30 days, there shall be transferred to the Subordinate Interest Account established within the Note Fund an amount equal to the interest that will become payable on such Subordinate Notes during the following calendar month. With respect to each Series of Subordinate Notes on which interest is paid at intervals in excess of every 30 days, there shall be made monthly deposits to the Subordinate Interest Account established within the Note Fund on each Monthly Calculation Date preceding each Interest Payment Date to aggregate the full amount of the interest payable on such Subordinate Notes on such Interest Payment Date. With respect to any Subordinate Notes which are Adjustable Rate Notes for which any such amount cannot be determined, such reservation shall be made based upon assumptions set forth in the Supplemental Indenture authorizing such Subordinate Notes; and

(B)     with respect to any Interest Rate Exchange Agreement relating to a Series of Subordinate Notes under which the Issuer is required to make a payment at least every 30 days (other than any payment due upon termination of the Interest Rate Exchange Agreement), there shall be deposited to the Subordinate Interest Account established within the Note Fund an amount equal to the amount of such payments that will become payable under the Interest Rate Exchange Agreement during the following calendar month. With respect to each Interest Rate Exchange Agreement relating to any Series of Subordinate Notes under which the Issuer is required to make payments at intervals in excess of 30 days (other than any payment due upon termination of the Interest Rate Exchange Agreement), there shall be made monthly deposits to the Subordinate Interest Account established within the Note Fund on each Monthly Calculation Date preceding each date on which such payments are due to aggregate the full amount of such payments payable on such date. With respect to any Interest Rate Exchange Agreement for which any such amount cannot be determined, such reservation shall be made

34

based upon assumptions set forth in the Supplemental Indenture authorizing such Interest Rate Exchange Agreement;

(viii)   there shall be transferred to the Subordinate Principal Account established within the Note Fund for the Subordinate Notes an amount which, together with amounts already on deposit in the Subordinate Principal Account, is equal to all principal due with respect to the Subordinate Notes during the following calendar month;

(ix)   all other amounts due and owing to a Credit Facility Provider under a Reimbursement Agreement with such Credit Facility Provider relating to a Credit Facility securing any Subordinate Notes, together with any required interest thereon, shall be paid to such Credit Facility Provider;

(x)   all other amounts due and owing to the Liquidity Facility Providers under the agreement or agreements with such Liquidity Facility Providers relating to a Liquidity Facility providing for payment of the Purchase Price of any Subordinate Notes, together with any interest thereon, shall be paid to such Liquidity Facility Provider;

(xi)   on a parity basis, pro rata between (A) and (B) in proportion to amounts payable in the aggregate pursuant to each of such subparagraphs:

(A)   with respect to each Series of Junior-Subordinate Notes on which interest is paid at least every 30 days, there shall be transferred to the Junior-Subordinate Interest Account established within the Note Fund an amount equal to the interest that will become payable on such Junior-Subordinate Notes during the following calendar month.  With respect to each Series of Junior-Subordinate Notes on which interest is paid at intervals in excess of every 30 days, there shall be made monthly deposits to the Junior-Subordinate Interest Account established within the Note Fund on each Monthly Calculation Date preceding each Interest Payment Date to aggregate the full amount of the interest payable on such Junior-Subordinate Notes on such Interest Payment Date.  With respect to any Junior-Subordinate Notes which are Adjustable Rate Notes for which any such amount cannot be determined, such reservation shall be made based upon assumptions set forth in the Supplemental Indenture authorizing such Junior-Subordinate Notes; and

(B)   with respect to any Interest Rate Exchange Agreement relating to a Series of Junior-Subordinate Notes under which the Issuer is required to make a payment at least every 30 days (other than any payment due upon termination of the Interest Rate Exchange Agreement), there shall be deposited to the Junior-Subordinate Interest Account established within the Note Fund an amount equal to the amount of such payments that will become payable under the Interest Rate Exchange Agreement during the following calendar month.  With respect to each

35

Interest Rate Exchange Agreement relating to any Series of Junior-Subordinate Notes under which the Issuer is required to make payments at intervals in excess of 30 days (other than any payment due upon termination of the Interest Rate Exchange Agreement), there shall be made monthly deposits to the Junior-Subordinate Interest Account established within the Note Fund on each Monthly Calculation Date preceding each date on which such payments are due to aggregate the full amount of such payments payable on such date. With respect to any Interest Rate Exchange Agreement for which any such amount cannot be determined, such reservation shall be made based upon assumptions set forth in the Supplemental Indenture authorizing such Interest Rate Exchange Agreement;

(xii)    there shall be transferred to the Junior-Subordinate Principal Account established within the Note Fund for the Junior-Subordinate Notes an amount which, together with amounts already on deposit in the Junior-Subordinate Principal Account, is equal to all principal due with respect to the Junior-Subordinate Notes during the following calendar month;

(xiii)   all other amounts due and owing to a Credit Facility Provider under a Reimbursement Agreement with such Credit Facility Provider relating to a Credit Facility securing any Junior-Subordinate Notes, together with any required interest thereon, shall be paid to such Credit Facility Provider;

(xiv)    all other amounts due and owing to the Liquidity Facility Providers under the agreement or agreements with such Liquidity Facility Providers relating to a Liquidity Facility providing for payment of the Purchase Price of any Junior-Subordinate Notes, together with any interest thereon, shall be paid to such Liquidity Facility Provider;

(xv)    there shall be reserved an amount equal to the Program Expenses, other than those described in Section 5.04(b)(i) hereof, that will become payable during the next calendar month, not in excess of the amount of such Program Expenses as are set forth in and limited by the latest Certificate and Agreement;

(xvi)    the Trustee shall make a transfer to the Operating Fund, subject to the certification required in Section 5.08 hereof, in an amount sufficient to pay Maintenance and Operating Expenses and any supplemental origination fees due to TERI that will become payable during the next calendar month, in each case not in excess of the amount of such Maintenance and Operating Expenses as are set forth in and limited by the latest Certificate and Agreement;

(xvii)   an amount up to the amounts due during the following month in connection with the termination of an Interest Rate Exchange Agreement shall be paid when due;

36

(xviii) if, on any Interest Payment Date occurring in the next calendar month, Carry-over Amount (including any accrued interest thereon) is due and payable with respect to a Series of Notes, as provided in the related Supplemental Indenture (to the extent amounts are available therefor after taking into account all other amounts payable therefrom on such Interest Payment Date), an amount up to such Carry-over Amount (including any accrued interest thereon) shall be paid, *first*, to the applicable Registered Owners of Senior Notes, *second*, to the applicable Registered Owners of Subordinate Notes, and *third,* to the applicable Registered Owners of Junior-Subordinate Notes;

(xix)   as directed in an Issuer Order, any portion or all of the remaining money shall be transferred to the Acquisition Fund and applied as set forth in Section 5.03 hereof;

(xx)   the Trustee shall make a transfer to the Operating Fund, subject to the certification required in Section 5.08 hereof, in an amount sufficient to pay outstanding Servicer Indemnity Payments that will become payable during the next calendar month;

(xxi)   the Trustee shall make a transfer to the Operating Fund, if permitted pursuant to Section 5.11 hereof, subject to the certification required in Section 5.08 hereof, in an amount sufficient to pay Structuring Advisory Fees that will become payable during the next calendar month;

(xxii)   any money remaining after the foregoing applications may be transferred to the Issuer on the last Note Payment Date of each month, if permitted pursuant to Section 5.11 hereof, if all applicable provisions set forth in any Supplemental Indenture are satisfied and if no Event of Default shall have occurred and be continuing hereunder.

(c)   Moneys in the Revenue Fund that have been reserved by the Trustee for the payment of the amounts specified in an Issuer Order shall be applied by the Trustee to the payment of such amounts when due in the priority described above.  In the event amounts are payable to more than one Person pursuant to any one of the preceding clauses, and the money available is insufficient to pay all such amounts, the available money shall be applied, first, pro rata to the payment of amounts on or relating to Senior Notes based upon the amount payable thereto, second, pro rata to the payment of amounts on or relating to Subordinate Notes based upon the amount payable thereto and, third, pro rata to the payment of amounts on or relating to Junior-Subordinate Notes based upon the amount payable thereto.

**Section 5.05. Note Fund**.   The Trustee shall deposit into each Interest Account established within the Note Fund, the amount transferred thereto from the Revenue Fund pursuant to Section 5.04(b) hereof and from the Debt Service Reserve Fund pursuant to Section 5.07 hereof.  The Trustee shall deposit into each Principal Account established within the Note Fund, all Recoveries of Principal required to be deposited therein, if any, pursuant to any

37

Supplemental Indenture, the amount transferred thereto from the Revenue Fund pursuant to Section 5.04(b) hereof and from the Debt Service Reserve Fund pursuant to Section 5.07 hereof.

Amounts on deposit in each Capitalized Funds Account of the Revenue Fund and Interest Account of the Note Fund shall be used (a) to pay interest on the Notes or payments due on related Interest Rate Exchange Agreements (other than any payment due upon termination of the Interest Rate Exchange Agreement) for which such Interest Account was created and (b) if such Notes are secured by a Credit Facility which is not a bond insurance policy, to reimburse such Credit Facility Provider for a drawing upon its Credit Facility to pay interest on the related Notes. Amounts on deposit in each Principal Account of the Note Fund shall be used (i) to pay the principal of, and premium, if any, on the Notes for which such Principal Account was created and (ii) if such Notes are secured by a Credit Facility which is not a bond insurance policy, to reimburse such Credit Facility Provider for a drawing upon its Credit Facility to pay principal on the related Notes.

**Section 5.06. Credit Proceeds Fund**.  The first source of payment of principal and interest on a Series of Notes secured by a Credit Facility that is not a bond insurance policy shall be a designated Account within the Credit Proceeds Fund established for such Series of Notes. The Trustee shall deposit into such designated Account of the Credit Proceeds Fund the proceeds of each drawing on that Credit Facility (other than drawings to provide the Purchase Price of tendered Notes) immediately upon receipt.  The Trustee shall draw under such Credit Facility in accordance with its terms in time and amount sufficient to provide for the payment of principal of and interest on the related Series of Notes secured by that Credit Facility on each Note Payment Date, whether at maturity or upon earlier proceedings for redemption or acceleration, or otherwise, in an amount equal to the full amount of the interest or principal coming due on such date with respect to all such Series of Notes then Outstanding (except with respect to Notes of such Series then registered to the order or in the name of such Credit Facility Provider or the Issuer).  The Trustee shall, following deposit of such proceeds into the Credit Proceeds Fund, apply the amounts in such designated Account solely to pay such principal and interest on the related Series of Notes as they become due.

Amounts on deposit in the Credit Proceeds Fund shall not be commingled with any other Fund or Account established hereunder.  The Trustee shall have the sole right of withdrawal from the Credit Proceeds Fund, and the Issuer shall have no legal, beneficial or equitable right, title or interest therein.  The Credit Proceeds Fund is established solely for the benefit of the Registered Owners (except the Issuer and any Credit Facility Provider as to Notes purchased with the proceeds of drawings under that Credit Facility), from time to time, of the Notes secured by a Credit Facility.  The Trustee shall have no lien on amounts on deposit in the Credit Proceeds Fund for payment of its fees or expenses.

With respect to any Credit Facility that is a bond insurance policy, the Trustee shall only make payments of principal, Redemption Price of, Purchase Price of (to the extent remarketing proceeds are not available for such purposes) and interest on Notes secured by a Credit Facility, first, from moneys in the Funds and Accounts established hereunder and, if insufficient, then from moneys drawn from the Credit Facility.

38

The Trustee shall not require any indemnity as a condition to presenting a draw certificate under the Credit Facility.

The provisions of this Section 5.06 shall not apply to a Credit Facility provided by Ambac.

**Section 5.07. Debt Service Reserve Fund**.   The Trustee shall deposit in the Debt Service Reserve Fund the Debt Service Reserve Requirement specified in any Supplemental Indenture and any transfers thereto from the Revenue Fund as set forth in Section 5.04(b) hereof. Amounts on deposit in the Debt Service Reserve Fund shall be applied as provided in Section 5.12 hereof and in conjunction with the final payment of the principal of and interest on the last Outstanding Notes.

To the extent moneys on deposit in the Debt Service Reserve Fund exceed the Debt Service Reserve Requirement, as required under a Supplemental Indenture, the Issuer may by Issuer Order direct the Trustee to transfer such excess to the Revenue Fund.  The Debt Service Reserve Fund shall be replenished from amounts on deposit in the Revenue Fund as provided in Section 5.04(b) hereof.

The Issuer may substitute for some or all of the cash deposit required to be maintained hereunder a Debt Service Reserve Policy or Policies with the written approval of each Credit Facility Provider to such substitution.  Any such Debt Service Reserve Policy shall be delivered to the Trustee who shall draw upon the Debt Service Reserve Policy in accordance with its terms and in the manner provided in a Supplemental Indenture.  Notwithstanding any of the foregoing, amounts available under any Debt Service Reserve Policy shall not be used to make any payments with respect to any Interest Rate Exchange Agreement.

**Section 5.08. Operating Fund**.  The Operating Fund shall be maintained in an account established by the Issuer with the Trustee or another depository financial institution.  Except as may be set forth in any Supplemental Indenture, the Issuer shall be entitled to withdraw in accordance with Section 5.04(b) hereof, moneys from the Revenue Fund to pay Maintenance and Operating Expenses and Servicer Indemnity Payments.  The amount deposited in the Operating Fund by transfer from the Revenue Fund and the schedule of deposits shall be determined by the Issuer, but Maintenance and Operating Expenses and Servicer Indemnity Payments expended in any one Fiscal Year shall not exceed the amount shown in the most recent applicable Certificate and Agreement with respect to the Notes.  The requisition, in the form of an Issuer Order, shall include a certification that the amount requisitioned, when combined with the amount requisitioned previously in the Fiscal Year and any other Maintenance and Operating Expenses and Servicer Indemnity Payments paid, does not exceed the amount shown in the most recent applicable Certificate and Agreement as Maintenance and Operating Expenses and Servicer Indemnity Payments for such Fiscal Year with respect to the Notes.   The Trustee may conclusively rely upon such Issuer Order.  Upon the receipt of such requisition, the Trustee shall withdraw the amount requisitioned from the Revenue Fund and transfer the same into the Operating Fund.  In the event there is not sufficient money on hand in the Revenue Fund, after transfers authorized by Section 5.12 hereof, to transfer the full amount requisitioned, the Trustee shall notify the Issuer and the Issuer shall then determine the amount to be transferred.   The Operating Fund shall be used to pay Maintenance and Operating Expenses and Servicer

39

Indemnity Payments of the Issuer in connection with its participation in the Student Loan Program, but shall not be a part of the Trust Estate.

**Section 5.09. Purchase Fund**. The Purchase Fund is not part of the Trust Estate and is a fund to be held by the Tender Agent. The Tender Agent shall deposit to the credit of the Purchase Fund only the following promptly upon receipt:

      (a)    the Purchase Price of tendered Notes or Undelivered Notes sold pursuant to a remarketing agreement (other than to the Issuer); and

      (b)    all amounts derived from a Liquidity Facility to purchase tendered Notes or Undelivered Notes.

The Tender Agent shall disburse amounts held for the credit of the Purchase Fund to purchase Notes, on behalf of the persons purchasing the same.

No Notes shall be remarketed to the Issuer by any Remarketing Agent.

**Section 5.10. Investment of Funds**. The Trustee shall invest money held for the credit of any Fund and Account solely as directed in writing by the Issuer or its designee to the fullest extent practicable and reasonable, but only in Investment Securities which shall mature or be redeemable at the option of the holder, in any event, prior to the respective dates when the money held for the credit of such Fund and Account shall be required for the purposes intended and in accordance with the investment and maturity limitations set forth in the following paragraph.

Money held for the credit of the Credit Proceeds Fund shall be invested only in Governmental Obligations which mature at the lesser of 30 days or when needed or Investment Securities having a maturity of one day. Money held for the credit of the Note Fund shall be invested only in Governmental Obligations which mature at the lesser of 30 days or when needed or Investment Securities having a maturity of one day, or in the shares of any no-load investment company registered under the Investment Company Act of 1940 that operates as a money market fund under Rule 2a-7. Any money held by the Tender Agent in any account in the Purchase Fund shall not be invested.

The Investment Securities purchased shall be held by the Trustee and shall be deemed at all times to be part of such Fund and Account or combination of Funds and Accounts, and the Trustee shall inform the Issuer of the details of all such investments. The Trustee shall use commercially reasonable efforts to sell or present for redemption any Investment Securities purchased by it as an investment whenever it shall be necessary to provide money to meet any payment from the applicable Fund or Account.

Notwithstanding the foregoing, the Trustee shall not be responsible or liable for any losses on investments made by it or sold by it hereunder or for keeping all funds held by it fully invested at all times, its only responsibility being to comply with the investment instructions of the Issuer.

40

The Trustee shall advise the Issuer and each Credit Facility Provider, if any, in writing, or in such other manner as the Trustee may choose in its sole discretion on or before the fifteenth day of each calendar month (or such later date as reasonably consented to by the Issuer), of all investments held for the credit of each Fund and Account as of the end of the preceding month and the value thereof.

If the period between Interest Payment Dates for any Series of Notes is greater than thirty days, the Trustee shall determine the cash available in the Funds and Accounts established under this Indenture on the fifth Business Day prior to any Note Payment Date for that Series of Notes. If at such time, the available moneys in the Funds and Accounts established with it are insufficient for the respective purpose for which the Funds and Accounts were established, taking into consideration the obligations of payment from each Fund or Account as of such Note Payment Date, the Trustee shall so notify the Issuer or its agent, and, after the expiration of two Business Days, unless otherwise directed, the Trustee may sell, to the extent possible on the open market, an amount of Investment Securities as may be required to meet such deficiency or anticipated deficiency, and the Trustee shall not be liable for any loss resulting from such sale. The Trustee shall provide notice of any such sale to the Credit Facility Provider.

When reference is made to the amount on deposit or required to be on deposit at any one time in any Fund established under this Indenture, such reference shall include (a) cash on deposit in such fund; and (b) the value, determined pursuant to this Indenture and the applicable Supplemental Indenture, of Investment Securities held in such fund.

**Section 5.11. Withdrawal of Excess Coverage**.  At any time, but no more frequently than once every month, the Issuer may deliver to the Trustee an Issuer Order, evidencing the fact that there is then Excess Coverage on deposit hereunder and specifying the amount thereof; provided that the Issuer shall not deliver any such Issuer Order if there are any losses incurred by the Issuer with respect to a Financed Student Loan as to which Bank One does not indemnify the Issuer under the Bank One Student Loan Purchase Agreement and if such losses result from any of (i) Section 5.02(e)(iii) thereof because origination of such Financed Student Loan was not in compliance in all material respects with all applicable state and federal laws, and the noncompliance in question did not involve a law concerning the actions of Bank One, (ii) Section 5.02(g) thereof because there was a defense to payment with respect to such Financed Student Loan that Bank One had no actual knowledge of at the time of its transfer to the Issuer, or (iii) any breach of any representation, warranty or covenant of Bank One contained therein which is deemed by Bank One not to be a material breach requiring Bank One's indemnity under Section 8.01 thereof, until (a) such losses have been reimbursed by any party or (b) the Issuer has received the written consent thereto from the Credit Facility Provider, or (c) in the case of Bank One's denial that a breach is material, a court of competent jurisdiction enters a final judgment, not subject to appeal, finding such breach to be material.  On the Monthly Calculation Date following Trustee's receipt of that Issuer Order, the Trustee shall release such Excess Coverage to the Issuer from the Revenue Fund pursuant to Section 5.04(b) (xxi) and (xxii) hereof (to the extent available). The Trustee shall have no duty or obligation to determine whether the Issuer is entitled to any such Excess Coverage and shall be entitled to rely conclusively upon any Issuer Order delivered hereunder.

41

**Section 5.12. Order of Use of Amounts in Funds For Payment of Program Expenses, Maintenance and Operating Expenses, Notes and Reimbursement Obligations.** Except as may be set forth in any Supplemental Indenture, in the event there shall be a deficiency in the amounts available in the Revenue Fund to be applied to the payment of those items described in Sections 5.04(b)(i) through (xvii) hereof, the Trustee shall transfer moneys on deposit in the Acquisition Fund to the Revenue Fund to the extent of such deficiency. In the event that after such transfer or transfers there remains a deficiency in the amounts available in the applicable Principal Account or Interest Account of the Note Fund to pay the principal of or interest on any Notes issued hereunder, the Trustee shall transfer moneys on deposit in the Debt Service Reserve Fund to the appropriate Principal Account or Interest Account of the Note Fund or, if applicable, draw on any Debt Service Reserve Policy, in accordance with its terms, to pay such principal or interest when due; provided, however, transfers from the Debt Service Reserve Fund to the Note Fund shall be deposited, *first*, to the Senior Interest Account and the Senior Principal Account to the extent necessary, *second*, to the Subordinate Interest Account and the Subordinate Principal Account to the extent necessary and, *third*, to the Junior-Subordinate Interest Account and the Junior-Subordinate Principal Account to the extent necessary.

**Section 5.13. Investment Requirements.** Any investment of funds in Investment Securities shall be held by a financial institution in accordance with the following requirements:

(a)    all Investment Securities shall be held in an account with such financial institution in the name of the Trustee;

(b)    all Investment Securities held in such account shall be delivered to the Trustee in the following manner:

(i)    with respect to bankers' acceptances, commercial paper, negotiable certificates of deposit and other obligations that constitute "instruments" within the meaning of Section 9-102(a)(47) of the UCC (other than certificated securities) and are susceptible to physical delivery, transferred to the Trustee by physical delivery to the Trustee, indorsed to, or registered in the name of, the Trustee or its nominee or indorsed in blank; or such additional or alternative procedures as may hereafter become appropriate to effect the complete transfer of ownership of any such Investment Securities to the Trustee free of any adverse claims, consistent with changes in applicable law or regulations or the interpretation thereof;

(ii)    with respect to a "certificated security" (as defined in Section 8-102(a)(4) of the UCC), transferred:

(A)    by physical delivery of such certificated security to the Trustee, provided that if the certificated security is in the registered form, it shall be endorsed to, or registered in the name of, the Trustee or indorsed in blank;

(B)    by physical delivery of such certificated security in registered form to a "securities intermediary" (as defined in

42

Section 8-102(a)(14) of the UCC) acting on behalf of the Trustee if the certificated security has been specially endorsed to the Trustee by an effective endorsement;

(iii)    with respect to any security issued by the U.S. Treasury, the Federal Home Loan Mortgage Corporation or by the Federal National Mortgage Association that is a book-entry security held through the Federal Reserve System pursuant to Federal book-entry regulations, the following procedures, all in accordance with applicable law, including applicable federal regulations and Articles 8 and 9 of the UCC: book-entry registration of such property to an appropriate book-entry account maintained with a Federal Reserve Bank by a securities intermediary which is also a "depositary" pursuant to applicable federal regulations and issuance by such securities intermediary of a deposit advice or other written confirmation of such book-entry registration to the Trustee of the purchase by the securities intermediary on behalf of the Trustee of such book-entry security; the making by such securities intermediary of entries in its books and records identifying such book-entry security held through the Federal Reserve System pursuant to Federal book-entry regulations as belonging to the Trustee and indicating that such securities intermediary holds such book-entry security solely as agent for the Trustee; or such additional or alternative procedures as may hereafter become appropriate to effect complete transfer of ownership of any such Investment Securities to the Trustee free of any adverse claims, consistent with changes in applicable law or regulations or the interpretation thereof;

(iv)    with respect to any "uncertificated security" (as defined in Section 8-102(a)(18) of the UCC) that is not governed by clause (iii) above, transferred:

(A)    (1)    by registration to the Trustee as the registered owner thereof, on the books and records of the issuer thereof, or

(2)    by registration to another Person (not a securities intermediary) that either becomes the registered owner of the uncertificated security on behalf of the Trustee or, have become the registered owner, acknowledges that it holds for the Trustee; or

(B)    by the issuer thereof having agreed that it will comply with instructions originated by the Trustee without further consent of the registered owner thereof;

(C)    with respect to any "security entitlement" (as defined in Section 8-102(a)(17) of the UCC), if a securities intermediary:

(1)    (a) indicates by book entry that a "financial asset" (as defined in Section 8-102(a)(9) of the UCC) has been credited to

43

the Trustee's "securities account" (as defined in Section 8-501 (a) of the UCC),

(b) receives a financial asset (as so defined) from the Trustee or acquires a financial asset for the Trustee, and, in either case, accepts it for credit to the Trustee's securities account (as so defined),

(c) becomes obligated under other law, regulation or rule to credit a financial asset to the Trustee's securities account, or

(d) has agreed that it will comply with "entitlement orders" (as defined in Section 8-102(a)(8) of the UCC) originated by the Trustee, without further consent by the "entitlement holder" (as defined in Section 8-102(a)(7) of the UCC), and

(2) such financial asset either is such Investment Security or a security entitlement evidencing a claim thereto; and

(D) in each case of delivery contemplated pursuant to clauses (A) through (C) above, the Trustee shall make appropriate notations on its records, and shall cause the same to be made on the records of its nominees, indicating that such Investment Security is held in trust pursuant to and as provided in this Indenture.

Any cash held and account maintained by the Trustee shall not be considered a "financial asset" for purposes of this Section. Subject to the other provisions hereof, the Trustee shall have sole control over each such investment and the income thereon, and any certificate or other instrument evidencing any such investment, if any, shall be delivered directly to the Trustee or its agent, together with each document of transfer, if any, necessary to transfer title to such investment to the Trustee in a manner which complies with this paragraph.

## ARTICLE VI

## REDEMPTION OF NOTES

**Section 6.01. Privilege of Redemption and Redemption Price.** Notes may be subject to redemption prior to maturity as set forth in a Supplemental Indenture. Such Notes shall be redeemable as set forth in this Article, except as may be otherwise provided in a Supplemental Indenture.

**Section 6.02. Optional Redemption.** In the case of any redemption of Notes other than as provided in Section 6.03 hereof, the Issuer shall give written notice to the Trustee and each Credit Facility Provider, if any (a) of its election or direction so to redeem, on the specified Redemption Date, (b) of the aggregate principal amount of the Notes within each Series and maturities to be redeemed (which Redemption Date, Series, maturities and principal amounts

thereof to be redeemed shall be determined by the Issuer in its sole discretion, subject to any limitations with respect thereto contained in or permitted by the respective Supplemental Indenture) and (c) of any moneys to be applied to the payment of the Redemption Price. Except as set forth in the respective Supplemental Indenture, the notice from the Issuer to the Trustee shall be given not less than 10 Business Days prior to the last day on which the Trustee can give notice of redemption to Registered Owners, unless a shorter period is acceptable to the Trustee. In the event notice of redemption shall have been given as provided in Section 6.05 hereof, the Trustee, if it holds the moneys to be applied to the payment of the Redemption Price, shall prior to the Redemption Date, pay or cause to be paid to the appropriate Paying Agent or Paying Agents an amount which, in addition to other moneys, if any, available therefor held by such Paying Agent or Paying Agents, will be sufficient to redeem on the Redemption Date at the Redemption Price thereof, all the Notes to be redeemed. Such moneys shall be derived from the Credit Proceeds Fund if the Notes to be redeemed are secured by a Credit Facility other than a bond insurance policy. Except as provided in the preceding sentence, funds used to optionally redeem Notes under this Section shall, to the extent any Credit Facility other than a bond insurance policy is in effect, be Eligible Funds.

Section 6.03. Mandatory Redemption. Whenever by the terms of this Indenture, the Trustee is required to redeem Notes otherwise than at the election or direction of the Issuer, and subject to and in accordance with the terms of the related Supplemental Indenture and this Article, the Trustee shall select the Redemption Date of the Notes to be redeemed, give the notice of redemption (with a copy to each Credit Facility Provider, if any) and transfer the Redemption Price to the appropriate Paying Agents.

Section 6.04. Selection of Notes to Be Redeemed. Except as may be otherwise provided in a Supplemental Indenture, in the event of redemption of less than all the Outstanding Notes of like Series and maturity, the Trustee shall select the Outstanding Notes to be redeemed by lot, or in its discretion, on a pro rata basis from Notes Outstanding and not previously called for redemption (unless the Issuer specifically directs the Trustee otherwise), in such manner as the Trustee shall deem fair and appropriate. Provisions of this Indenture that apply to Outstanding Notes called for redemption shall also apply to portions of Outstanding Notes called for redemption.

Each Supplemental Indenture may specify the minimum authorized denominations for Notes of the Series and redemptions of a portion of any Series of Notes issued hereunder shall be effected in integral multiples of the applicable minimum authorized denominations.

Section 6.05. Notice of Redemption. When the Trustee shall receive notice from the Issuer of its election or direction to redeem Notes pursuant to Section 6.02 hereof or whenever redemption of Notes is required by this Indenture pursuant to Section 6.03 hereof, but in each case, on the dates and at the Redemption Prices specified in the related Supplemental Indenture, the Trustee shall give notice, in the name of the Issuer, of the redemption of such Notes. Such notice shall specify the complete name and Series, CUSIP Number, interest rate, date of issue, and maturities of the Notes to be redeemed, the Redemption Date and the place or places where amounts due upon such redemption will be payable (with the name, address and phone number of a contact person for the Trustee) and, if less than all the Notes of any Series and maturity are to be redeemed, the identification of such Notes to be redeemed and, in the case of Notes to be

45

redeemed in part only, such notice shall also specify the respective portions of the principal amount thereof to be redeemed. Such notice shall further state that on such date there shall become due and payable upon each Note to be redeemed the Redemption Price thereof, or the Redemption Price of the specified portions of the principal thereof in the case of Notes to be redeemed in part only, and that from and after such date interest thereon shall cease to accrue and be payable. Such notice shall be given by first-class mail, not less than 15 days in the case of Adjustable Rate Notes, and not less than 30 days, in the case of Fixed Rate Notes, and in each case not more than 60 days before the Redemption Date, to the Registered Owners of any Notes or portions of Notes which are to be redeemed, at their addresses appearing upon the Note registration books; provided, however, that shorter periods before the Redemption Date during which notice pursuant to this Section must be given may be prescribed by a Supplemental Indenture as to Notes issued pursuant to such Supplemental Indenture. Failure so to mail any such notice shall not affect the validity of the proceedings for the redemption of Notes with respect to which no such failure occurred.

**Section 6.06. Payment of Redeemed Notes**. Notice having been given by mail in the manner provided in Section 6.05 hereof, the Notes or portions thereof so called for redemption shall become due and payable on the Redemption Date so designated at the Redemption Price, and, upon presentation and surrender thereof at the office specified in such notice, such Notes, or portions thereof, shall be paid at the Redemption Price. If there shall be called for redemption less than the entire principal amount of a Note, the Issuer shall execute, the Authenticating Agent shall authenticate and the Paying Agent shall deliver, upon the surrender of such Note, without charge to the Registered Owner thereof, for the unredeemed balance of the principal amount of the Note so surrendered at the option of the Registered Owner, Notes of like Series and maturity in any of the authorized denominations. If, on the Redemption Date, moneys for the redemption of all the Notes or portions thereof of any like Series and maturity to be redeemed, together with interest to the Redemption Date, shall be held by the Paying Agent so as to be available therefor on said date and if notice of redemption shall have been mailed as aforesaid, then, from and after the Redemption Date, interest on the Notes or portions thereof of such Series and maturities so called for redemption shall cease to accrue. If said moneys shall not be available on the Redemption Date, such Notes or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

The Redemption Price of Notes (including any premium, thereon) shall be paid from amounts available for such redemption; provided that amounts available to pay the Redemption Price shall not be used to pay any premium without the prior written consent of the Credit Facility Provider.

## ARTICLE VII

## REPRESENTATIONS, WARRANTIES AND COVENANTS OF THE ISSUER

**Section 7.01. Payment of Notes**. The Issuer shall duly and punctually pay or cause to be paid, as herein provided, the principal or Redemption Price of every Note and the interest, if any, thereon, at the dates and places and in the manner stated in the Notes, according to the true intent and meaning thereof.

46

**Section 7.02. Designation of Indenture Agents**.  The Issuer shall designate such Indenture Agents, in addition to or replacing the Trustee as to the agencies to which they are appointed, as Tender Agent, Paying Agents, Registrar or Authenticating Agent as it may deem appropriate under the provisions of any Supplemental Indenture.

**Section 7.03. Power to Issue Notes and Pledge Trust Estate**.  The Issuer is duly authorized under all applicable laws to authorize and issue the Notes and to enter into, execute and deliver this Indenture and to pledge the Trust Estate pledged hereby in the manner and to the extent herein provided.  The Trust Estate so pledged is and will be free and clear of any pledge, lien, charge or encumbrance thereon, or with respect thereto, prior to the pledge created hereby, and all action on the part of the Issuer to that end has been and will be duly and validly taken.  The Notes and the provisions of this Indenture are and will be the valid and legally enforceable limited obligations of the Issuer in accordance with their terms and the terms of this Indenture.

**Section 7.04. Further Assurances**.  At any and all times, the Issuer shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, pledging, assigning and confirming all and singular the Trust Estate, rights and assets hereby pledged or assigned, or intended so to be, or which the Issuer may become bound to pledge or assign.

**Section 7.05. Accounts and Reports.**

(a)  The Issuer shall keep, or cause to be kept, proper books of record and account in which complete and accurate entries shall be made of all of its transactions relating to the Financed Student Loans and all Funds established by this Indenture which shall upon reasonable notice and at all reasonable times be subject to the inspection of the Trustee, any Credit Facility Provider and the Registered Owners of an aggregate of not less than 25% in principal amount of Notes then Outstanding or their representatives duly authorized in writing.

(b)  Within 45 days following the end of each fiscal quarter (other than the fourth fiscal quarter) or as soon as practicable thereafter, the Issuer shall deliver to the Trustee and the Credit Facility Provider a balance sheet for the Issuer as of the end of such quarter, a statement of the Issuer's revenues and expenses for such quarter, and a statement of changes in financial position and fund balances during such quarter.

(c)  The Issuer shall annually, within 180 days after the end of the Issuer's first Fiscal Year and within 150 days after the close of each Fiscal Year thereafter, file with the Trustee, any Credit Facility Provider, any Liquidity Facility Provider and the Rating Agencies then rating the Notes: (i) audited financial statements for such Fiscal Year for the Issuer and (ii) a balance sheet showing the assets and liabilities of the Issuer at the end of such Fiscal Year.  The financial statements shall be accompanied by a certificate of an Accountant stating, without qualification or condition, that the financial statements examined present fairly the financial position of the Issuer at the end of the Fiscal Year, the results of its operations and the changes in financial position for the period examined, in conformity with generally accepted accounting principles.

47

(d)     The Trustee shall have no duty or responsibility with respect to the Issuer's financial statements or accounts and reports set forth herein except to make them available at no charge, upon request, to the Registered Owners as hereinbefore provided and to persons or entities that claim in writing to be a beneficial owner of Notes.  The Trustee shall be entitled to reimbursement for all expenses and charges related to the Trustee providing such financial statements to the Registered Owners.

**Section 7.06. Student Loan Program.**

(a)     The Issuer, through its Servicers and Subservicers, shall diligently collect all principal and interest payments on all the Financed Student Loans held under this Indenture, and Default Claims first from the Pledge Account and second from Guarantee Agency, if any, which relate to such Financed Student Loans.

(b)     No amount in the Acquisition Fund shall be expended or applied for the purpose of purchasing or financing a Private Loan, and no Private Loan shall be financed hereunder, unless the Issuer has determined that each of the Student Loans meets the requirements of Section 7.12 hereof.

(c)     The Issuer may at any time exchange a Financed Student Loan for another Student Loan that does not meet the similar characteristics requirement of paragraph (d) of this Section provided that it is not delinquent or in default under its applicable provisions, it has a maturity no longer than the maturity of and an aggregate principal amount and interest rate not less than the aggregate principal amount and interest rate of the Financed Student Loan being exchanged, or sell, assign, transfer or otherwise dispose of a Financed Student Loan at a price:

(i)     in excess of the principal amount thereof (plus accrued borrower interest) or in excess of the purchase price paid by the Issuer for such Financed Student Loan (less principal amounts received with respect to such Financed Student Loan);

(ii)     equal to the principal amount thereof (plus accrued borrower interest), when the amounts on deposit in the Funds and Accounts and the Financed Student Loans in the Acquisition Fund (including accrued interest thereon), are at least equal to the principal amount of the Outstanding Notes plus accrued interest and all accrued expenses or in order to pay current Debt Service on the Notes or to avoid any default in the payment obligations of the Issuer under any Reimbursement Agreement or otherwise; or

(iii)     lower than the principal amount thereof (plus accrued borrower interest) if the Issuer has received a Credit Confirmation (or, for Notes not subject to a Credit Facility, a Rating Confirmation).

; provided, however, that if at the time of any such exchange, Excess Coverage is not at the required level, the Issuer shall have first obtained the prior written consent for such exchange from Ambac.

48

(d)    Notwithstanding anything herein to the contrary, the Issuer may at any time and from time to time exchange Financed Student Loans for other Student Loans having similar characteristics (including insurance or guarantees, if any, maturities and payment status) and an aggregate principal amount and interest rate not less than the aggregate principal amount and interest rate of the Financed Student Loans being exchanged; provided, however, that if at the time of any such exchange, Excess Coverage is not at the required level, the Issuer shall have first obtained the prior written consent to such exchange from Ambac.

(e)    Quarterly, the Issuer shall deliver to the Trustee and Ambac a Certificate and Agreement setting forth the loan types, school type concentration, and, if required, other characteristics of the Private Loans that may be financed pursuant to this Indenture. The initial Certificate and Agreement shall provide that only Private Loans (as provided in such Certificate and Agreement) may be so financed from original proceeds of the Notes and from recycled proceeds, but with the consent of the Credit Facility Provider, such Certificate and Agreement may be amended or supplemented in order to permit other types of Private Loans to be financed. Any amendment or supplement to such Certificate and Agreement shall be signed by an Authorized Representative of the Issuer, countersigned by Ambac, and delivered promptly by the Issuer to the Trustee and Ambac. No Private Loans may be financed pursuant to this Indenture except those conforming to the Certificate and Agreement.

(f)    The Issuer shall from time to time, with all practical dispatch and in a sound and economical manner consistent with the Certificate and Agreement and with all other provisions of this Indenture, (i) apply the proceeds of the Notes for the purposes set forth in this Indenture, including the payment of principal of, and premium, if any, and interest on, the Notes and (ii) do all such acts and things as shall be necessary to receive and collect Revenues sufficient to pay the expenses of the Issuer.

(g)    The Issuer may not purchase Private Loans at a higher premium than reflected in the most recent Certificate and Agreement.

(h)    The Issuer may not purchase Private Loans that mature after the stated maturity of the Notes except (i) as reflected in the most recent Certificate and Agreement or (ii) with the prior written consent of Ambac.

**Section 7.07. Servicing of Financed Student Loans.**   The Issuer shall cause all Financed Student Loans to be properly serviced and the payment and collection of all payments of principal and interest to be enforced by the Servicer or any additional or successor Servicer evidencing, in the judgment of the Issuer, the capability and experience necessary to adequately service student loans. The Issuer covenants that the Servicer will be its agent and subject to its general direction under a contract with the Servicer. The Servicer may perform its duties through Subservicers, except as may be provided by any Supplemental Indenture. The Issuer shall cause all Financed Student Loan notes to be held in trust as part of the Trust Estate subject to the lien of this Indenture.

49

The Issuer shall cause to be diligently enforced, and take all reasonable steps, actions and proceedings necessary for the enforcement of, all terms, covenants and conditions of all Servicing Agreements, including the prompt payment of all principal and interest payments and all other amounts due the Issuer thereunder. The Issuer shall not permit the release of the obligations in any manner that materially adversely affects the rights or security of the Registered Owners, any Credit Facility Provider or any Liquidity Facility Provider of any Servicer under any Servicing Agreement and shall at all times, to the extent permitted by law, cause to be defended, enforced, preserved and protected the rights and privileges of the Issuer, the Trustee and the Registered Owners under or with respect to each Servicing Agreement. The Issuer shall not consent or agree to or permit any amendment or modification of any Servicing Agreement (but not including the Program Manual) without the consent of Ambac or which will in any manner materially adversely affect the rights or security of the Trustee, the Registered Owners, any Credit Facility Providers or any Liquidity Facility Providers.

**Section 7.08.  Issuance of Additional Notes.**

(a)     After the issuance of the initial Series of Notes under this Indenture, the Issuer shall not create or permit the creation of or issue any obligations or create any additional indebtedness which will be secured by a lien or charge on the Trust Estate, except as follows: (i) additional Series of Notes may be issued from time to time, subject to the provisions of Section 2.03 hereof, including a Rating Confirmation and written consent of each Credit Facility Provider, if any, for Senior Notes, which may have any priority designation and which may be superior to (but not superior to Senior Notes), on a parity with, or subordinate to one or more initial Series of Notes or Interest Rate Exchange Agreements; and (ii) Interest Rate Exchange Agreements may be entered into from time to time which may have any priority designation and which may be superior to (but not superior to Senior Notes), on a parity with or subordinate to one or more Series of Notes or Interest Rate Exchange Agreements.  The Issuer shall not enter into an Interest Rate Exchange Agreement without obtaining a Credit Confirmation (or, for Notes not subject to a Credit Facility, a Rating Confirmation).

(b)     No Series of Notes shall be issued under this Indenture except in accordance with Section 2.03 hereof.

(c)     The Issuer hereby expressly reserves the right to execute and deliver one or more additional general indentures, to issue indebtedness thereunder, and to pledge other assets not in the Trust Estate to payment of such indebtedness.

**Section 7.09.  Compliance With Conditions Precedent.**  The Issuer represents that upon the date of issuance of any of the Notes, all conditions, acts and things required by law or by this Indenture to exist, to have happened or to have been performed precedent to or in the issuance of such Notes shall exist, have happened and have been performed, or will have happened or been performed, and such Notes, together with all other indebtedness of the Issuer, shall be within every debt and other limit prescribed by law.

**Section 7.10.  General Compliance With Conditions in this Indenture and any Reimbursement Agreements.**  The Issuer shall do and perform or cause to be done and

50

performed at all times any and all covenants, agreements and all acts and things required to be done or performed by or on behalf of the Issuer under the provisions of this Indenture and any Reimbursement Agreement in accordance with the terms of such provisions. In the event of a conflict between the terms of Reimbursement Agreements pertaining to the Notes, the Reimbursement Agreement pertaining to the Senior Notes shall govern (or if no Senior Notes are Outstanding, the Reimbursement Agreement pertaining to the Subordinate Notes shall govern and, if no Senior Notes or Subordinate Notes are Outstanding, the Reimbursement Agreement pertaining to the Junior-Subordinate Notes shall govern).

**Section 7.11. Additional Covenants**. The Issuer covenants that it will acquire or cause to be acquired Student Loans as described herein. The Registered Owners of the Notes shall not in any circumstances be deemed to be the owner or holder of the Financed Student Loan.

The Issuer, or its designated agent, shall be responsible for each of the following actions:

(a)     The Issuer, or its designated agent, shall cause the benefits of the Guarantee Agreements to flow to the Trustee.

(b)     The Trustee shall have no obligation to administer, service or collect the loans in the Trust Estate or to maintain or monitor the administration, servicing or collection of such loans.

(c)     The Issuer shall comply with all United States statutes, rules and regulations which apply to the Student Loan Program, the Program Manual and the Student Loans.

(d)     The Issuer shall cause to be diligently enforced and taken all reasonable steps, actions and proceedings necessary for the enforcement of all terms, covenants and conditions of all Student Loans made and agreements in connection therewith, including the prompt payment of all principal and interest payments and all other amounts due the Issuer thereunder. The Issuer shall not permit the release of the obligations of any borrower under any Student Loan without the consent of the Credit Facility Provider and shall at all times, to the extent permitted by law, cause to be defended, enforced, preserved and protected the rights and privileges of the Issuer and of the Registered Owners under or with respect to each Student Loan and agreement in connection therewith.

(e)     The Issuer shall take all appropriate action to ensure that at the time each Student Loan becomes a part of the Trust Estate it shall be free and clear from all liens.

(f)     The Issuer shall diligently enforce, and take all steps, actions and proceedings reasonably necessary to protect its rights with respect to each Student Loan, and to maintain any Guarantee (including the Guarantee issued by TERI) on and to enforce all terms, covenants and conditions of Student Loans, including its rights and remedies under any Student Loan Purchase Agreement (including the Bank One Student Loan Purchase Agreement) and any Pledge Account.

51

The Trustee shall not be deemed to be the designated agent for the purposes of this Section unless it has agreed in writing to be such agent.

**Section 7.12. Covenant Regarding Financed Student Loans**.   The Issuer hereby covenants that all Student Loans to be acquired hereunder will meet the following:

(a)    Each Student Loan is evidenced by an executed promissory note, which note is a valid and binding obligation of the borrower, enforceable by or on behalf of the holder thereof in accordance with its terms, subject to bankruptcy, insolvency and other laws relating to or affecting creditors' rights.

(b)    The amount of the unpaid principal balance of each Student Loan is due and owing, and no counterclaim, offset, defense or right to rescission exists with respect to any such Student Loan which can be asserted and maintained or which, with notice, lapse of time, or the occurrence or failure to occur of any act or event, could be asserted and maintained by the borrower against the Issuer as assignee thereof.  The Issuer shall take all reasonable actions to assure that no maker of a Student Loan has or may acquire a defense to the payment thereof.

(c)    No Student Loan has a payment that is more than 90 days overdue other than such Student Loans that, in the aggregate, do not exceed 1.00% of the then aggregate outstanding principal amount of the Student Loans.

(d)    The Issuer has full right, title and interest in each Student Loan free and clear of all liens, pledges or encumbrances whatsoever.

(e)    Each Student Loan was made in compliance with all applicable state and federal laws, rules and regulations, including, without limitation, all applicable nondiscrimination, truth-in-lending, consumer credit and usury laws.

(f)    Except as otherwise approved in writing by each Credit Facility Provider, all loan documentation shall be delivered to the Servicer (as custodian for the Trustee) prior to payment of the purchase price of such Student Loan.

(g)    Each Student Loan is accruing interest (whether or not such interest is being paid currently by the borrower or is being capitalized), except as otherwise expressly permitted by this Indenture.

(h)    Each Private Loan was originated in substantial conformity with the Program Manual.

**Section 7.13. Continued Existence; Successor of Issuer**.  The Issuer agrees that it will do or cause to be done all things necessary to preserve and keep in full force and effect its existence, rights and franchises as a business trust under the laws of the State of Delaware, except as otherwise permitted by this Section.  The Issuer further agrees that it will not (a) sell, transfer or otherwise dispose of all or substantially all, of its assets (except Financed Student Loans if such sale, transfer or disposition will discharge this Indenture in accordance with Article XII hereof); (b) consolidate with or merge into another business trust or other entity; or

52

(c) permit one or more other corporations or entities to consolidate with or merge into it. The preceding restrictions in clauses (a), (b) and (c) shall not apply to a transaction if the transferee or the surviving or resulting entity, if other than the Issuer, by proper written instrument for the benefit of the Trustee, irrevocably and unconditionally assumes the obligation to perform and observe the agreements and obligations of the Issuer under this Indenture and the Credit Facility Provider has provided its written consent.

**Section 7.14. [Reserved]**

**Section 7.15. Representations and Warranties and Covenants of the Issuer**. The Issuer hereby makes the following representations and warranties to the Trustee on which the Trustee relies in authenticating the Notes and on which the Registered Owners have relied in purchasing the Notes. Such representations and warranties shall survive the transfer and assignment of the Trust Estate to the Trustee.

(a) ***Organization and Good Standing***. The Issuer is a business trust, duly organized and validly existing under the laws of the State of Delaware, and has the power to own its own assets and to transact the business in which it presently engages.

(b) ***Due Qualification***. The Issuer is duly qualified to do business and is in good standing, and has obtained all material, necessary licenses and approvals, in all jurisdictions where the failure to be so qualified, have such good standing or have such licenses or approvals would have a material adverse effect on the Issuer's business and operations or in which the actions as required by this Indenture require or will require such qualification.

(c) ***Authorization***. The Issuer has the power, authority and legal right to conduct its business as currently conducted and to execute, deliver and perform its obligations under this Indenture and to grant the Trust Estate to the Trustee and the execution and delivery of and the performance of its obligations under this Indenture and the Transaction Documents to which it is a party and grant of the Trust Estate to the Trustee have been duly authorized by the Issuer by all necessary action.

(d) ***Binding Obligation***. This Indenture and the Transaction Documents to which it is a party, assuming due authorization, execution and delivery by the Trustee, constitutes a legal, valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, except that (i) such enforcement may be subject to bankruptcy, insolvency, reorganization, moratorium or other similar laws (whether statutory, regulatory or decisional) now or hereafter in effect relating to creditors' rights generally and (ii) the remedy of specific performance and injunctive and other forms of equitable relief may be subject to certain equitable defenses and to the discretion of the court before which any proceeding therefor may be brought, whether a proceeding at law or in equity.

(e) ***No Violation***. The consummation of the transactions contemplated by this Indenture and the Transaction Documents to which it is a party and the fulfillment of the terms hereof and thereof does not conflict with, result in any breach of any terms and

53

provisions of or constitute (with or without notice, lapse of time or both) a default under the organizational documents of the Issuer, or any material indenture, agreement, mortgage, deed of trust or other instrument to which the Issuer is a party or by which it is bound, or result in the creation or imposition of any lien upon any of its material properties pursuant to the terms of any such indenture, agreement, mortgage, deed of trust or other instrument, other than this Indenture, nor violate any law or any order, rule or regulation applicable to the Issuer of any court or of any federal or state regulatory body, administrative agency, or other governmental instrumentality having jurisdiction over the Issuer or any of its properties.

(f)   *No Proceedings*.  There are no proceedings, injunctions, writs, restraining orders or investigations to which the Issuer or any of its Affiliates is a party pending, or, to the best of such entity's knowledge, threatened, before any court, regulatory body, administrative agency, or other tribunal or governmental instrumentality (i) asserting the invalidity of this Indenture, (ii) seeking to prevent the issuance of any Notes or the consummation of any of the transactions contemplated by this Indenture or (iii) seeking any determination or ruling that might materially and adversely affect the performance by the Issuer of its obligations under, or the validity or enforceability of this Indenture.

(g)   *Approvals*.  All approvals, authorizations, consents, orders or other actions of any person, corporation or other organization, or of any court, governmental agency or body or official, required on the part of the Issuer in connection with the execution and delivery of this Indenture have been taken or obtained on or prior to the Issue Date.

(h)   *Place of Business*.  The Issuer's principal place of business is located in Wilmington, Delaware.

(i)   *Tax and Accounting Treatment*.  The Issuer intends to treat the transactions contemplated by Student Loan Purchase Agreements for Student Loans as an absolute transfer rather than as a pledge of the Student Loans from the Seller for federal income tax, and the Issuer will be treated as the owner of the Financed Student Loans for all purposes.  The Issuer further intends to treat the Notes as its indebtedness for federal income tax.

(j)   *Taxes*.  The Issuer has filed (or caused to be filed) all federal, state, county, local and foreign income, franchise and other tax returns required to be filed by it through the date hereof, and has paid all taxes reflected as due thereon.  There is no pending dispute with any taxing authority that, if determined adversely to the Issuer, would result in the assertion by any taxing authority of any material tax deficiency, and the Issuer has no knowledge of a proposed liability for any tax year to be imposed upon such entity's properties or assets for which there is not an adequate reserve reflected in such entity's current financial statements.

(k)   *Legal Name*.  The legal name of the Issuer is "The National Collegiate Master Student Loan Trust I" and the Issuer has not changed its legal name since its inception and will not change its legal name without the prior written consent of the Credit Facility Provider.  The Issuer has no trade names, fictitious names, assumed

54

names or "dba's" under which it conducts its business and has made no filing in respect of any such name.

(l)     ***Business Purpose***.  The Issuer will acquire Student Loans conveyed to it under Student Loan Purchase Agreements for a bona fide business purpose rather than as an agent of any other person.  The Issuer has no subsidiaries, has adopted and operated consistently with all formalities with respect to its operations and has engaged in no other activities other than those specified in this Indenture and its organizational documents and in accordance with the transactions contemplated herein and therein.

(m)     ***Compliance With Laws***.  The Issuer is in compliance with all applicable laws and regulations with respect to the conduct of its business and has obtained and maintains all permits, licenses and other approvals as are necessary for the conduct of its operations.

(n)     ***Valid Business Reasons; No Fraudulent Transfers***.  The transactions contemplated by this Indenture are in the ordinary course of the Issuer's business and the Issuer has valid business reasons for granting the Trust Estate pursuant to this Indenture. At the time of each such grant: (i) the Issuer granted the Trust Estate to the Trustee without any intent to hinder, delay, or defraud any current or future creditor of the Issuer; (ii) the Issuer was not insolvent and did not become insolvent as a result of any such grant; (iii) the Issuer was not engaged and was not about to engage in any business or transaction for which any property remaining with such entity was an unreasonably small capital or for which the remaining assets of such entity are unreasonably small in relation to the business of such entity or the transaction; (iv) the Issuer did not intend to incur, and did not believe or should not have reasonably believed, that it would incur, debts beyond its ability to pay as they become due; and (v) the consideration paid received by the Issuer for the grant of the Trust Estate was reasonably equivalent to the value of the related grant.

(o)     ***No Management of Affairs of Affiliates***.  The Issuer is not and will not be involved in the day-to-day management of the Issuer's parent or any Affiliate.

(p)     ***No Interentity Transfers With Seller or Affiliates***.  Other than the acquisition of assets and the transfer of any Notes pursuant to this Indenture, the Issuer does not engage in and will not engage in any interentity transactions with any of its Affiliates, except as provided herein.

(q)     ***Ability to Perform***.  There has been no material impairment in the ability of the Issuer to perform its obligations under this Indenture.

(r)     ***Financial Condition***.  No material adverse change has occurred in the Issuer's financial status since the date of its formation.

(s)     ***Event of Default***.  No Event of Default has occurred and no event has occurred that, with the giving of notice, the passage of time, or both, would become an Event of Default.

55

(t)   *Acquisition of Student Loans Legal*.   The Issuer has complied with all applicable, federal, state and local laws and regulations in connection with its acquisition of the Student Loans from the Seller.

(u)   *No Material Misstatements or Omissions*.   No information, certificate of an officer, statement furnished in writing or report delivered to the Trustee, any Servicer, any Guarantee Agency, any Credit Facility Provider, any Liquidity Facility Provider, any Surety Provider or any Registered Owner by the Issuer contains any untrue statement of a material fact or omits a material fact necessary to make such information, certificate, statement or reporting not misleading.

**Section 7.16. Issuer Covenants**.  So long as any of the Notes are Outstanding:

(a)   The Issuer shall not engage in any business or activity other than in connection with the activities contemplated hereby and in the Student Loan Purchase Agreements, and in connection with the issuance of Notes.

(b)   The funds and other assets of the Issuer shall not be commingled with those of any other individual, corporation, estate, partnership, joint venture, association, joint stock company, trust, unincorporated organization, or government or any agency or political subdivision thereof.

(c)   The Issuer shall not be, become or hold itself out as being liable for the debts of any other party.

(d)   The Issuer shall not form, or cause to be formed, any subsidiaries.

(e)   The Issuer shall act solely in its own name and through its duly authorized officers or agents in the conduct of its business, and shall conduct its business so as not to mislead others as to the identity of the entity with which they are concerned.

(f)   The Issuer shall maintain its records and books of account and shall not commingle its records and books of account with the records and books of account of any other Person.   The books of the Issuer maybe kept (subject to any provision contained in the statutes) inside or outside the State of Delaware at such place or places as may be designated from time to time by the board of trustees or in the bylaws of the Issuer.

(g)   All actions of the Issuer shall be taken by a duly authorized officer or agent of the Issuer.

(h)   The Issuer shall not amend, alter, change or repeal any provision contained in this Section without (i) the prior written consent of the Trustee and each Credit Facility Provider or Liquidity Facility Provider, if required by the Reimbursement Agreement relating to such Liquidity Facility, and (ii) a Rating Confirmation from each Rating Agency rating any Notes Outstanding (a copy of which shall be provided to the Trustee) that such amendment, alteration, change or repeal will have no adverse effect on the rating assigned to the Notes.

56

(i)     The Issuer shall not amend its organizational documents or change its jurisdiction of formation without first obtaining the prior written consent of each Rating Agency and each Credit Facility Provider, if any.

(j)     All audited financial statements of the Issuer that are consolidated with those of any Affiliate thereof will contain detailed notes clearly stating that (i) all of the Issuer's assets are owned by the Issuer, and (ii) the Issuer is a separate entity with creditors who have received ownership and/or security interests in the Issuer's assets.

(k)     The Issuer will strictly observe legal formalities in its dealings with any of its Affiliates, and funds or other assets of the Issuer will not be commingled with those of any of its Affiliates.  The Issuer shall not maintain joint bank accounts or other depository accounts to which any of its Affiliates has independent access.  None of the Issuer's funds will at any time be pooled with the funds of any of its Affiliates.

(l)     The Issuer will maintain an arm's length relationship with each Seller (and any Affiliate thereof).  Any Person that renders or otherwise furnishes services to the Issuer will be compensated by the Issuer at market rates for such services it renders or otherwise furnishes to the Issuer except as otherwise provided in this Indenture.  The Issuer will not hold itself out to be responsible for the debts of the Seller, the parent or the decisions or actions respecting the daily business and affairs of the Seller or parent.

(m)     The Issuer shall not sell, transfer, exchange or otherwise dispose of any portion of the Trust Estate except as expressly permitted by this Indenture.

(n)     The Issuer shall not claim any credit on, or make any deduction from, the principal amount of any of the Notes by reason of the payment of any taxes levied or assessed upon any portion of the Trust Estate.

(o)     The Issuer shall not permit the validity or effectiveness of this Indenture, any Supplement or any grant hereunder to be impaired, or permit the lien of this Indenture to be amended, hypothecated, subordinated, terminated or discharged, or permit any Person to be released from any covenants or obligations under this Indenture, except as may be expressly permitted hereby.

**Section 7.17.  Program Expenses**.

Subject to Section 5.04(b)(i), the Issuer shall not permit Program Expenses and Management and Operating Expenses to exceed those reflected in the most recent related Certificate and Agreement unless Ambac agrees to amend the current Certificate and Agreement based, in part, on (i) the Issuer having delivered to the Trustee and Ambac a revised statement of Program Expenses and Management and Operating Expenses and such supporting data as Ambac may reasonably request, (ii) Ambac having approved such revised statement and (iii) the Issuer having delivered a cash flow statement satisfactory to Ambac giving effect to such revised Program Expenses and Management and Operating Expenses.  Thereafter, the Certificate and Agreement shall be revised to incorporate such revised Program Expenses and Management and Operating Expenses, and the Program Expenses and Management and Operating Expenses shall

57

not differ from those reflected in such a revised Certificate and Agreement until a further revised Certificate and Agreement is delivered and approved as aforesaid.

## ARTICLE VIII

## SUPPLEMENTAL INDENTURES NOT REQUIRING CONSENT OF REGISTERED OWNERS

**Section 8.01.  Supplemental Indentures Not Requiring the Consent of Registered Owners**.  For any one or more of the following purposes and at any time or from time to time subject to the provisions of Section 8.02 hereof and with the written consent of each Credit Facility Provider, if any, a Supplemental Indenture not requiring the consent of Registered Owners may be executed and delivered by the Issuer and the Trustee for the following purposes:

(a)      to close this Indenture, or provide limitations and restrictions in addition to the limitations and restrictions contained in this Indenture on, the authentication and delivery of Notes or the issuance of other evidences of indebtedness;

(b)      to add to the covenants and agreements of the Issuer in this Indenture other covenants and agreements to be observed by the Issuer which are not contrary to or inconsistent with this Indenture as theretofore in effect;

(c)      to add to the limitations and restrictions in this Indenture other limitations and restrictions to be observed by the Issuer which are not contrary to or inconsistent with this Indenture as theretofore in effect;

(d)      to surrender any right, power or privilege reserved to or conferred upon the Issuer by the terms of this Indenture, but only if the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of the Issuer contained in this Indenture;

(e)      to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, this Indenture, of the Trust Estate or of any other revenues or assets;

(f)      to modify any of the provisions of this Indenture in any respect whatever, but only if (i) such modification shall be, and be expressed to be, effective only after all Notes Outstanding at the date of the execution of such Supplemental Indenture shall cease to be Outstanding, and (ii) such Supplemental Indenture shall be specifically referred to in the text of all Notes authenticated and delivered after the date of the execution of such Supplemental Indenture and of Notes issued in exchange therefor or in place thereof;

(g)      to authorize the issuance of one or more Series of Notes and to prescribe the terms and conditions upon which such Notes may be issued;

(h)      to create additional special trust accounts for the further securing of all Notes, all Senior Notes, all Subordinate Notes, all Junior-Subordinate Notes or all Notes

58

of a Series issued pursuant to this Indenture if along with such Supplemental Indenture there is filed an Opinion of Counsel to the effect that the creation and operation of such account will in no way impair the existing security of the Registered Owner of any Outstanding Note;

(i)     to cure any ambiguity, supply any omission, or cure or correct any defect or inconsistent provisions in this Indenture;

(j)     to insert such provisions clarifying matters or questions arising under this Indenture as are necessary or desirable and are not contrary to or inconsistent with this Indenture as theretofore in effect;

(k)     to provide for additional duties of the Trustee in connection with the Financed Student Loans, upon the written consent of the Trustee;

(l)     to satisfy the requirements of a Rating Agency in order to obtain, maintain or improve the rating on any of the Notes;

(m)     to replace, change or alter the Rating Agencies then rating the Notes;

(n)     to provide for the orderly sale or remarketing of Notes;

(o)     to make any other change which, in the judgment of the Trustee acting in reliance on an Opinion of Counsel is necessary or desirable to maintain the tax status of the Notes as debt for federal tax purposes;

(p)     to make any change which, in the judgment of the Trustee acting in reliance upon an Opinion of Counsel, to the extent the Trustee deems such opinion desirable, is not to the prejudice of the Trustee or the Registered Owners;

(q)     to make any change that affects only the rights of a Credit Facility Provider or Liquidity Facility Provider which has issued a Credit Facility or Liquidity Facility with respect to any of the Notes, with the prior written consent of such Credit Facility Provider or Liquidity Facility Provider;

(r)     to provide for the conversion of the interest rate on any Series of Notes as provided in a Supplemental Indenture;

(s)     to make any other change with a Credit Confirmation (or, for Notes not subject to a Credit Facility, a Rating Confirmation); or

(t)     to modify, amend or supplement this Indenture or any Supplemental Indenture in such manner as to permit the qualification hereof and thereof under the Trust Indenture Act of 1939, as amended or any similar federal statute hereafter in effect or to permit the qualification of the Notes for sale under the securities laws of the United States of America or of any of the states of the United States of America, and, if they so determine, to add to this Indenture or any Supplemental Indenture hereto such other

59

terms, conditions and provisions as may be permitted by said Trust Indenture Act of 1939, as amended or similar federal statute.

**Section 8.02.  General Provisions.**

(a)    Any Supplemental Indenture permitted or authorized by Section 8.01 hereof may be executed by the Issuer without the consent of any of the Registered Owners, but with the consent of each Credit Facility Provider, and the Liquidity Facility Provider for the Series of Notes affected.  The Issuer shall further notify the Rating Agencies then Rating the Notes of the execution of such Supplemental Indenture.  The copy of every Supplemental Indenture filed with the Trustee shall be accompanied by an Opinion of Counsel including a statement that such Supplemental Indenture has been duly and lawfully executed in accordance with the provisions of this Indenture and any applicable Reimbursement Agreement, is authorized or permitted by this Indenture, and, assuming due authorization, execution and delivery by the other parties thereto, is valid and binding upon the Issuer.

(b)    The Trustee is hereby authorized and shall execute any Supplemental Indenture referred to and permitted or authorized by Section 8.01 or Article IX hereof if such Supplemental Indenture shall not adversely affect the rights, duties, liabilities or immunities of the Trustee, and to make all further agreements and stipulations which may be therein contained.  The Trustee, in taking or refraining from taking such action, shall be fully protected in relying on an Opinion of Counsel that such Supplemental Indenture is authorized or permitted by the provisions of this Indenture.

(c)    No Supplemental Indenture shall change or modify any of the rights or obligations of any Indenture Agent without its written assent thereto.

## ARTICLE IX

## SUPPLEMENTAL INDENTURES REQUIRING CONSENT OF REGISTERED OWNERS

**Section 9.01.  Mailing of Notice of Amendment.**  Any provision of this Article for the mailing of a notice or other document to Registered Owners shall be fully complied with if it is mailed postage prepaid (a) to each Registered Owner of Notes then Outstanding at his address appearing upon the Note registration books of the Registrar, (b) to the Trustee, (c) to the Rating Agencies then rating the Notes, (d) to each Credit Facility Provider, if any, and (e) to each Liquidity Facility Provider for any Notes to which such notice or other document relates.

**Section 9.02.  Powers of Amendment.**  Except as provided in Article VIII hereof, any modification of or amendment to this Indenture and of the rights and obligations of the Issuer, any Credit Facility Provider, or any Liquidity Facility Provider under a Supplemental Indenture, and of the Registered Owners of the Notes of any particular Series, may be made by a Supplemental Indenture, with the written consent: (a) of a majority of the Registered Owners determined by principal amount of the Senior Notes Outstanding (or, if no Senior Notes are Outstanding, then by a majority of the Registered Owners determined by principal amount of the

SSL-DOCS2 70028246v8

Subordinate Notes Outstanding at the time such consent is given or, if no Senior Notes or Subordinate Notes are Outstanding, then by a majority of the Registered Owners determined by in principal amount of the Junior-Subordinate Notes Outstanding at the time such consent is given); (b) in case less than all of the several Series of Notes then Outstanding are affected by the modification or amendment, a majority of the Registered Owners determined by principal amount of the Notes of each Series so affected and Outstanding at the time such consent is given, (c) in case the modification or amendment changes the terms of any Sinking Fund Payment, of the Registered Owners of at least 100% in principal amount of the Notes of the particular Series and maturity entitled to such Sinking Fund Payment and Outstanding at the time such consent is given, and (d) of each Credit Facility Provider, if any.

In the event that a Credit Facility Provider has issued a Credit Facility or a Liquidity Facility Provider has issued a Liquidity Facility respecting a Series of Notes and unless such Credit Facility Provider or such Liquidity Facility Provider is then in receivership, bankruptcy or reorganization or is then continuing wrongfully to dishonor drawings under the Credit Facility or Liquidity Facility, such Credit Facility Provider or, in the event there is no Credit Facility Provider, such Liquidity Facility Provider shall be considered as the Registered Owner of 100% of such Series of Notes for the purpose of consenting to any modification of or amendment to this Indenture, but, only if so required by the applicable Reimbursement Agreement in the case of the Liquidity Facility Provider.

If any such modification or amendment will not take effect so long as any Notes of any specified maturity remain Outstanding, the consent of the Registered Owners of such Notes shall not be required and such Notes shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Notes under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal of any Outstanding Note or of any installment of interest thereon or a reduction in the principal amount or the Redemption Price thereof or in the rate of interest thereon without the consent of the Registered Owner of such Note (which consent shall not be deemed to be effected by a Credit Facility Provider or Liquidity Facility Provider), or shall reduce the percentages or otherwise affect the Series of Notes that must consent to any modification or amendment of this Indenture without the consent of all of Registered Owners of the Notes of that Series, or shall change or modify any of the rights or obligations of any Indenture Agent without its written assent thereto. For the purposes of this Section, a Series of Notes shall be deemed to be affected by a modification or amendment of this Indenture if the same adversely affects or diminishes the rights of the Registered Owners of Notes of such Series. The Trustee may determine, upon receipt of an Opinion of Counsel, whether Notes of any particular Series would be affected by any modification or amendment hereof and any such determination shall be binding and conclusive on the Issuer, any Credit Facility Provider or Liquidity Facility Provider and all Registered Owners of Notes.

### Section 9.03.  Consent of Registered Owners.

(a)     A copy of any Supplemental Indenture making a modification or amendment which is not permitted by the provisions of Section 8.01 hereof (or brief summary thereof or reference thereto in a form approved by the Trustee), together with a request to Registered Owners for their consent thereto in a form satisfactory to the Trustee, shall be mailed by the Registrar on behalf of the Issuer to each Credit Facility

61

Provider, if any, and the Registered Owner of any Note to be affected by such proposed amendment or modification. Such Supplemental Indenture shall not be effective unless and until there shall have been filed with the Trustee (A) the written consents of Registered Owners of the percentages of Outstanding Notes and each Credit Facility Provider specified in Section 9.02 hereof and (B) an Opinion of Counsel stating that such Supplemental Indenture has been duly executed by the Issuer in accordance with the provisions of this Indenture and any applicable Reimbursement Agreement, is authorized or permitted hereby and, assuming due authorization, execution and delivery by the other parties thereto, is valid and binding upon the Issuer.

(b)     Any such consent shall be binding upon the Registered Owner of the Notes giving such consent and upon any subsequent Registered Owner of such Notes and of any Notes issued in exchange therefor (whether or not such subsequent Registered Owner thereof has notice thereof) unless such consent is revoked in writing by the Registered Owner of such Notes giving such consent or a subsequent Registered Owner thereof by filing with the Trustee, prior to the time when the written statement of the Trustee hereinafter provided for in this Section is filed, such revocation.

(c)     At any time after the Registered Owners of the required percentages of Notes shall have filed their consents to the Supplemental Indenture, the Trustee shall make and file with the Issuer a written statement that the Registered Owners of such required percentages of Notes have filed such consents. Such written statements shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Indenture (which may be referred to as a Supplemental Indenture dated as of a stated date, a copy of which is on file with the Trustee) has been consented to by the Registered Owners of the required percentages of Notes and will be effective as provided in this Section shall be given to Registered Owners by the Issuer by mailing such notice to the Registered Owners not more than 90 days after the Registered Owners of the required percentages of Notes shall have filed their consents to the Supplemental Indenture and the written statement of the Trustee herein above provided for is filed. The Issuer shall file with the Trustee proof of the mailing of such notice. A record, consisting of the papers required or permitted by this Section to be filed with the Trustee, shall be proof of the matters therein stated. Such Supplemental Indenture making such amendment or modification shall be deemed conclusively binding upon the Issuer, the Indenture Agents and the Registered Owners of all Notes after the filing with the Trustee of the proof of the mailing of the notice of such consent, except in the event of a final decree of a court of competent jurisdiction setting aside such Supplemental Indenture in a legal action or equitable proceeding for such purpose.

**Section 9.04. Modifications by Unanimous Consent**. The terms and provisions of this Indenture and the rights and obligations of the Issuer and of the Registered Owners of the Notes hereunder may be modified or amended in any respect upon the execution by the Issuer and the Trustee of a Supplemental Indenture with the consent of the Registered Owners of all the Notes then Outstanding, such consent to be given as provided in Section 9.03 hereof and with Ambac's written consent, but no such modification or amendment shall change or modify any of the rights or obligations of any Indenture Agent without the filing with the Trustee of the written assent

62

thereto of such Indenture Agent in addition to the consent of the Registered Owners.  No notice of any such modification, amendment, assent or publication thereof shall be required.

Section 9.05. **Exclusion of Notes**.  Notes owned or held by the Issuer or its Affiliates shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Notes provided for in this Article, and the Issuer or its Affiliates shall not be entitled with respect to such Notes to give any consent or take any other action provided for in this Article.  At the time of any consent or other action taken under this Article, the Issuer shall furnish the Trustee a Certificate of an Authorized Representative, upon which the Trustee may rely, describing all Notes so to be excluded.

Section 9.06. **Notation on Notes**.  Notes authenticated and delivered after the effective date of any action taken as provided in Article VIII hereof or this Article may and, if the Trustee so determines, shall bear a notation by endorsement or otherwise in form approved by the Issuer and the Trustee as to such action, and in that case upon demand of the Registered Owner of any Outstanding Note at such effective date and presentation of his Note for the purpose at the principal corporate trust office of the Trustee or upon any transfer or exchange of any Note Outstanding at such effective date, suitable notation shall be made on such Note or upon any Note issued upon any such transfer or exchange by the Trustee as to any such action.  If the Issuer or the Trustee shall so determine, new Notes modified to conform to such action in the opinion of the Trustee and the Issuer shall be prepared, executed, authenticated and delivered, and upon demand of the Registered Owner of any Note then Outstanding shall be exchanged, without cost to such Registered Owner, upon surrender of such Outstanding Note.

Section 9.07. **Consent of the Credit Facility Provider to Certain Modifications**.

Except as otherwise provided in this Indenture, so long as the Credit Facility is in full force and effect, no supplement, modification or amendment shall be made to any Transaction Document, other than the Program Manual, without the prior written consent of Ambac.

## ARTICLE X

## DEFAULTS AND REMEDIES

Section 10.01. **Events of Default**.  Each of the following events is an "Event of Default":

(a)     payment by the Issuer of the principal, Purchase Price, or Redemption Price, if any, with respect to the Senior Notes Outstanding shall not be made when and as the same shall become due, whether at maturity or upon call for redemption or otherwise (or, if no Senior Notes are Outstanding, payment by the Issuer of the principal, Purchase Price, or Redemption Price, if any, with respect to the Subordinate Notes Outstanding shall not be made when and as the same shall become due, whether at maturity or upon call for redemption or otherwise, or, if no Senior Notes or Subordinate Notes are Outstanding, payment by the Issuer of the principal, Purchase Price, or Redemption Price, if any, with respect to the Junior-Subordinate Notes Outstanding shall not be made

63

when and as the same shall become due, whether at maturity or upon call for redemption or otherwise); or

(b)    payment by the Issuer of any installment of interest with respect to the Senior Notes Outstanding shall not be made when and as the same shall become due (or, if no Senior Notes are Outstanding, payment by the Issuer of any installment of interest with respect to the Subordinate Notes Outstanding shall not be made when and as the same shall become due, or, if no Senior Notes or Subordinate Notes are Outstanding, payment by the Issuer of any installment of interest with respect to the Junior-Subordinate Notes Outstanding shall not be made when and as the same shall become due); or

(c)    the Issuer shall fail or refuse to comply with the provisions of this Indenture, or shall default in the performance or observance of any of the other covenants, agreements or conditions on its part or has breached any of its representations or warranties contained herein, in any Supplemental Indenture or the Notes, in any Certificate and Agreement or any Transaction Document to which it is a party, other than those described in paragraph (a) or (b) of this Section, and such failure, refusal or default shall continue for a period of 30 days after either the Issuer has knowledge of or written notice thereof has been delivered to the Issuer by the Trustee or by the Registered Owners of not less than 25% in principal amount of the Outstanding Notes;

(d)    the Issuer has failed to reimburse or otherwise pay the Credit Facility Provider or Liquidity Facility Provider pursuant to the terms of its Reimbursement Agreement or this Indenture as and when such reimbursement or payment becomes due and payable; or

(e)    the Issuer shall have commenced a voluntary case or other proceeding seeking liquidation, reorganization or other relief with respect to itself or its debts under any bankruptcy, insolvency, or other similar law now or hereafter in effect, or an involuntary case or other proceeding shall have been commenced against the Issuer seeking liquidation, reorganization or other relief with respect to it or its debts under any bankruptcy, insolvency or other similar law now or hereafter in effect.

(f)    default by the Issuer in the due and punctual payment of the Purchase Price of any Note required to be purchased pursuant to Section 6.02 or 6.03 from remarketing proceeds or amounts received pursuant to a request under any Liquidity Facility; or

(g)    default by the Issuer in the due and punctual payment of its obligations under any Liquidity Facility; or

(h)    a draw on any Credit Facility of Ambac.

**Section 10.01A        Waivers of Events of Default.**

The Trustee shall waive any Event of Default and its consequences and rescind any declaration of maturity of principal upon the written request of Ambac or, with the prior written

64

consent of Ambac, the written request of a majority of the Registered Owners in aggregate principal amount of all Notes then Outstanding in respect of which such Event of Default exists; provided that an Event of Default specified in subsections (a) or (b) of Section 10.01 hereof shall not be waived unless prior to such waiver all arrears of interest on the Notes, with interest (to the extent permitted by law) at the rates borne by the Notes, and all arrears of payments of principal on the Notes (due at their stated maturity or upon redemption, but not by declaration of acceleration), and all fees and expenses of the Trustee, Program Expenses and Reimbursement Amounts then due, shall have been paid or provided for. In case of any such waiver or rescission, or in case any proceeding taken by the Trustee on account of any such Event of Default shall have been discontinued or abandoned or determined adversely to the Trustee, then and in every such case, the Issuer, the Trustee, the Credit Facility Provider, and the Registered Owners shall be restored to their former positions and rights hereunder respectively (subject, however, to such determination), but no such waiver or rescission shall extend to any subsequent or other Event of Default, or impair any right consequent thereon.

**Section 10.02. Remedies.**

(a)     Upon the occurrence and continuance of any Event of Default specified in paragraphs (a), (b), (d), (e), (f), (g) or (h) of Section 10.01 hereof of which the Trustee has actual knowledge, the Trustee shall promptly notify the Issuer, each Credit Facility Provider, each Liquidity Facility Provider, each Surety Provider, each counterparty to an Interest Rate Exchange Agreement and each Indenture Agent of the existence of such Event of Default and shall proceed upon indemnification to the Trustee's satisfaction with the consent of each Credit Facility Provider or at the written direction of each Credit Facility Provider subject to the provisions of Article XI hereof, or upon the occurrence and continuance of any Event of Default specified in paragraph (c) of Section 10.01 hereof of which the Trustee has actual knowledge, the Trustee shall promptly notify the Issuer, each Credit Facility Provider, each Liquidity Facility Provider, each Surety Provider, each counterparty to an Interest Rate Exchange Agreement and each Indenture Agent of the existence of such Event of Default and may, with the written consent of each Credit Facility Provider, but shall not be required to (or, if instructed by the Registered Owners as described in Section 10.05 hereof with the written consent of each Credit Facility Provider, if any, or, if instructed in writing by each Credit Facility Provider, shall) proceed in its own name, subject to the provisions of Article XI hereof, to protect and enforce the rights of the Registered Owners by such of the following remedies, as the Trustee, being advised by counsel, shall deem most effectual to protect and enforce such rights:

(i)     by mandamus or other suit, action or proceeding at law or in equity, to enforce all rights of the Registered Owners, including the right to require the Issuer to carry out the covenants and agreements as to, and the assignment of, the Financed Student Loans and to require the Issuer to carry out any other covenants or agreements with Registered Owners and to perform its duties as prescribed by law;

(ii)     by bringing suit upon the Notes;

65

(iii)     by action or suit in equity, to require the Issuer to account as if it were the trustee of an express trust for the Registered Owners of the Notes;

(iv)     by action or suit in equity to enjoin any acts or things which may be unlawful or in violation of the rights of the Registered Owners of the Notes; or

(v)     upon the occurrence of an Event of Default specified in paragraphs (a) or (b), (d) or (e) of Section 10.01 hereof, the Trustee shall, but only with the written consent or at the written direction of each Credit Facility Provider, if any, and in the case of an Event of Default specified in paragraph (c), the Trustee shall, upon the written direction of the Registered Owners with the written consent or the written direction of each Credit Facility Provider, if any, as provided in Section 10.05 hereof, after written notice to the Issuer, to the extent required by law, declare the principal of the Notes then Outstanding to be immediately due and payable, whereupon the principal and the accrued interest on such Notes through the date of acceleration shall, without further action, become and be immediately due and payable, anything in this Indenture, or in the Notes to the contrary notwithstanding.  If all defaults shall be cured or waived, then, the Trustee may annul such declaration and its consequences with the written consent of each Credit Facility Provider, if any; provided each Credit Facility or Liquidity Facility for the Notes previously in effect is fully reinstated and in full force and effect.

(b)     [Reserved]

(c)     In the enforcement of any rights and remedies under this Indenture, the Trustee shall be entitled to sue for, enforce payment of and receive any and all amounts then or during any default becoming, and at any time remaining, due and unpaid from the Issuer for principal, interest or otherwise, under any provisions of this Indenture or a Supplemental Indenture or of the Notes, with interest on overdue payments at the rate of interest specified in such Notes, together with any and all costs and expenses of collection and of all proceedings thereunder and under such Notes without prejudice to any other right or remedy of the Trustee or of the Registered Owners, and to recover and enforce a judgment or decree against the Issuer for any portion of such amounts remaining unpaid, with interest, costs and expenses (including without limitation pretrial, trial and appellate attorney fees), and to collect from the Issuer any moneys adjudged or decreed to be payable; provided, however, any recovery against the Issuer is limited to the Trust Estate.

(d)     Upon the occurrence of any Event of Default, and on the filing of suit or other commencement of judicial proceedings to enforce the rights of the Registered Owners under this Indenture, the Trustee shall, at the written direction of each Credit Facility Provider, if any, be entitled, as a matter of right, to the appointment of a receiver or receivers of the Trust Estate and of the assets of the Issuer relating to the Student Loan Program, pending such proceedings, with such powers as the court making such appointment shall confer.

(e)      Except upon the occurrence and during the continuance of an Event of Default hereunder, the Issuer hereby expressly reserves and retains the privilege to receive and, subject to the terms and provisions of this Indenture, to keep or dispose of, claim, bring suit upon or otherwise exercise, enforce or realize upon its rights and interest in and to the Financed Student Loans and the proceeds of any collections therefrom, and neither the Trustee nor any Registered Owner shall in any manner be or be deemed to be an indispensable party to the exercise of any such privilege, claim or suit.

(f)      The Trustee shall select and liquidate or sell Trust Estate assets as provided in the following paragraph or as provided in the last paragraph of this Section but only at the written direction of each Credit Facility Provider, if any, and shall not be liable to any Registered Owner, any Credit Facility Provider, any Liquidity Facility Provider or the Issuer by reason of such selection, liquidation or sale.

Whenever moneys are to be applied pursuant to this Article irrespective of and whether other remedies authorized under this Indenture shall have been pursued in whole or in part, the Trustee, upon the written direction of the Credit Facility Provider, may cause any or all of the assets of the Trust Estate to be sold.  The Trustee may so sell the assets of the Trust Estate and all right, title, interest, claim and demand thereto and the right of redemption thereof, in one or more parts, at any such place or places, and at such time or times and upon such notice and terms as the Trustee may deem appropriate with written consent of each Credit Facility Provider, if any, or at the written direction of each Credit Facility Provider and as may be required by law and apply the proceeds thereof in accordance with the provisions of this Section at the written direction of each Credit Facility Provider or with the written consent of each Credit Facility Provider.  Upon such sale, the Trustee may make and deliver to the purchaser or purchasers a good and sufficient assignment or conveyance for the same, which sale shall be a perpetual bar both at law and in equity against the Issuer, each Credit Facility Provider, each Liquidity Facility Provider, the Registered Owners, and all other persons claiming such properties.  No purchaser at any sale shall be bound to see to the application of the purchase money proceeds thereof or to inquire as to the authorization, necessity, expediency or regularity of any such sale. Nevertheless, if so requested by the Trustee, the Issuer shall ratify and confirm any sale or sales by executing and delivering to the Trustee or to such purchaser or purchasers all such instruments as may be necessary or, in the judgment of the Trustee, proper for the purpose which may be designated in such request.

To the extent that funds are not otherwise available to pay amounts due to a Credit Facility Provider or a Liquidity Facility Provider under its Reimbursement Agreement pursuant to this Section, including any Ambac Indemnity Amounts, and unless otherwise provided in a Supplemental Indenture, the Trustee, at the request and in the sole discretion of the Issuer (except as provided in the final paragraph of this Section), shall convey or sell and deliver Financed Student Loans purchased with assets of the Trust Estate to such Credit Facility Provider or such Liquidity Facility Provider in partial or complete satisfaction of such obligations of the Issuer, subject to the acceptance of such Financed Student Loans by such Credit Facility Provider or such Liquidity Facility Provider in satisfaction of such obligations, at a purchase price equal to the principal outstanding plus accrued interest.

Should an event of default under a Reimbursement Agreement have occurred and be continuing unremedied or payment obligation of the Issuer to Ambac under this Indenture or any Supplemental Indenture or Credit Facility remain unpaid for more than 15 days each Credit Facility Provider under its Reimbursement Agreement, and Ambac as provided herein, shall be entitled to direct the Trustee in writing to sell Financed Student Loans constituting part of the Trust Estate and to apply the proceeds thereof as provided in Section 10.03 hereof.

Anything in this Indenture to the contrary notwithstanding, upon the occurrence and continuance of an Event of Default, Ambac shall be entitled to control and direct the enforcement of all rights and remedies granted to the Registered Owners of Notes or the Trustee for the benefit of the Registered Owners under this Indenture, including, without limitation: (i) the right to accelerate the principal of the Notes as described in this Indenture, and (ii) the right to annul any declaration of acceleration, and Ambac shall also be entitled to approve all waivers of Events of Default.

**Section 10.03. Priority of Payments After Default.**

(a)     In the event that upon the occurrence and during the continuance of any Event of Default, the funds held by the Trustee and Paying Agents shall be insufficient for the payment of principal or Redemption Price of and interest then due on the Notes, such funds (other than funds held for the payment of particular Notes pursuant to Article XII hereof or which have theretofore become due at maturity) and any other amounts received or collected by the Trustee acting pursuant to this Article, after providing for the payment of any fees, expenses, charges and liabilities incurred and advances made by the Trustee or another Indenture Agent or the Owner Trustee in the performance of their respective duties under this Indenture or the Trust Agreement (except that no lien shall attach to the proceeds of any drawing under a Credit Facility or Liquidity Facility or on any remarketing proceeds for the payment of such fees, charges and expenses), shall be applied as follows:

(i)     If the principal of all of the Notes is not due and payable:

FIRST: To the payment to the persons entitled thereto of all installments of interest then due on Senior Notes and unpaid installments of amounts then due on any Interest Rate Exchange Agreements secured on a parity with the Senior Notes in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference.

SECOND: To the payment to the persons entitled thereto of the unpaid principal or Redemption Price of any Senior Notes then due and, if the amounts available shall not be sufficient to pay in full all the Senior Notes due, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

SSL-DOCS2 70028246v8

THIRD: To the payment of any amounts then due and owing to a Credit Facility Provider or Liquidity Facility Provider for Senior Notes not paid pursuant to Section 10.03(a)(iv) hereof and Reimbursement Amounts, including but not limited to premiums, costs, reimbursements, expenses, late fees, interest and Ambac Indemnity Payments.

FOURTH: To the payment of any amounts then due and owing to the provider of a Debt Service Reserve Policy.

FIFTH: To the payment to the persons entitled thereto of all installments of interest then due on Subordinate Notes and unpaid installments of amounts then due on any Interest Rate Exchange Agreements secured on a parity with Subordinate Notes in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference.

SIXTH: To the payment to the persons entitled thereto of the unpaid principal or Redemption Price of any Subordinate Notes then due and, if the amounts available shall not be sufficient to pay in full all the Subordinate Notes due, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

SEVENTH: To the payment of any amounts then due and owing on a Credit Facility or Liquidity Facility for Subordinate Notes not paid pursuant to Section 10.03(a)(iv) hereof.

EIGHTH: To the payment to the persons entitled thereto of all installments of interest then due on Junior-Subordinate Notes and unpaid installments of amounts then due on any Interest Rate Exchange Agreements secured on a parity with Junior-Subordinate Notes in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference.

NINTH: To the payment to the persons entitled thereto of the unpaid principal or Redemption Price of any Junior-Subordinate Notes then due and, if the amounts available shall not be sufficient to pay in full all the Junior-Subordinate Notes due, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

TENTH: To the payment of any amounts then due and owing on a Credit Facility or Liquidity Facility for Junior-Subordinate Notes not paid pursuant to Section 10.03(a)(iv) hereof.

69

(ii)     If the principal of all of the Notes have become or have been declared due and payable:

FIRST, to the payment of the principal and interest then due and unpaid upon the Senior Notes and amounts payable on Interest Rate Exchange Agreements secured on a parity with Senior Notes without preference or priority of principal over interest or of interest over principal, or of any installment of interest on an Interest Rate Exchange Agreement secured on a parity with the Senior Notes over any other installment of interest, or of any Senior Notes or Interest Rate Exchange Agreements secured on a parity with Senior Notes over any other Senior Note or Interest Rate Exchange Agreements secured on a parity with Senior Notes, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Senior Notes or any Interest Rate Exchange Agreements secured on a parity with Senior Notes;

SECOND, to the payment of any amounts then due and owing to a Credit Facility Provider or Liquidity Facility Provider for Senior Notes not paid pursuant to Section 10.03(a)(iv) hereof, Reimbursement Amounts, including but not limited to premiums, costs, reimbursements, expenses, late fees, interest and Ambac Indemnity Payments;

THIRD, to the payment of any amounts then due and owing to any provider of a Debt Service Reserve Policy;

FOURTH, to the payment of the principal and interest then due and unpaid upon the Subordinate Notes and amounts payable on Interest Rate Exchange Agreements secured on a parity with Subordinate Notes without preference or priority of principal over interest or of interest over principal, or of any installment of interest on an Interest Rate Exchange Agreement secured on a parity with the Subordinate Notes over any other installment of interest, or of any Subordinate Notes or Interest Rate Exchange Agreements secured on a parity with Subordinate Notes over any other Subordinate Note or Interest Rate Exchange Agreements secured on a parity with Subordinate Notes, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Subordinate Notes or any Interest Rate Exchange Agreements secured on a parity with Subordinate Notes;

FIFTH, to the payment of any amounts then due and owing on a Credit Facility or Liquidity Facility for Subordinate Notes not paid pursuant to Section 10.03(a)(iv) hereof;

SIXTH, to the payment of the principal and interest then due and unpaid upon the Junior-Subordinate Notes and amounts payable on Interest Rate Exchange Agreements secured on a parity with Junior-Subordinate Notes without

preference or priority of principal over interest or of interest over principal, or of any installment of interest on an Interest Rate Exchange Agreement secured on a parity with the Junior-Subordinate Notes over any other installment of interest, or of any Junior-Subordinate Notes or Interest Rate Exchange Agreements secured on a parity with Junior-Subordinate Notes over any other Junior-Subordinate Note or Interest Rate Exchange Agreements secured on a parity with Junior-Subordinate Notes, ratably, according to the amounts due respectively for principal and interest, to the persons entitled thereto without any discrimination or preference except as to any difference in the respective rates of interest specified in the Junior-Subordinate Notes or any Interest Rate Exchange Agreements secured on a parity with Junior-Subordinate Notes;

SEVENTH, to the payment of any amounts then due and owing on a Credit Facility or Liquidity Facility for Junior-Subordinate Notes not paid pursuant to Section 10.03(a)(iv) hereof.

(iii)    If the principal of all the Notes shall have been declared immediately due and payable, and if such declarations shall thereafter have been rescinded and annulled under the provisions of this Article, then, subject to the provisions of Section 10.02(a)(v) hereof in the event that the principal of all the Notes shall later become due or be declared due and payable, the moneys shall be applied in accordance with the provisions of Section 10.03(a)(i) hereof.

(iv)    With respect to any payment made under this Section 10.03(a), in the event the Notes on which a payment is to be made are secured by a Credit Facility and any payment of principal and interest on such Notes shall have been paid from a drawing on the Credit Facility and each Credit Facility Provider shall be reimbursed for such drawing and any other amounts due and owing the Credit Facility Provider in the priority given to such Notes in subsections (i) and (ii) above.

(b)    Whenever moneys are to be applied by the Trustee pursuant to the provisions of this Section, the Trustee shall fix the date (which shall be an Interest Payment Date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate for the fixing of any such date.  The Trustee shall not be required to make payment to the Registered Owner of any unpaid Note unless such Note shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

**Section 10.04. Termination of Proceedings**.  In case any proceedings taken by the Trustee on account of any Event of Default shall have been discontinued or abandoned for any reason, then in every such case the Issuer, the Trustee and the Registered Owners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no such proceeding had been taken; provided each Credit Facility or Liquidity Facility for the Notes previously in effect is fully reinstated and in full force and effect.

71

**Section 10.05. Registered Owners' Direction of Proceedings**. Whenever it is provided in this Article that the Registered Owners of the Notes shall enjoy certain rights, be permitted to exercise certain remedies or to direct the Trustee to take certain actions, this Section shall control. Upon the occurrence of an Event of Default described in Section 10.01(c), (d) or (e) hereof, each Credit Facility Provider, if any, for or the Registered Owners of not less than 100% in principal amount of the Senior Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Senior Notes (or, if no Senior Notes are Outstanding, each Credit Facility Provider, if any, for or the Registered Owners of not less than 100% in principal amount of the Subordinate Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Subordinate Notes, or, if no Senior Notes or Subordinate Notes are Outstanding, each Credit Facility Provider, if any, or the Registered Owners of not less than 100% in principal amount of the Junior-Subordinate Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Junior-Subordinate Notes), or, upon the occurrence of an Event of Default described in Section 10.01(a) or (b) hereof, each Credit Facility Provider, if any, for or the Registered Owners of a majority in the principal amount of the Senior Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Senior Notes (or, if no Senior Notes are Outstanding, each Credit Facility Provider, if any, for or the Registered Owners of a majority in principal amount of the Subordinate Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Subordinate Notes, or, if no Senior Notes or Subordinate Notes are Outstanding, each Credit Facility Provider, if any, or the Registered Owners of a majority in principal amount of the Junior-Subordinate Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Junior-Subordinate Notes), shall have the right to direct the Trustee to take all or any of the actions described in Section 10.02(a) hereof. In the event that each Credit Facility Provider or such Registered Owners have previously given to the Trustee written notice of an Event of Default and shall have afforded the Trustee a reasonable opportunity, following the offer to the Trustee of security and indemnity satisfactory to it against the fees, costs, expenses and liabilities to be incurred therein or thereby, either to proceed to exercise the powers herein granted or to pursue a remedy described herein, and the Trustee shall have refused or neglected to comply with such request, then each Credit Facility Provider, if any, for or the Registered Owners of the requisite percentage in principal amount of the Senior Notes with the written consent of each Credit Facility Provider for the Senior Notes (or, if no Senior Notes are Outstanding, each Credit Facility Provider, if any, for or the Registered Owners of requisite percentage in principal amount of the Subordinate Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Subordinate Notes, or, if no Senior Notes or Subordinate Notes are Outstanding, each Credit Facility Provider, if any, or the Registered Owners of requisite percentage in principal amount of the Junior-Subordinate Notes then Outstanding, but only with the written consent of each Credit Facility Provider, if any, for the Junior-Subordinate Notes), shall have the right to take all or any of the actions described in this Section as the Trustee may exercise.

In the event that a Credit Facility Provider has issued a Credit Facility or a Liquidity Facility Provider has issued a Liquidity Facility respecting a Series of Notes and unless such Credit Facility Provider or such Liquidity Facility Provider is then in receivership, bankruptcy or reorganization or is then continuing wrongfully to dishonor drawings under the Credit Facility or Liquidity Facility, upon the occurrence of any Event of Default or any other event described

72

below, such Credit Facility Provider or, in the event there is no Credit Facility Provider, such Liquidity Facility Provider (provided amounts are owing to the Liquidity Facility Provider under the applicable Reimbursement Agreement) shall be considered as the Registered Owner of 100% of such Series of Notes for the purpose of directing all actions of the Trustee under this Indenture and for purposes of any consent, request, direction, approval, objection or other instrument required by this Indenture to be executed by the Registered Owners.  All rights and remedies described in this Article shall apply not only following the occurrence of an Event of Default, but also following the occurrence of any event which gives rights to a Credit Facility Provider or Liquidity Facility Provider upon the occurrence of an event of default under the Reimbursement Agreement with that Credit Facility Provider or Liquidity Facility Provider.  Notwithstanding anything else herein, if the Trustee receives contrary written direction from the Registered Owners, any Credit Facility Provider and any Liquidity Facility Provider for the same Series of Notes, it shall act on the direction of such Credit Facility Provider provided (a) the direction complies with the requirements of this Indenture (including the provisions of satisfactory indemnity), and (b) such Credit Facility Provider is not then in receivership, bankruptcy or reorganization or continuing to dishonor wrongfully a drawing on the Credit Facility.  If the conditions for direction by such Credit Facility Provider are not met, the Trustee shall act on the direction of the Liquidity Facility Provider provided (i) the direction complies with the requirements of this Indenture (including the provisions of satisfactory indemnity), (ii) the Liquidity Facility Provider is not then in receivership, bankruptcy or reorganization or continuing to dishonor wrongfully a drawing on the Liquidity Facility, and (iii) amounts are owing to the Liquidity Facility Provider under the applicable Reimbursement Agreement.  If the conditions for direction by such Credit Facility Provider and Liquidity Facility Provider are not met, the Trustee shall act on the direction of the Registered Owners provided in the manner described in this Section.

Any provision of this Indenture to the contrary notwithstanding, the consent or approval of a Credit Facility Provider or Liquidity Facility Provider shall not be necessary where, in the case of consent or approval by a Credit Facility Provider, such Credit Facility Provider is in bankruptcy, insolvency, receivership or similar proceeding or in default of or contesting its obligations under any Credit Facility, and in the case of consent or approval of a Liquidity Facility Provider, such Liquidity Facility Provider is in bankruptcy, insolvency, receivership or similar proceeding, or is in default of or contesting its obligations under any Liquidity Facility.

### Section 10.06.  Limitation on Rights of Registered Owners.

(a)      Except as otherwise specifically provided by Section 10.05 hereof or by this Section, no Registered Owner of any Note shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Indenture.  It is understood and intended that, except as otherwise above provided, no one, or more Registered Owners of the Notes shall have any right in any manner whatever by its or their action to affect, disturb or prejudice the security of this Indenture, or to enforce any right hereunder with respect to the Notes or this Indenture, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of Registered Owners of the Outstanding Notes.

SSL-DOCS2 70028246v8

(b)     Anything to the contrary notwithstanding contained in this Section, or any other provision of this Indenture, each Registered Owner of any Note by his acceptance thereof shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under this Indenture or any Supplemental Indenture, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pretrial, trial and appellate attorneys fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee.

**Section 10.07.  Possession of Notes by Trustee Not Required**.  All rights of action under this Indenture or under any of the Notes, enforceable by the Trustee, may be enforced by it without the possession of any of the Notes or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Registered Owners of such Notes, subject to the provisions of this Indenture.

**Section 10.08.  Remedies Not Exclusive**.  No remedy herein conferred upon or reserved to the Trustee or to the Registered Owners of the Notes is intended to be exclusive of any other remedy or remedies, and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

**Section 10.09.  No Waiver of Default**.  No delay or omission of the Trustee or of any Registered Owner of the Notes to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by this Indenture to the Trustee and the Registered Owners of the Notes, respectively, may be exercised from time to time and as often as may be deemed expedient.

**Section 10.10.  Notice of Event of Default; Acceleration**.  The Trustee shall give to all the Registered Owners, the Issuer, each Indenture Agent, each Credit Facility Provider, each Liquidity Facility Provider and each Surety Provider notice of each Event of Default hereunder known by a trust officer in the corporate trust department of the Trustee within [2] days after actual knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice; provided, that, the Trustee shall be protected in withholding such notice from the Registered Owners if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Registered Owners.  The Trustee shall be deemed to have actual knowledge of any Event of Default under Section 10.01(a) and (b) and any other Event of Default for which an Indenture Agent, a Credit Facility Provider, a Liquidity Facility Provider or a Registered Owner has provided the Trustee with written notice of such Event of Default.  Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof (a) to all Registered Owners of Notes, as the names and addresses of such Registered Owners appear upon the books for registration and

74

transfer of Notes as kept by the Trustee and (b) to such other persons, at the addresses given herein or in the related Supplemental Indenture.

The Trustee shall give to all Registered Owners, the Issuer, each Indenture Agent, each Credit Facility Provider, each Liquidity Facility Provider and each Surety Provider notice of acceleration of a Series of Notes as soon as possible, but in any event no later than the second Business Day after an acceleration.

# ARTICLE XI

## CONCERNING THE INDENTURE AGENTS

**Section 11.01. Appointment and Acceptance of Duties of Trustee.** State Street Bank and Trust Company is hereby appointed as Trustee.  By executing this Indenture, the Trustee hereby accepts the trusts and obligations imposed upon it by this Indenture and agrees to perform such trusts and obligations, but only upon and subject to the following express terms and conditions:

(a)     The Trustee, prior to the occurrence of an Event of Default and after the curing of all Events of Default which may have occurred, undertakes to perform such duties and only such duties as are specifically set forth in this Indenture and there shall be no implied duties or obligations.  In case an Event of Default has occurred (which has not been cured or waived) the Trustee shall exercise such of the rights and powers vested in it by this Indenture, and use the same degree of care and skill in their exercise, as a prudent man would exercise or use in the circumstances in the conduct of his own affairs.

(b)     The Trustee may execute any of the trusts or powers hereof and perform, any of its duties by or through attorneys, agents, receivers or employees but shall be answerable for the conduct of the same in accordance with the standard specified above, and shall be entitled to act, upon the opinion or advice of its counsel concerning all matters hereof, and may in all cases be reimbursed hereunder for reasonable compensation paid to all such attorneys, agents, receivers and employees as may reasonably be employed in connection with the trust hereof.  The Trustee may act upon an Opinion of Counsel, and shall not be responsible for any loss or damage resulting from any action by it taken or omitted to be taken in good faith in reliance upon such Opinion of Counsel.  The Trustee may act upon an Issuer Order and shall not be responsible for any loss or damage resulting from any action by it taken or omitted to be taken in good faith in reliance upon such Issuer Order without negligence or willful default.  The Trustee need not investigate or make any independent determination of the facts, representations or conclusions contained in an Issuer Order.  Prior to taking any action hereunder, the Trustee shall be entitled to an Issuer Order and/or an Opinion of Counsel that all conditions precedent under this Indenture and any Supplemental Indenture to the taking of such action have been satisfied.

(c)     The recitals of fact (other than those expressly made by the Trustee) contained herein and in the Notes shall be taken as statements of the Issuer and the Trustee shall not be responsible for any recital herein or in the Notes (except in respect to

75

the certificate of the Trustee endorsed on the Notes), or for the validity of the execution by the Issuer of this Indenture or of any supplements thereto or instruments of further assurance, or for the sufficiency of, or filing of documents related to, the security for the Notes issued hereunder or intended to be secured hereby, and the Trustee shall not be bound to ascertain or inquire as to the observance or performance of any covenants, conditions or agreements on the part of the Issuer except as set forth in subsection (j) of this Section. The Trustee makes no representations as to the value of the Financed Student Loans, the Trust Estate, the Funds and Accounts or any part thereof, or as to the title of the Issuer thereto or as to the security or priority afforded thereby and hereby, or as to the validity or sufficiency of this Indenture or of the Notes issued hereunder and the Trustee shall not be responsible or liable for any loss suffered directly or indirectly in connection with any investment of funds made by it in accordance with this Indenture.

(d)     The Trustee shall not be accountable for the use of any Notes authenticated or delivered hereunder. The commercial bank or trust company acting as Trustee and its directors, officers, employees or agents may in good faith buy, sell, own, hold and deal in the Notes and may join in any action which any Registered Owner may be entitled to take with like effect as if such commercial bank or trust company were not the Trustee. To the extent permitted by law, such bank or trust company may also receive tenders and purchase in good faith Notes from itself, including any department, affiliate or subsidiary, with like effect as if it were not the Trustee.

(e)     The Trustee shall be protected in acting upon any notice, request, consent, certificate, order, affidavit, letter, telegram, opinion or other paper or document reasonably believed by it to be genuine and correct and to have been signed or sent by the proper person or persons. Any action taken by the Trustee pursuant to this Indenture upon the request or authority or consent of any person who at the time of making such request or giving such authority or consent is the Registered Owner of any Note shall be conclusive and binding upon all future Registered Owners of the same Note and upon Notes issued in exchange there for or in place thereof.

(f)     As to the existence or nonexistence of any fact or as to the sufficiency or validity of any document, instrument, certificate, paper or proceeding, the Trustee shall be entitled to rely upon a certificate believed in good faith to be genuine and correct, signed on behalf of the Issuer by an Authorized Representative as sufficient evidence of the facts therein contained, the Trustee may also accept a similar certificate to the effect that any particular dealing, transaction or action is necessary or expedient, but may at its discretion secure such further evidence deemed necessary or advisable, but shall in no case be bound to secure the same. The Trustee may accept a certificate of an Authorized Representative of the Issuer to the effect that a resolution in the form therein set forth has been adopted by the Issuer as conclusive evidence that such resolution has been duly adopted and is in full force and effect.

(g)     The permissive right of the Trustee to do things enumerated in this Indenture shall not be construed as a duty and the Trustee shall not be answerable for other than its negligence or willful default. The immunities and exceptions from liability of the Trustee shall extend to its officers, directors, employees and agents.

(h)     The Trustee shall not be required to give any Note or surety in respect to the execution of its rights and obligations hereunder.

(i)     All moneys received by the Trustee shall, until used or applied or invested as herein provided, be held in trust in the manner and for the purposes for which they were received but need not be segregated from other funds except to the extent required by this Indenture or by law.  The Trustee shall not be under any liability for interest on any moneys received hereunder except such as may be agreed upon.

(j)     The Trustee shall not be required to take notice or be deemed to have notice of any Event of Default hereunder except Events of Default of which the Trustee has, through a trust officer of its corporate trust department, actual knowledge, and in the absence of such knowledge the Trustee may conclusively assume there is no Event of Default except as aforesaid.

(k)     Notwithstanding anything contained elsewhere in this Indenture, the Trustee shall have the right, but shall not be required, to demand, in respect of the authentication of any Notes, the withdrawal of any cash, the release of any property, or any action whatsoever within the purview of this Indenture, any showings, certificates, opinions, appraisals or other information, or corporate action or evidence thereof, in addition to that required by the terms hereof as a condition of such action by the Trustee, reasonably and in good faith deemed necessary by the Trustee, for the purpose of establishing the right of the Issuer to the authentication of any Notes, the withdrawal of any cash, or the taking of any other action by the Trustee.

(l)     Except for establishing and notifying Registered Owners of mandatory tenders, mandatory redemptions and acceleration of the Notes and actions required to effect drawings under a Credit Facility or a Liquidity Facility and the payment of proceeds thereof to entitled Registered Owners, in each case in the manner contemplated herein and in any Supplemental Indenture hereto, before taking any action hereunder, whether permissive or mandatory, the Trustee may require that security and/or indemnification satisfactory to it be furnished for the reimbursement of all fees and expenses to which it may be put and to protect it against all liability, except liability which is adjudicated to have resulted from its negligence or willful misconduct by reason of any action so taken.

(m)     If the Trustee receives different or conflicting instructions or directions from more than one group of Registered Owners of Notes of a given Series or priority of Notes, each of which is provided in accordance with the Indenture, the Trustee shall act in accordance with the instructions or directions provided by the group of Registered Owners representing the larger aggregate principal amount with such Series or priority of Notes then Outstanding.

(n)     Recitals, statements and representations contained in any document in the nature of an official statement or offering circular, preliminary or final, relating to any Series of Notes shall not be taken or construed as made by the Trustee, and the Trustee neither assumes or shall be under any responsibility for the correctness or truth of the

77

same.  Except for information concerning the Trustee provided in writing by the Trustee, if any, the Trustee shall have no duty or responsibility to examine or review and shall have no liability for the contents of any documents submitted or delivered to any Registered Owner in the nature of an official statement or offering circular, preliminary or final.

(o)     The Trustee shall not be accountable or responsible in any manner whatsoever for any action of the Issuer, any other Indenture Agent, any Servicer or Subservicer, any Guarantee Agency, any Remarketing Agent or for the application of moneys by any Servicer or Subservicer or moneys on deposit in the Operating Fund until such time as funds are received by the Trustee.  The Trustee shall have no duty to monitor or supervise any actions relating to the servicer's obligations under any Servicing Agreement.

(p)     In fulfilling its responsibilities hereunder, under any other instruments or agreements, or under law the Trustee may act in full reliance upon the Issuer or any Servicer or Subservicer with respect to all such determinations made, actions taken and directions to the Trustee given by them, and the Trustee shall have no duty or responsibility to the Issuer, any Servicer, any Subservicer, the Registered Owners of the Notes or any other person or entity for any action (or inaction) of the Trustee taken in reliance upon any such determinations, actions or directions.  The Issuer shall hold the Trustee harmless for any error or omission resulting from the Trustee's reliance upon the Issuer, any Indenture Agent or any Servicer or Subservicer unless in connection with such action or omission the Trustee has unreasonably or negligently failed to perform its obligations under an agreement with any Servicer or under this Indenture.

(q)     Before taking any action hereunder (other than a draw on a Credit Facility, Liquidity Facility or Debt Service Reserve Policy) requested by the Registered Owner, or by any Credit Facility Provider or any Liquidity Facility Provider, the Trustee may require that it be furnished an indemnity note or other indemnity and security satisfactory to it, for the reimbursement of all expenses to which it may be put and to protect it against all liability, except liability which results from the negligence or willful misconduct of the Trustee pursuant to this Indenture, by reason of any action so taken by the Trustee.

(r)     No provision of this Indenture shall require the Trustee to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers (other than the Trustee's duty to draw on a Credit Facility, a Liquidity Facility or a Debt Service Reserve Policy), unless it shall have indemnity and security satisfactory to it for the reimbursement of all payments and expenses to which it may be put and to protect it against all liability.

(s)     All moneys received by any Indenture Agent shall, until used or applied or invested as herein provided, be held in trust for the purposes for which they were received but need not be segregated from other funds maintained in the Funds and Accounts except to the extent required herein or by law.  No Indenture Agent shall have any liability for interest on any moneys received hereunder.

(t)     The Trustee shall, upon the written direction of Ambac, exercise all of its respective rights and remedies under the TERI Deposit and Security Agreement in accordance with the respective terms thereof.

(u)     The Trustee shall not enter into or consent to any termination of or amendment or supplement to any Transaction Document to which it is a party without the consent of Ambac.

(v)     The Trustee will not at any time institute against the Issuer any bankruptcy proceeding under the Bankruptcy Code or any state bankruptcy or similar law in connection with any obligations of the Issuer under any Transaction Document.

**Section 11.02. Appointment and Acceptance of Duties of Paying Agents Note Registrar and Other Indenture Agents.**

(a)     The Issuer may appoint one or more Indenture Agents as the Issuer deems necessary, provided that each such Indenture Agent shall at all times be a commercial bank or trust company organized and doing business under the laws of the United States or of any state with a combined capital and surplus of at least $25,000,000 and authorized under such laws to exercise corporate trust powers subject to supervision or examination by a Federal or state regulatory authority.  If such corporation publishes reports of condition at least annually pursuant to law or the requirements of such regulatory authority, then for the purposes of this Section the combined capital and surplus of such corporation shall be deemed to be its combined capital and surplus as set forth in its most recent report of condition to be published.  Such Indenture Agents shall include one or more Paying Agents and a Registrar for the Notes and the Issuer may at any time or from time to time appoint one or more other Paying Agents having the qualifications set forth above for a successor Paying Agent, along with such other Indenture Agents as may be required in connection with any Notes in accordance with the provisions of and by designation in the Supplemental Indenture authorizing such Notes with the written consent of each Credit Facility Provider, if any.

(b)     Each Paying Agent, Registrar and other Indenture Agent (other than the Trustee) shall signify its acceptance of the duties and obligations imposed upon it by this Indenture by a written statement of acceptance executed and delivered to the Issuer and the Trustee which shall include the address to which notice may be delivered in accordance with Section 13.04 hereof.

(c)     The principal or corporate trust officers of the Paying Agents are hereby designated as the respective agents of the Issuer for the payment of the Notes.

**Section 11.03. Responsibility of Indenture Agents**.  The recitals of fact herein and in the Notes contained shall be taken as the statements of the Issuer and no Indenture Agent assumes any responsibility for the correctness of the same.  No Indenture Agent makes any representations as to the validity or sufficiency of this Indenture or of any Notes issued hereunder or in respect of the security afforded by this Indenture, and no Indenture Agent shall incur any responsibility in respect thereof.  The Authenticating Agent shall, however, be

79

responsible for its representations contained in its certificate on the Notes. No Indenture Agent shall be under any responsibility or duty with respect to the issuance of the Notes for value or the application of the proceeds thereof or the application of any moneys paid to the Issuer. No Indenture Agent shall be under any responsibility or duty with respect to the application of any moneys paid to any other Indenture Agent. No Indenture Agent shall be under any obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless indemnified to its satisfaction (but no such indemnification shall be made with proceeds of a drawing on a Credit Facility or a Liquidity Facility or with remarketing proceeds). No Indenture Agent shall be liable in connection with the performance of its duties hereunder except for its own negligence or willful misconduct. Neither the Trustee nor any Paying Agent shall be under any responsibility or duty with respect to the application of any moneys paid to any one of the others.

**Section 11.04. Evidence on Which Indenture Agents May Act**. Each Indenture Agent shall be protected in acting upon any notice, indenture, request, consent, order, certificate, report, Opinion of Counsel, Note or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. Each Indenture Agent may consult with counsel, who may be counsel to the Issuer, and the Opinion of Counsel of such counsel shall be full and complete authorization and protection in respect of any action taken or suffered by it hereunder in good faith and in accordance therewith. Whenever any Indenture Agent shall deem it necessary or desirable that a matter be proved or established prior to taking or suffering any action hereunder, including payment of moneys out of any Fund or Account, such matter (unless other evidence in respect thereof be herein specifically prescribed) may be deemed to be conclusively proved and established by a certificate signed by a Authorized Representative or by another Indenture Agent if so specified herein or in the applicable Supplemental Indenture, and such certificate shall be full warrant for any action taken or suffered in good faith under the provisions of this Indenture upon the faith thereof, but in its sole discretion the Indenture Agent may in lieu thereof accept other evidence of such fact or matter or may require such further or additional evidence as to it may seem reasonable. Neither the Trustee nor any successor Trustee or other Indenture Agent shall be liable to the Issuer, the Registered Owners of any of the Notes, any Credit Facility Provider, any Liquidity Facility Provider, or any other person for any act or omission done or omitted to be done by such Indenture Agent in reliance upon any instruction, direction or certification received by the Trustee pursuant to this Indenture or for any act or omission done or omitted in good faith and without negligence or willful misconduct. Except as otherwise expressly provided herein, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision hereof by the Issuer to any Indenture Agent shall be sufficiently executed if executed in the name of the Issuer by an Authorized Representative.

**Section 11.05. Compensation and Indemnification**. Except as may be otherwise provided in a Supplemental Indenture, the Issuer shall pay to each Indenture Agent from time to time reasonable compensation for all services rendered under this Indenture, and also all reasonable expenses, charges, counsel fees and other disbursements, including those of their attorneys, agents and employees, incurred in and about the performance of their powers and duties under this Indenture. The Issuer further agrees to indemnify and save each Indenture Agent harmless against any liabilities which it may incur in the exercise and performance of its powers and duties hereunder, and which are not due to its negligence or willful misconduct, to

80

the extent solely payable from the Trust Estate, but not from the proceeds of a drawing on a Credit Facility or a Liquidity Facility or from remarketing proceeds.

**Section 11.06. Permitted Acts and Functions**.  Any Indenture Agent may become the Registered Owner of any Notes, with the same rights it would have if it were not an Indenture Agent.  Any Indenture Agent may permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Registered Owners or to effect or aid in any reorganization growing out of the enforcement of the Notes or this Indenture, whether or not any such committee shall represent the Registered Owners of a majority in principal amount of the Notes then Outstanding.  Any Indenture Agent may be a participant in the Student Loan Program and may sell Student Loans to the Issuer.  Any Indenture Agent may be an underwriter in connection with the sale of the Notes or of any other securities offered or issued by the Issuer.

**Section 11.07.  [Reserved]**

**Section 11.08.  [Reserved]**

**Section 11.09. Resignation of Trustee**.  The Trustee may at any time resign and be discharged of the duties and obligations created by this Indenture by giving not less than 60 days' written notice to the Issuer, each Indenture Agent, each Credit Facility Provider, each Liquidity Facility and each Surety Provider, and mailing notice thereof specifying the date when such resignation shall take effect, to the Registered Owners, and such resignation shall take effect upon the day specified in such notice unless a successor shall have been appointed as provided in Section 11.11 hereof, in which event such resignation shall take effect immediately on the appointment of such successor.  Notwithstanding the foregoing, no resignation of the Trustee hereunder shall become effective until a successor Trustee has been appointed with the written consent of each Credit Facility Provider, if any, and accepted its appointment and each Credit Facility, each Liquidity Facility and each Debt Service Reserve Policy has been properly transferred to the successor Trustee in accordance with their respective terms.

**Section 11.10. Removal of Trustee**.  The Trustee shall be removed by the Issuer if at any time so requested by an instrument or concurrent instruments in writing, filed with the Trustee and the Issuer and signed by each Credit Facility Provider, if any, or by the Registered Owners of a majority in principal amount of the Notes then Outstanding or their attorney-in-fact duly authorized, excluding any Notes held by or for the account of the Issuer and its Affiliates, with the written consent of each Credit Facility Provider, if any, shall have been obtained.  The Issuer may remove the Trustee at any time, with the written consent of the Credit Facility Provider, except during the existence of an Event of Default, for such cause as shall be determined in the sole discretion of the Issuer by filing with the Trustee an instrument signed by an Authorized Representative.  The Issuer shall remove the Trustee if directed to do so in writing by each Credit Facility Provider for cause by filing with the Trustee an instrument signed by an Authorized Representative and such Credit Facility Provider.  Notwithstanding the foregoing, no removal of the Trustee hereunder shall become effective until a successor has been appointed and has accepted such appointment and until each Credit Facility, each Liquidity Facility and each Debt Service Reserve Policy then in effect has been properly transferred to a successor Trustee in accordance with their respective terms.  The Issuer's obligations under Section 11.05

81

shall continue for the benefit of the retiring Trustee with respect to the period during which such retiring Trustee acted as Trustee hereunder.

### Section 11.11.  Appointment of Successor Trustee.

(a)    If at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, the Issuer covenants and agrees that it will promptly thereupon appoint a successor Trustee.  The Issuer shall mail notice of any such appointment made by it within 20 days after such appointment to all Registered Owners of Notes.

(b)    If no appointment of a successor Trustee shall have been made pursuant to the provisions of subsection (a) above within 45 days after the Trustee shall have given to the Issuer written notice, as provided in Section 11.09 hereof, or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act, the Trustee or the Registered Owner of any Note may apply to any court of competent jurisdiction to appoint a successor Trustee.  Said court may thereupon, after such notice, if any, as such court may deem proper and prescribe, appoint a successor Trustee.

Every successor Trustee appointed pursuant to this Section shall be a commercial bank or trust company in good standing, duly authorized to exercise trust powers and subject to examination by federal or state authority, having a reported capital and surplus of not less than $75,000,000, but otherwise meet the requirements of Section 11.02(a) hereof and shall be acceptable to each Credit Facility Provider.

### Section 11.12.  Transfer of Rights and Property to Successor Trustee.  Any successor Trustee appointed under this Indenture shall execute, acknowledge and deliver to its predecessor Trustee, and also to the Issuer, an instrument accepting such appointment, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee, but the Trustee ceasing to act shall nevertheless, on the request of the Issuer, or of its successor Trustee, upon payment in full of all fees, costs and expenses, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the right, title and interest of the predecessor Trustee in and to any property held by it under this Indenture, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth.  Should any deed, conveyance or instrument in writing from the Issuer be required by such successor Trustee for more fully and certainly vesting in and confirming to such successor Trustee any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Issuer.  Any such successor Trustee shall promptly notify each Indenture Agent, each Credit Facility Provider, each Liquidity Facility and each Surety Provider of its appointment as Trustee.  Upon the effectiveness of the resignation or removal of the Trustee, such Trustee's authority to act pursuant to this Indenture

82

shall terminate and such Trustee shall have no further responsibility or liability whatsoever for performance of this Indenture as Trustee.

Section 11.13. **Merger or Consolidation**.   Any company into which any Indenture Agent may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which any Indenture Agent may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a trust company or bank which is qualified to be a successor to such Indenture Agent under Section 11.11 or 11.15 hereof and shall be authorized by law to perform all the duties imposed upon it by this Indenture, shall be the successor to such Indenture Agent without the execution or filing of any paper or the performance of any further act, anything herein to the contrary notwithstanding.

Section 11.14. **Adoption of Authentication**.   In case any of the Notes contemplated to be issued under this Indenture shall have been authenticated but not delivered, any successor Authenticating Agent may adopt the certificate of authentication of any predecessor Authenticating Agent so authenticating such Notes and deliver such Notes so authenticated, and in case any of the said Notes shall not have been authenticated, any successor Authenticating Agent may authenticate such Notes in the name of the successor Authenticating Agent, and in all such cases such certificate shall have the full force provided anywhere in said Notes or in this Indenture.

Section 11.15. **Resignation or Removal of the Tender Agent, Paying Agents, Registrar and Other Indenture Agents and Appointment of Successors.**

(a)      The Tender Agent, any Paying Agent, the Registrar and any other Indenture Agent (other than the Trustee) may at any time resign and be discharged of the duties and obligations created by this Indenture by giving at least 60 days' written notice to the Issuer, the Trustee, the Owner Trustee, each Auction Agent, each Broker-Dealer, each Credit Facility Provider, each Liquidity Facility Provider, each Surety Provider, each Remarketing Agent, the Registered Owners and any other Person required to get notice pursuant to a Supplemental Indenture.  The Tender Agent, any Paying Agent, the Registrar and any other Indenture Agent (other than the Trustee) may be removed at any time by an instrument signed by an Authorized Representative and filed with the Tender Agent, any Paying Agent, Registrar or such other Indenture Agent, each Credit Facility Provider and with the Trustee.  Any successor Tender Agent, Paying Agent, Registrar or other Indenture Agent (other than the Trustee) shall be appointed by the Issuer with the written consent of each Credit Facility Provider, if any, and shall be a trust company or commercial bank having trust powers, having a reported capital and surplus aggregating at least $25,000,000, shall otherwise meet the requirements of Section 11.02(a) hereof and be willing and able to accept the office of Tender Agent, Paying Agent, Registrar or Indenture Agent (other than the Trustee), as the case may be, on reasonable and customary terms and shall be authorized by law to perform all the duties imposed upon it by this Indenture.  Notwithstanding any other provision of this Indenture, no resignation or removal of the Tender Agent, any Paying Agent, Registrar or Indenture Agent shall take effect until a successor shall be appointed and has accepted such appointment.

83

(b)      In the event of the resignation or removal of the Tender Agent, any Paying Agent, Registrar or other Indenture Agent (other than the Trustee), the Tender Agent, such Paying Agent, Registrar or other Indenture Agent (other than the Trustee) shall, after payment of its fees, costs and expenses, pay over, assign and deliver any moneys held by it to its successor.

**Section 11.16.  Evidence of Signatures of Registered Owners and Ownership of Notes.**

(a)      Any request, consent or other instrument which this Indenture may require (or permit) to be executed by Registered Owners may be executed by such Registered Owners or by their attorneys pursuant to powers of attorney or instruments of similar tenor and shall be signed or executed by such Registered Owners in person or by their attorneys appointed in writing.  Proof of (i) the execution of any such instrument, or of an instrument appointing any such attorney, or (ii) the holding by any person of the Notes shall be sufficient for any purpose of this Indenture (except as otherwise herein expressly provided) if made in the following manner, but the Trustee may nevertheless in its sole discretion require further or other proof in cases where it deems the same desirable.

The fact and date of the execution by any Registered Owner or his attorney of such instrument may be proved by the Certificate, which need not be acknowledged or verified, of an officer of a bank or trust company, financial institution or other member of the National Association of Securities Dealers, Inc. or of any notary public or other officer authorized to take acknowledgments of deeds to be recorded in the state in which he purports to act, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer.  The authority of the person or persons executing any such instrument on behalf of a corporate Registered Owner may be established without further proof if such instrument is signed by a person purporting to be the president or vice president of such corporation with a corporate seal affixed and attested by a person purporting to be its secretary or an assistant secretary.

(b)      The ownership of Notes and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

(c)      Any request, consent or vote of the Registered Owner of any Note shall bind all future Registered Owners of such Note in respect of anything done or suffered to be done by the Issuer or any Indenture Agent in accordance therewith.

**Section 11.17.  Preservation and Inspection of Documents**.  All Indenture Agents under the provisions of this Indenture or any Supplemental Indenture shall maintain adequate records relating to the performance of their duties consistent with industry practices, which records shall be subject at all reasonable times to the inspection of the Issuer, any other Indenture Agent, any Credit Facility Provider and any Registered Owner and their agents and their representatives, any of whom may make copies thereof.

84

**Section 11.18.  Statement of Trustee of Funds and Accounts and Other Matters**.  Not more than 30 days after the close of each Fiscal Year the Trustee shall furnish the Issuer and each Credit Facility Provider a statement setting forth (to the extent applicable) in respect to such Fiscal Year, (a) all transactions relating to the receipt, disbursement and application of all money received by the Trustee pursuant to all terms of this Indenture, (b) the balances held by the Trustee at the end of such Fiscal Year to the credit of each Fund, (c) a brief description of all moneys and Investment Securities held by the Trustee as part of the balance of each Fund as of the end of such Fiscal Year, and (d) any other information which the Issuer may reasonably request.

The Issuer, not more than 30 days after the close of each Fiscal Year and 25 days after the close of each calendar month, shall furnish to each Credit Facility Provider, each Rating Agency and the Trustee a statement setting forth in respect to such Fiscal Year or month, a brief description (including aggregate principal balance plus accrued interest) of all Financed Student Loans in the form attached as Exhibit C hereto.

## ARTICLE XI-A

## PROVISIONS RELATING TO THE CREDIT FACILITY

### Section 11.01A  Covenants and Notices.

(a)     The provisions of this Article XI-A with respect to Ambac shall be for the benefit of Ambac, which may direct the Trustee to enforce or waive one or more of these covenants in its sole discretion; and any breach of the covenants of the Issuer contained in this Article XI-A shall constitute a Default hereunder.  The provisions of this Article XI-A shall apply for so long as Ambac shall insure any Notes, such Insured Notes shall be Outstanding and Ambac shall not be in default under any Credit Facility.

(b)     The Trustee shall provide to Ambac, except as provided in clause "(iv)" below, as soon as practicable following receipt by the Trustee of actual notice thereof:

(i)     a notice of any failure of the Issuer to provide to the Trustee any notice or certificate required under this Indenture or any Supplemental Indenture, of which the Trustee has actual knowledge;

(ii)     a notice of any determination by the Trustee of any insufficiency of moneys to pay the principal of or interest on any Insured Notes when due;

(iii)     a notice of any draw upon the Debt Service Reserve Fund;

(iv)     a notice of any failure of the Issuer to direct any required transfer into the Debt Service Reserve Fund, within two Business Days after actual knowledge thereof;

(v)     a notice of the redemption of any of the Notes, including the principal amount, maturities and CUSIP numbers thereof;

85

(vi)     a notice of any Notes that are purchased by the Liquidity Facility Provider under the terms of the Liquidity Facility;

(vii)    a notice of a Recycling Suspension Event;

(viii)   a notice of any downgrade of the credit rating of TERI by any Rating Agency; and

(ix)     a notice of any failure of Bank One to pay any indemnity amounts payable to the Issuer pursuant to the Bank One Student Loan Purchase Agreement.

(c)     Additionally, to the extent available to the Issuer, the Issuer shall furnish to Ambac the following reports at the following times:

(i)     Reports Required Annually:

(a)     audited financial statements for The First Marblehead Corporation, the Issuer and TERI;

(b)     a Servicing Review for each Servicer, and audited financial statements for each Servicer and the Issuer.

in each case, as soon as practicable following receipt thereof by the Issuer.

(ii)     Reports Required Quarterly:

(a)     each balance sheet report required to be provided under Section 7.05 and the Financed Student Loan Report in a form set forth on Exhibit C hereto, within 45 days following the end of each fiscal quarter;

(b)     the Parity Ratio as of the last day of each calendar quarter, within 30 calendar days following the end of each fiscal quarter; and

(c)     unaudited financial statements for The First Marblehead Corporation and TERI, within 45 calendar days following the end of each fiscal quarter.

(iii)    The Issuer will provide to Ambac cash flow statements in connection with any request for consent or action to be taken by Ambac pursuant to this Indenture, any Supplemental Indenture or as related to the Student Loan Program.

(iv)    The Issuer will provide Ambac, to the extent available to the Issuer, all other information reasonably requested by Ambac.

86

(d)    In addition to any consents of Ambac required elsewhere in this Indenture, the following actions under this Indenture shall require the prior written consent of Ambac:

(i)    the removal of the Trustee and the appointment of a successor thereto;

(ii)    the addition or replacement of a Servicer, Administrator, Guarantee Agency, other Credit Facility Provider or the Liquidity Facility Provider ;

(iii)    any conversion of any of the Notes to a different interest mode;

(iv)    the extension of any Recycling Period as provided in a Supplemental Indenture;

(v)    an increase in the maximum percentage of any type of loan that is restricted or limited as described in the most recent Certificate and Agreement;

(vi)    an increase in the amount of Program Expenses and Management and Operating Expenses to be paid pursuant to this Indenture; and

(vii)    the execution and delivery of any Supplemental Indenture.

**Section 11.02A        Ambac May Direct An Accounting**.

Ambac shall have the right to direct an accounting at the Issuer's expense and the Issuer's failure to comply with such direction within thirty (30) days after receipt of written notice of the direction from Ambac shall be deemed an Event of Default hereunder; provided, however, that if compliance cannot occur within such period, then such period will be extended so long as compliance is begun within such period and diligently pursued, but only if such extension would not materially adversely affect the interests of any owner of the Notes.   The foregoing notwithstanding, Ambac may direct such an accounting only if (a) an Event of Default has occurred and is continuing; (b) Ambac has a reasonable basis to believe that an Event of Default is likely to occur; (c) the Issuer has failed to comply with the Certificate and Agreement or (d) there has occurred a Recycling Suspension Event.   If at any time while Insured Notes remain Outstanding under this Indenture, Ambac has a reasonable basis to believe that anticipated Accrued Assets would not be sufficient to pay the principal of and interest on the Notes when due and all expenses payable under this Indenture when due, Ambac may request the Issuer to prepare a cash flow statement.

**Section 11.03A        [Reserved]**

**Section 11.04A        Other Rights of Ambac**.

The Issuer covenants that to the extent permitted by applicable law it will discuss with Ambac the affairs, finances and accounts of the Issuer or any other matters Ambac may reasonably request regarding the security for the Insured Notes.   The Issuer to the extent

87

permitted by applicable law will permit Ambac to have access to and make all copies of all books and records relating to the Insured Notes during business hours.

(a)     Servicer Failure. The Issuer will obtain from each Servicer copies of third party audits of such Servicer at least once each calendar year and upon the written request of the Credit Facility Provider upon the occurrence of an Event of Default under the Indenture to ensure that such Servicer is complying with the terms of the Servicing Agreement and the rules and regulations of the Issuer and provide such report to the Credit Facility Provider.  Such report shall report such compliance in writing (or otherwise describe any noncompliance in such detail as shall be reasonably satisfactory to the Credit Facility Provider) and the Issuer shall provide such report to the Credit Facility Provider.  In the event that the Issuer is notified (whether by such accountants or otherwise) of any material noncompliance by a Servicer with the due diligence standards, the Issuer shall use its best efforts to cause such Servicer to do all things necessary to cure such noncompliance.  If a required audit of a Servicer is not received within 30 days after the time required or if a Servicer shall fail to cure noncompliance described in the preceding sentence within 60 days after the Issuer received notice thereof, the Issuer shall, at the written request of the Credit Facility Provider, arrange for the prompt substitution of such Servicer for the Financed Student Loans satisfactory to the Credit Facility Provider and the Issuer under a Servicing Agreement granting rights substantially identical to the rights granted under the initial Servicing Agreement with respect to the Financed Student Loans or otherwise satisfactory to the Credit Facility Provider.  The Issuer covenants that each Servicing Agreement shall provide that the Issuer may terminate the Servicing Agreement, at the written direction of the Credit Facility Provider, if the Servicer refuses or fails to perform in a material fashion any part of its obligations under the Servicing Agreement, and fails or refuses to correct said action or lack of action within 60 days after written notice, upon 60 days' written notice to the Servicer.  All written information required under this Section shall be delivered to each Credit Facility Provider and the Trustee within 15 days after receipt thereof by the Issuer.  The Issuer covenants that all amendments to a Servicing Agreement will be consented to in writing by the Credit Facility Provider.  The Issuer covenants that each Servicing Agreement shall provide that the Servicer thereunder shall, upon an Event of Default under this Indenture, service the Financed Student Loans as if the Credit Facility Provider is the owner of the Financed Student Loans (a third-party beneficiary).  The Issuer covenants that pursuant to each Servicing Agreement or a related custody agreement, the Servicer will act as bailee and agent of the Financed Student Loans for the Issuer.  The Issuer shall annually certify to the Trustee that each Servicer is in compliance with its Servicing Agreement

(b)     Recycling.

With respect to any Series of Notes, Recycling shall begin on the related Issue Date and may continue until the end of the related Recycling Period, or such other date as may be approved by Ambac.

If there occurs and is continuing any of the following events or conditions (each, a "Recycling Suspension Event"), the Trustee (to the extent it has actual knowledge or received

88

specific notice in writing thereof) or the Issuer shall promptly notify Ambac thereof and, if Ambac so requests, the Issuer shall stop or restrict Recycling; provided that if there occurs and is continuing a Recycling Suspension Event described in "(vi)" below, the Issuer shall immediately stop Recycling:

      (i)     an Event of Default;

      (ii)    if any of the Notes of a Series bear interest at the Maximum Rate set forth in the auction procedures of the related Supplemental Indenture for two consecutive Interest Periods or for three Interest Periods during latest twelve Interest Periods

      (iii)   the Party Ratio decreases from the prior reported quarter;

      (iv)   a material and continuing servicing problem (in the reasonable determination of Ambac) that has not been cured for 60 consecutive days following written notice of such determination from Ambac to the Issuer;

      (v)    Notes are held by any Liquidity Facility Provider under the terms of any Liquidity Facility for 30 consecutive days; and

      (vi)   Any other event characterized as a Recycling Suspension Event in the latest applicable Certificate and Agreement.

If the Issuer stops Recycling as a result of the occurrence of a Recycling Suspension Event, it will not resume Recycling without receiving the prior written consent of the Ambac.

Upon the occurrence of a Recycling Suspension Event, all funds in the Acquisition Fund will be required to be transferred to the Senior Principal Account within 30 days to redeem Senior Notes on the next Interest Payment Date after the transfer occurs.

No Private Loans will be financed upon the occurrence of a Recycling Suspension Event. In the event that a Recycling Suspension Event is cured (such cure to be evidenced by the written approval of Ambac), the financing of Private Loans may resume during the applicable Recycling Period.

Upon the expiration or suspension of the Recycling Period, the Issuer shall direct the Trustee to use amounts in the Acquisition Fund representing proceeds of the sale of Notes or Recoveries of Principal to redeem or purchase for cancellation Notes in accordance with and at a price not in excess of the amount set forth in the related Supplemental Indenture; provided, however, that in the event of an occurrence of a Recycling Suspension Event as described in sections (i), (iv) or (v) of the definition thereof of which the Trustee has actual knowledge, the Trustee shall immediately take steps to redeem Notes, notwithstanding the 30-day period described in this subsection. Notwithstanding anything to the contrary, the Issuer may purchase Notes for cancellation, at a price in excess of the principal amount of such Notes, using amounts available that are not part of the Trust Estate.

SSL-DOCS2 70028246v8

If the Issuer obtains the approval of Ambac during the period referenced in the second preceding paragraph to resume the financing of Student Loans, the Issuer shall not be required to redeem Notes in accordance with the preceding paragraph.

All Recycling shall be carried out within the parameters (which shall permit concurrent use of Recoveries of Principal for Recycling and for redemption) of the most recent Certificate and Agreement delivered to Ambac.

**Section 11.05A        Default by Ambac.**

All rights of Ambac under this Indenture, including without limitation the right of Ambac to direct proceedings under this Indenture but excluding Ambac's right to subrogation for claims paid under the Credit Facility, shall cease for so long as Ambac shall be in default under the Credit Facility.

**Section 11.06A        Rating Agencies.**

The Issuer agrees to cooperate in providing the Rating Agencies any information (not privileged or otherwise required to be kept confidential) relating to the Issuer or this Indenture or any Supplemental Indenture reasonably requested in writing by the Rating Agencies. In addition, the Issuer shall provide prompt written notice to the Rating Agencies of any of the following: (i) if there is any change in any Credit Facility; (ii) if there is any change in any Liquidity Facility or Liquidity Facility Provider; and (iii) if the Issuer shall initiate any insolvency or bankruptcy proceeding under the Bankruptcy Code.

The Issuer, in accordance with this Indenture shall promptly pay all periodic fees of any Rating Agency then rating the Notes promptly following receipt of a statement with respect thereto, which fees are Program Expenses.

**Section 11.07A        Reimbursement of Fees, Expenses and Draws under Policy.**

The following amounts shall constitute "Reimbursement Amounts" :

(a)        *Premium.*  In consideration of the issuance by Ambac of a Credit Facility, Ambac shall be entitled to receive a premium owed with respect to each such Credit Facility issued by Ambac as specified in the Credit Facility. The Issuer shall pay or cause to be paid the premium with respect to each Credit Facility.  Any premium paid hereunder shall be nonrefundable without regard to whether Ambac makes any payment under the related Credit Facility or any other circumstances relating to the Notes or provision being made for payment of the Notes prior to maturity.

(b)        Reimbursement Obligation.

(i)        In accordance with the priorities established in Section 5.04(b) and 10.03 hereto, Ambac shall be entitled to reimbursement for any payment made by Ambac under any Credit Facility, which reimbursement shall be due and payable on the date that any amount is paid thereunder, in an amount equal to the amount to be so paid and all amounts previously paid that remain unreimbursed, together

90

with interest on any and all amounts remaining unreimbursed (to the extent permitted by law, if in respect of any unreimbursed amounts representing interest) from the date such amounts became due until paid in full (after as well as before judgment), at a rate of interest equal to the Late Payment Rate.

(ii)     The Issuer agrees to pay to Ambac as follows: any and all charges, fees, costs and expenses that Ambac may reasonably pay or incur, including, but not limited to, attorneys' and accountants' fees and expenses, in connection with (i) any accounts established to facilitate payments under any Credit Facility to the extent Ambac has not been immediately reimbursed on the date that any amount is paid by Ambac under any Credit Facility, (ii) the enforcement, defense or preservation of any rights of Ambac in respect of any of the Transaction Documents, including defending, monitoring or participating in any litigation or proceeding (including any insolvency or bankruptcy proceeding in respect of any party to a Transaction Document or any affiliate thereof) relating to any of the Transaction Documents, (iii) any amendment, waiver or other action with respect to, or related to, any Transaction Document, whether or not executed or completed, or (iv) preparation of bound volumes of the Transaction Documents. Costs and expenses shall include a reasonable allocation of compensation and overhead attributable to the time of employees of Ambac spent in connection with the actions described above, and Ambac reserves the right to charge a reasonable fee as a condition to executing any waiver or consent proposed in respect of any of the Transaction Documents.

(c)     *Interest on Unpaid Obligations.*

The Issuer agrees to pay to Ambac interest on any and all amounts described in subsection (a) and (b) of this section from the date payable or paid by such party until payment thereof in full, payable to Ambac at the Late Payment Rate.

All such amounts are to be immediately due and payable on the dates indicated without demand.

**Section 11.08A     Ambac Indemnity**

(a)     In addition to any and all of Ambac's rights of reimbursement, indemnification, subrogation and to any other rights of Ambac pursuant hereto or under law or in equity, the Issuer agrees to pay, and to protect, indemnify and save harmless, Ambac and its officers, directors, shareholders, employees, agents and each Person, if any, who controls Ambac within the meaning of either Section 15 of the Securities Act of 1933, as amended (the "Securities Act") or Section 20 of the Securities and Exchange Act of 1934, as amended (the "Securities Exchange Act") from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, damages, costs or expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out

91

of or relating to the transactions contemplated by the Transaction Documents by reason of:

(i)     any omission or action (other than of or by Ambac) in connection with the offering, issuance, sale, remarketing or delivery of the Notes;

(ii)     the negligence, bad faith, willful misconduct, misfeasance, malfeasance or theft committed by any director, officer, employee or agent of the Issuer or its agents in connection with any transaction arising from or relating to the Transaction Documents;

(iii)     the violation by the Issuer or its agents of any domestic or foreign law, rule or regulation, or any judgment, order or decree applicable to it;

(iv)     the breach by the Issuer or its agents of any representation, warranty or covenant under any of the Transaction Documents or the occurrence, in respect of the Issuer or its agents, under any of the Transaction Documents of any "event of default" or any event which, with the giving of notice or the lapse of time or both, would constitute any "event of default"; or

(v)     any untrue statement or alleged untrue statement of a material fact contained in any offering document relating to the issuance of Notes or any omission or alleged omission to state therein a material fact necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, except insofar as such claims, losses, liabilities (including penalties), actions, suits, judgments, damages, costs or expenses (including, without limitations, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) arise out of or are based upon any untrue statement or omission in information included in such offering document and furnished by Ambac in writing expressly for use therein (all such information so furnished being referred to herein as "Ambac Information"), it being understood that, in respect of the initial offering document, Ambac Information is limited to the information with respect to Ambac included under the caption "The Note Insurer and the Note Guaranty Insurance Policy" and the financial statements of Ambac appended thereto.

(d)     Ambac agrees to pay, and to protect, indemnify and save harmless, the Issuer and its agents, and their respective officers, directors, shareholders, employees, agents and each Person, if any, who controls the Issuer within the meaning of either Section 15 of the Securities Act or Section 20 of the Securities Exchange Act from and against any and all claims, losses, liabilities (including penalties), actions, suits, judgments, damages, costs or expenses (including, without limitation, reasonable fees and expenses of attorneys, consultants and auditors and reasonable costs of investigations) of any nature arising out of or by reason of any untrue statement or alleged untrue statement of a material fact contained in Ambac Information.

Payments to be made to Ambac under this Indenture shall bear interest at the Late Payment Rate from the date when due to the date paid.

## ARTICLE XII

## TERMINATION

### Section 12.01. Termination of the Trust.

(a)    The trust created by this Indenture (the "Trust") shall terminate upon the earlier of (i) the later of (A) payment to the Registered Owners and to the Trustee of all amounts required to be paid to them pursuant to this Indenture and any Supplemental Indenture and the disposition of all property held as part of the Trust Estate or (B) the day following the date on which all reimbursement obligations and all other amounts owed to each Credit Facility Provider, each Liquidity Facility Provider, each Surety Provider and each provider of an Interest Rate Exchange Agreement, if any, and any other Person as may be provided for in any Supplemental Indenture have been paid in full, or (ii) subject to Section 12.01(d) hereof, upon the occurrence of a Liquidation Event (as defined in Section 12.01(c) hereof).  The Issuer shall promptly notify the Trustee of any prospective termination pursuant to this Section.

(b)    Notice of any prospective termination, specifying the Interest Payment Date for payment of the final distribution and requesting the surrender of the Notes for cancellation, shall be given promptly by the Trustee by letter to Registered Owners mailed not less than 10 nor more than 15 days preceding the specified Interest Payment Date stating (i) the Interest Payment Date upon which final payment of the Notes shall be made, (ii) the amount of any such final payment and (iii) the location for presentation and surrender of the Notes.  Payment of the final distribution which shall be made only upon presentation and surrender of the Notes at the corporate trust office of the Trustee specified in the notice.

(c)    A "Liquidation Event" shall be deemed to have occurred, subject to Section 12.01(d) hereof, upon Dissolution of the Issuer.

(d)    The Issuer shall not voluntarily take any action that would cause it to be deemed dissolved within the meaning of this Article.

In the event of the Dissolution of the Issuer or any action that would cause the Issuer to cease being deemed a Delaware business trust, the Trust shall terminate 90 days after the date of such event and its assets liquidated in accordance with Section 12.01(e) hereof unless both of the following occur:

(i)    the Registered Owners representing a majority of the aggregate principal of the Notes Outstanding, inform the Trustee in writing before the end of such 90 day period that they disapprove of the liquidation of the assets of the Trust; and

93

(ii)     the Issuer, the Trustee, each Credit Facility Provider and each Liquidity Facility Provider shall receive an Opinion of Counsel to the effect that the continuation of the Trust shall not cause the Trust to be treated as an association taxable as a corporation for federal income tax purposes.

(e)     Upon receipt by the Trustee from the Issuer of notice of the occurrence of a Liquidation Event (as defined in Section 12.01(c) hereof), the Trustee shall, subject to the direction of the Registered Owners representing a majority of the aggregate principal of the Notes Outstanding (provided that, if Registered Owners representing a majority of the aggregate principal of the Notes Outstanding shall not have provided such direction to the Trustee within 30 days of the Trustee having sent a written request for such direction to the Registered Owners, the Trustee shall proceed without such direction) sell the remaining assets of the Trust Estate, if any, at public or private sale, in a commercially reasonable manner and on commercially reasonable terms.  The Issuer agrees to cooperate with the Trustee to effect any such sale, including by executing such instruments of conveyance or assignment as shall be necessary or required by the purchaser.  Proceeds of sale, net of expenses, shall be treated as collections on the assets of the Trust and shall be deposited into the Revenue Fund.  On the next Interest Payment Date the Trustee shall cause to be paid to Registered Owners and the Issuer amounts distributable on such Interest Payment Date pursuant to Article V hereof.  Following the termination of the Trust, all right, title and interest in and to the Financed Student Loans and other property and funds in the Trust Estate (other than funds on deposit in certain accounts for the payment of expenses) shall be conveyed and transferred to the Issuer.

**Section 12.02. Notice.**  The Trustee shall give notice of termination of the Trust to the Issuer and each Rating Agency.

## ARTICLE XIII

## DEFEASANCE; MISCELLANEOUS PROVISIONS

### Section 13.01. Defeasance.

(a)     If the Issuer shall pay or cause to be paid to the Registered Owners of the Notes, the principal or Redemption Price and interest to become due thereon at the times and in the manner stipulated in the Notes and in this Indenture, and pay or cause to be paid (i) to each Indenture Agent its fees, costs and expenses, (ii) to each Credit Facility Provider and each Liquidity Facility Provider any and all amounts owing under each Credit Facility, each Liquidity Facility and each Reimbursement Agreement relating thereto, (iii) to each Surety Provider all amounts owing under the agreement relating its Debt Service Reserve Policy, (iv) to each Remarketing Agent all amounts owing under each remarketing agreement and (v) to each party to any Interest Rate Exchange Agreement all amounts owing to it, then the pledge of the Trust Estate, including any Revenues, Recoveries of Principal and other moneys, securities, funds and property hereby pledged and all other rights granted hereby shall be discharged and satisfied; provided that in the event that the principal and/or interest due on the Notes shall be paid by a Credit Facility Provider pursuant to a Credit Facility, the Notes shall remain

Outstanding for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Issuer, and the assignment and pledge of the Trust Estate and all covenants, agreements and other obligations of the Issuer to the Registered Owners shall continue to exist and shall run to the benefit of such Credit Facility Provider, and the Credit Facility Provider shall be subrogated to the rights of such Registered Owners. In such event, the Trustee shall, upon the request of the Issuer, execute and deliver to the Issuer all such instruments as may be desirable to evidence such discharge and satisfaction and the Indenture Agents shall pay over or deliver to the Issuer all moneys or securities held by them pursuant to this Indenture which are not required for the payment of Notes not theretofore surrendered for such payment.

(b)    Except as otherwise provided in any Supplemental Indenture, all Notes shall, prior to the maturity or Redemption Date thereof, be deemed to have been paid and no longer Outstanding if (i) in case any of said Notes are to be redeemed on any date prior to their maturity, the Issuer shall have given to the Trustee in form satisfactory to it irrevocable instructions to mail as provided in Article VI hereof notice of redemption on said date, (ii) there shall have been deposited with the Trustee either moneys (which shall be Eligible Funds to the extent any Liquidity Facility or Credit Facility other than a bond insurance policy is in effect for such Notes) in an amount which shall be sufficient, or noncallable and nonprepayable Governmental Obligations (including any Governmental Obligations issued or held in book entry form on the books of the Department of the Treasury of the United States of America) (which Governmental Obligations shall have been purchased with Eligible Funds to the extent any Liquidity Facility or Credit Facility other than a bond insurance policy is in effect for such Notes) the principal of and the interest on which when due, without reinvestment, will provide moneys which together with the moneys, if any, deposited with the Trustee at the same time, shall be sufficient to pay when due the principal of and interest to become due on such Notes on and prior to the Redemption Date or maturity date thereof and expenses and Reimbursement Amounts, as the case may be, verified as to sufficiency by a report of an Accountant, and (iii) in the event said Notes are not by their terms subject to redemption within the next succeeding 60 days, the Issuer shall have given the Trustee in form satisfactory to it irrevocable instructions to mail, as soon as practicable, a notice to the Registered Owners of such Notes that the deposit required by clause (ii) above has been made with the Trustee and that said Notes are deemed to have been paid in accordance with this Section and stating such maturity or Redemption Date upon which moneys are to be available for the payment of the principal or Redemption Price, if any, on said Notes. In the event the Notes are Adjustable Rate Notes, for periods in which the interest rate has not been determined, a rate equal to the maximum rate such Notes may bear shall be assumed. Neither Governmental Obligations or moneys deposited with the Trustee pursuant to this Section nor principal or interest payments on any such Governmental Obligations shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal of or Redemption Price, if any, and interest on said Notes; but any cash received from such principal or interest payments on such Governmental Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested in Governmental Obligations maturing at times and in amounts sufficient to pay when due the principal or Redemption Price, if any, and interest to become due on said Notes on and prior to such maturity date thereof, as the

95

case may be, and interest earned from such reinvestments shall, as contemplated by a report of an Accountant verifying continued sufficiency, be paid over to the Issuer, as received by the Trustee, free and clear of any trust, lien or pledge; provided, however, that such reinvestment may be effected only upon receipt by the Trustee of an approving Opinion of Counsel. The Trustee shall deposit the moneys to be set aside for payment of the Redemption Price of the Notes hereunder in a separate redemption account or pursuant to a separate escrow agreement, if the Issuer so designates, and shall use the money for the purpose of reimbursing each Credit Facility Provider for a drawing on its Credit Facility.

(c)     The deposit required by paragraph (b) above may be made with respect to any Series of Notes, or a portion thereof, within any particular maturity, in which case such maturity of Notes shall no longer be deemed to be Outstanding under the terms of this Indenture, and the Registered Owners of such defeased Notes shall be secured only by such trust funds and not by any other part of the Trust Estate, and this Indenture shall remain in full force and effect to protect the interests of the Registered Owners of Notes remaining Outstanding thereafter.    Notwithstanding the foregoing and paragraph (b) above and the definition of "Registered Owner," the provisions of this Indenture relating to optional purchases with respect to Adjustable Rate Notes and to payment, registration, transfer and redemption of Notes shall remain in effect until final maturity or the Redemption Date of the Notes.

(d)     In addition to the foregoing provisions of this Section, Notes or interest installments for the payment of which moneys shall have been set aside and shall be held in trust by the Indenture Agents (through deposit by the Issuer of funds for such payment or otherwise) shall, upon maturity or upon the Redemption Date established therefor, be deemed to have been paid and no longer Outstanding. Should any of the Notes not be presented for payment when due, the Trustee shall retain from any moneys transferred to it for the purpose of paying said Notes so due, for the benefit of the Registered Owners thereof, a sum of money sufficient to pay such Notes when the same are presented by the Registered Owners thereof for payment (upon which sum the Trustee shall not be required to pay interest).  All liability of the Issuer to the Registered Owners of such Notes and all rights of such Registered Owners against the Issuer under the Notes or under the Indenture shall thereupon be and become limited to amounts on deposit with the Trustee and set aside for such payment, and the sole right of such Registered Owners shall thereafter be against such deposit. The Trustee shall bear no duty or liability to the Registered Owners of such nonpresented Notes other than to disburse funds from such deposit upon presentation of the appropriate Note. If any Note shall not be presented for payment within the period of [two] years following its maturity, the Trustee shall, to the extent permitted by law, turn over the money theretofore held by it for payment of such Note to the Issuer, provided, however, that such amounts shall not be so transferred until at least one year after the final maturity date of the Notes of the related Series.

(e)     From and after the date of payment in full of all Notes Outstanding and payment of all amounts owed to all Credit Facility Providers, the Issuer shall have the right to receive payments with respect to all Financed Student Loans.

**Section 13.02. Delegation of Duties by the Issuer**.  When any action is required to be taken by the Issuer under this Indenture, the Issuer may (a) delegate such duty to a committee of the Issuer or to the Administrator pursuant to the Administration Agreement or (b) contract for another to perform such duty, provided in either instance that actions of those to whom the duty is delegated or contracted are reviewed at least annually by the Issuer.  When any duty is placed upon the Servicer by contract, such contract may permit the Servicer to delegate such duty to another, by contract, and a copy of any such contract shall be filed with the Trustee.

**Section 13.03. Appointment of Agents, Etc**.  The Issuer shall appoint all employees and attorneys which it may consider necessary.  The individual members of the Issuer shall not be personally liable, neither singly nor collectively, for any act or omission of any agent or employee.

**Section 13.04. Notices**.  Any notice, demand, direction, request or other instrument authorized or required by this Indenture or by any Supplemental Indenture to be given to or filed with the Issuer, the Trustee or any other Indenture Agent shall be deemed to have been sufficiently given or filed for all purposes if and when delivered or sent by facsimile transmission, promptly confirmed by first class mail, postage prepaid:

| | |
|---|---|
| If to the Issuer: | The National Collegiate Master Student Loan Trust I |
| | c/o First Union Trust Company, National Association, as Owner Trustee |
| | One Rodney Square, 1st Floor |
| | 920 King Street |
| | Wilmington, Delaware  19801 |
| Attention: | Corporate Trust Administration |
| Phone: | (302) 888-7528 |
| Facsimile: | (302) 888-7544 |
| | |
| | with a copy to: |
| | |
| | The First Marblehead Corporation |
| | 30 Little Harbor |
| | Marblehead, Massachusetts  01945 |
| | |
| Attention: | Controller |
| Telephone: | (781) |
| Facsimile: | (781) 639-2000 |
| | |
| If to the Trustee: | State Street Bank and Trust Company Trust Company |
| | Corporate Trust Department |
| | 6th Floor |
| | 2 Avenue de Lafayette |
| | Boston, Massachusetts  02111-1724 |
| Attention: | NCT 2001 Auction Rate Notes |

97

| Phone: | (617) 662-1326 |
| Facsimile: | (617) 662-1435 |

If to the Credit Facility
Provider:                          Ambac Assurance Corporation
                                   One State Street Plaza, 19th Floor
                                   New York, New York
         Attention:               Surveillance – Consumer Loans Auction
                                     Backed Securities
         Phone:                   (212) 668-0340
         Facsimile:               (212) 363-1459

To any other Indenture Agent: to such facsimile number and address as such Indenture Agent shall indicate in the acceptance of office filed by each such Indenture Agent pursuant to Section 11.02(b) hereof.

To any Credit Facility Provider or Liquidity Facility Provider: to the address specified in the related Supplemental Indenture.

The Issuer, the Trustee, any other Indenture Agent, any Credit Facility Provider and Liquidity Facility Provider may, by like written notice to each other such person, designate any further or different facsimile numbers and addresses to which subsequent notices shall be sent.

The Trustee shall notify the Credit Facility Provider of any failure by the Issuer to mail any notice or other document to the Credit Facility Provider required to mailed hereunder, of which failure the Trustee has actual knowledge.

**Section 13.05. Governing Law**.  This Indenture shall be construed pursuant to the laws of the State of New York.

**Section 13.06. Notices to Rating Agencies**.  The Issuer shall provide written notice to each Rating Agency (and each Credit Facility Provider) then rating some or all Notes of any Series Outstanding hereunder, to the address specified by such Rating Agency (and each Credit Facility Provider) for such purposes, upon the occurrence of any of the following:

(a)      substitution or replacement of any Indenture Agent;

(b)      any amendment to this Indenture and any Supplemental Indenture pursuant to which Notes are then outstanding or any amendment to any Credit Facility or Liquidity Facility pursuant to a Supplemental Indenture; and

(c)      mandatory tender, redemption, or defeasance of all Outstanding Notes of any Series.

**Section 13.07. Nonliability of Officers**.  It is hereby expressly made a condition of this Indenture that any agreements, covenants or representations herein contained or contained in the Notes do not and shall never constitute or give rise to a personal or pecuniary liability or charge

98

against the officers, employees, agents or members of the Issuer, or the general credit of the Issuer, and in the event of a breach of any such agreement, covenant or representation, no personal or pecuniary liability or charge payable directly or indirectly from the general revenues of the Issuer shall arise therefrom. Nothing contained in this Section, however, shall relieve the Issuer from the observance and performance of the several covenants and agreements on its part herein contained.

**Section 13.08. Parties Interested Herein**.   Each Credit Facility Provider and each Liquidity Facility Provider shall be deemed to be a third party beneficiary and party in interest to this Indenture and each may enforce such provisions of this Indenture as inure to its benefit in accordance with the terms hereof.  Notwithstanding anything to the contrary in this Indenture, any provision of this Indenture expressly recognizing or granting rights in or to a Credit Facility provider or a Liquidity Facility Provider  may not be amended in any manner which affects the rights of such Credit Facility Provider or such Liquidity Facility Provider  without the prior written consent of such Credit Facility Provider or such Liquidity Facility Provider, as the case may be.

**Section 13.09. Counterparts**.  This Indenture maybe executed in several counterparts, each of which shall be an original and all of which shall constitute but one and the same instrument.

**Section 13.10. Limitation of Liability**.  It is expressly understood and agreed by the parties hereto that (a) this Indenture is executed and delivered by First Union Trust Company, National Association ("First Union"), not individually or personally but solely as Owner Trustee in the exercise of the powers and authority conferred and vested in it under the Trust Agreement, (b) each of the representation, undertakings and agreements herein made on the part of the Issuer is made and intended not as personal representations, undertakings and agreements by First Union but is made and intended for the purpose for binding only the Issuer, (c) nothing herein contained shall be construed as creating any liability on First Union, individually or personally, to perform any covenant either expressed or implied contained herein, all such liability, if any, being expressly waived by the parties hereto and by any Person claiming by, through or under the parties hereto and (d) under no circumstances shall First Union be personally liable for the payment of any indebtedness or expenses of the Issuer or be liable for the breach or failure of any obligation, representation, warranty or covenant made or undertaken by the Issuer under this Indenture or any other Transaction Document.

SSL-DOCS2 70028246v8

IN WITNESS WHEREOF, the undersigned authorized officers of The National Collegiate Master Student Loan Trust I and of the Trustee have hereunto executed this General Indenture as of the date first written above.

THE NATIONAL COLLEGIATE MASTER
STUDENT LOAN TRUST I
By FIRST UNION TRUST COMPANY,
NATIONAL ASSOCIATION, not in its
individual capacity but solely
as Owner Trustee

By: _____,
Name:     STERLING C. CORREIA
Title         VICE PRESIDENT

Attest: _____,

By: _____,
      EDWARD L. TRUITT, JR.

STATE STREET BANK AND TRUST
COMPANY as Trustee

By: _____
      Name:
      Title:

IN WITNESS WHEREOF, the undersigned authorized officers of The National Collegiate Master Student Loan Trust I and of the Trustee have hereunto executed this General Indenture as of the date first written above.

**THE NATIONAL COLLEGIATE MASTER STUDENT LOAN TRUST I**
By FIRST UNION TRUST COMPANY, NATIONAL ASSOCIATION, not in its individual capacity but solely as Owner Trustee

By: _____,
    Name:
    Title:

Attest:

By: _____,
    Secretary

STATE STREET BANK AND TRUST COMPANY as Trustee

By: _____
    Name:
    Title: Julie A. Kirby
    Vice President

## EXHIBIT A

## STUDENT LOAN ACQUISITION CERTIFICATE

This Student Loan Acquisition Certificate is submitted pursuant to the provisions of Section 5.03 of the General Indenture, dated as of November 1, 2001 (as amended, the "Indenture"), between The National Collegiate Master Student Loan Trust I (the "Issuer") and State Street Bank and Trust Company, as Trustee. All capitalized terms used in this Certificate and not otherwise defined herein shall have the same meanings given to such terms in the Indenture. In your capacity as Trustee, you are hereby authorized and requested to disburse to _____ (the "Seller") the sum of approximately $_____ in accordance with specific instructions that will follow (or, in the case of an exchange, the Financed Student Loans listed in Schedule A hereto) for the purchase of Student Loans. With respect to the Student Loans so to be acquired, the Issuer hereby certifies as follows:

1. The Student Loans to be acquired are those specified in Schedule A, attached hereto and furnished to you by the Servicer (the "Acquired Student Loans"). The remaining unpaid principal amount of each Acquired Student Loan is as shown on such Schedule.

2. The amount to be disbursed pursuant to this Certificate does not exceed the amount permitted by Section 5.03 of the Indenture (or, if a Student Loan is being sold in exchange for another Student Loan under the Indenture, the aggregate unpaid principal amount of, and accrued interest on, such Student Loan does not exceed the amount permitted by Section 5.03 of the Indenture) and the price at which the Student Loans are being acquired permits the results of the applicable Certificate and Agreement provided to each Credit Facility Provider and Rating Agency then rating the Notes not to be changed in material adverse manner.

3. The Issuer and Seller represent that each Acquired Student Loan is a Student Loan that meets the requirements of Section 7.12 of the Indenture and each such Student Loan is authorized to be acquired by the Indenture.

4. You have been previously, or are herewith, provided with the following items (the items listed in subparagraphs (a), (b) and (c) have been received and are being retained, on your behalf, by the Issuer or the Servicer):

(a) a copy of the Student Loan Purchase Agreement between the Issuer and the Seller with respect to the Acquired Student Loans;

(b) with respect to each Guaranteed Student Loan included among the Acquired Student Loans, a certified copy of the Guarantee Agreement relating thereto;

(c) a blanket endorsement of the promissory notes evidencing the Acquired Student Loans specifying that they have been assigned to the Trustee with all necessary endorsements which the Servicer has been instructed to attach to each promissory note;

(d) instruments duly assigning the Acquired Student Loans to the Trustee; and

(e) an opinion of counsel to the Issuer specifying each action necessary to perfect a security interest in all Acquired Student Loans to be acquired by the Issuer pursuant to the Student Loan Purchase Agreement in favor of the Trustee, including, if applicable, in the manner provided for by the provisions of 20 U.S.C. § 1087-2(d)(3) or 20 U.S.C. § 1082(m)(1)(d)(iv), as applicable (you are authorized to rely on the advice of a single blanket opinion of counsel to the Issuer until such time as this Issuer shall provide any amended opinion to you).

5.   The Issuer is not, on the date hereof, in default under the Indenture or the Student Loan Purchase Agreement applicable to the Acquired Student Loans, and, to the best knowledge of the Issuer, the Seller is not in default under the Student Loan Purchase Agreement applicable to the Acquired Student Loans.  The Issuer is not aware of any default existing on the date hereof under any of the other documents referred to in paragraph 4 hereof.

6.   All of the conditions specified in the Student Loan Purchase Agreement applicable to the Acquired Student Loans and in the Indenture for the disbursement hereby authorized and requested have been satisfied; provided that the Issuer may waive any requirement of receiving an opinion of counsel from the counsel to the Seller.

7.   If a Student Loan is being sold in exchange for another Student Loan, such sale and exchange shall not adversely affect the ability of the Trust Estate to make timely principal and interest payments on its Notes.

8.   With respect to all Acquired Student Loans which are insured, the Contract of Insurance is in effect with respect thereto, and with respect to all Acquired Student Loans which are guaranteed, the Guarantee Agreement is in effect with respect thereto.

9.   The Issuer is not in default in the performance of any of its covenants and agreements made in the Guarantee Agreement applicable to the Acquired Student Loans.

10. The proposed use of moneys in the Acquisition Fund is in compliance with the provisions of the Indenture.

11. The undersigned is authorized to sign and submit this Certificate on behalf of the Issuer.

A-2

WITNESS my hand this __ day of _____, 20__.

THE NATIONAL COLLEGIATE MASTER
STUDENT LOAN TRUST I
By [_____]


By _____
Name _____
Title _____

A-3

**EXHIBIT B**
**CERTIFICATE AND AGREEMENT**

See Tab 24.

# EXHIBIT C

## FINANCED STUDENT LOAN REPORT

| Form of  Monitoring Report |
| --- |

**The National Collegiate Master Student Loan Trust I
Student Loan Asset Backed Auction Rate Notes**

**Reporting Period :**
        **Contact :**                                        **Phone:**

**Note Status**

|  | *Series 2001* |
| --- | --- |
| *Beginning Principal Balance ($)* | |
| *Interest Due ($)* | |
| *Interest Paid ($)* | |
| *Carryover Interest ($)* | |
| *Principal Due ($)* | |
| *Principal Paid ($)* | |
| *Ending Principal Balance($)* | |
| *Actual Coupon Rate* | |

| *Pool Size ($)* | *$* | *Weighted Average Interest Rate (%)* |
| --- | --- | --- |
| *Beginning Principal Balance* | | |
| *Loans Added* | | |
| *Loans Repaid* | | |
| *Capitalized Interest* | | |
| *Ending Balance* | | |

The following items should be as of the end of the reporting period.

| *Loans by Program Type* | *Principal plus Capitalized Interest* | *% of Total* |
| --- | --- | --- |
| *Cosigned Loans* | | |
| *Credit Worthy Signature Loans* | | |
| *Total* | | |

C-1

**Loans by School Type**

| | $ (Principal plus capitalized interest | % of Total |
|---|---|---|
| 4-Year | | |
| 2-Year | | |
| Proprietary | | |
| Graduate | | |
| Other | | |
| Total | | |

**Loans by Payment Status**

| | $ (Principal plus capitalized interest) | % of Total | WA Rem.term in status |
|---|---|---|---|
| Deferment of principal | | | |
| Deferment of principal and interest | | | |
| Forbearance | | | |
| Repayment of principal and interest | | | |
| Total | | | |

**Credit Scores for Cosigned Loans at origination**

| | $ (Principal plus capitalized interest | % of Total |
|---|---|---|
| 700 or Higher | | |
| 645-699 | | |
| 600-644 | | |
| Below 600 | | |
| Total | | |

**Credit Scores for Credit Worthy Signature Loans at origination**

| | $ (Principal plus capitalized interest | % of Total |
|---|---|---|
| 700 or Higher | | |
| 645-699 | | |
| 600-644 | | |
| Below 600 | | |
| Total | | |

**Payment Status**

The following items should be as of the end of the reporting period.
Please indicate whether amounts are based on Principal Only or on Principal plus Capitalized Interest.

| Delinquency Bucket (days) | 31-60 | 61-90 | 91-120 | 121-180 | Outstanding Claims not paid by TERI or Pledge Account |
|---|---|---|---|---|---|
| Private Loans | | | | | |
| By ending balance, $ | | | | | |
| By ending balance, % | | | | | |

C-2

Please indicate whether amounts are based on Principal Only or on Principal plus Capitalized Interest.

| *Claims ($)* | *Filed during reporting period* | *Paid during reporting period* | *Rejected status at end of period (1)* | *Outstanding at end of period (2)* |
|---|---|---|---|---|
| *Private Loans* | | | | |
| *All Loans* | | | | |

1. *Rejected subject to cure, aged six months or more*
2. *Outstanding, including rejected aged less than six months*

**Trigger to Increase Excess Coverage:** $
*Private Loan Cumulative Default Rate*

Numerator - cumulative defaults since the Issue Date for all Private Loans)

Denominator - the cumulative principal balance (on a loan by loan basis, the beginning principal balance of each Private Loan on the first date each Private Loan first enters repayment status) of all Private Loans that have entered repayment status since the Issue Date, plus prepayments of such Private Loans that have occurred prior to repayment of those Private Loans.

Private Loan Cumulative Default Rate (on a percentage basis rounded to two decimal places, or 0.00%)

(10% or higher triggers an increase in the Excess Coverage to 105.5%)

**Recycling Suspension Event:** *Cosigned* $
*Loan Cumulative Default Rate*

Numerator – cumulative defaults since the Issue Date for all Cosigned Loans)

Denominator – the cumulative principal balance (on a loan by loan basis, the beginning principal balance of each Cosigned Loan on the first date each Cosigned Loan first enters repayment status) of all Cosigned Loans that have entered repayment status since the Issue Date, plus prepayments of such Cosigned Loans that have occurred prior to repayment of those Cosigned Loans.

Cosigned Loan Cumulative Default Rate (on a percentage basis rounded to two decimal places, or 0.00%)

(5% or higher is a Recycling Suspension Event)

**Recycling Suspension Event:** *Credit Worthy* $
*Signature Loan Cumulative Default Rate*

Numerator – cumulative defaults since the Issue Date for all Credit Worthy Signature Loans)

Denominator - the cumulative principal balance (on a loan by loan basis, the beginning principal balance of each Credit Worthy Signature Loan on the first date each Credit

C-3

Worthy Signature Loan first enters repayment status) of all Credit Worthy Signature Loans Loans that have entered repayment status since the Issue Date, plus prepayments of such Credit Worthy Signature Loans that have occurred prior to repayment of those Credit Worthy Signature Loans.

Credit Worthy Signature Loan Cumulative Default Rate (on a percentage basis rounded to two decimal places, or 0.00%)

(8% or higher is a Recycling Suspension Event)

**Trust Estate Assets:**

*Revenue Fund*
*Acquisition Fund*
*Debt Service Reserve Fund*
*Capitalized Funds Account*
*Pledge Account*
*Accrued interest on Trust Estate investments*
*Student Loan principal balance*
*Accrued Student Loan interest*
*Student Loan capitalized interest*
**ARTICLE XIV   Total Assets**

Trust Estate Liabilities:
*Note Balance*
*Accrued Note interest*
*Accrued expenses to be paid in Section 5.04 of the General Indenture*
**ARTICLE XV   Total Liabilities**

*Parity % Calculation*
*(Total Assets/Total Liabilities):*
***Parity % (on a percentage basis rounded to two decimal places, or 0.00%)***

Rejected Guarantee claims by TERI related to Private Loans in the Trust Estate:

1.   Cumulative rejected Guarantee claims by TERI due to originator error $_____, _____(number of Private Loans ).

2.   Cumulative cures of previously rejected Guarantee claims by TERI related to originator error $_____, _____(number of Private Loans).

3.   Cumulative rejected Guarantee claims by TERI due to Servicer error $_____, _____(number of Private Loans ).

4.   Cumulative cures of previously rejected Guarantee claims by TERI related to Servicer error $_____, _____(number of Private Loans).

C-4

**Losses under Bank One Student Loan Purchase Agreement**

Cumulative outstanding losses under the Bank One Student Loan Purchase Agreement related to clauses (i), (ii), and (iii) of Section 5.11 in the General Indenture are _____.

Please mail, fax, or email to:

Moody's Investors Service
ABS Monitoring Department
99 Church Street
New York, NY  10007
FAX:  212-298-7139
Email: ServicerReports@moodys.com

Fitch, Inc.
ABS Surveillance
1 State Street Plaza
New York, NY 10014
FAX: (212) 635-0466
Email: amurad@fitchibca.com

Ambac Assurance Corporation
Surveillance - Consumer Asset-Backed Securities Group
One State Street Plaza
New York, New York, 10004

Fax:  212-363-1459

Email: dtroia@ambac.com

C-5